# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| ACTION READY MIX CONCRETE INC., SUPERIOR CONCRETE AND FLORIDA BUILDING MATERIALS, INC., DANIEL MORGAN CONSTRUCTION, INC., SHEAR CONSTRUCTION AND DEVELOPMENT, INC., and SQUARE D. HOMES, INC. on Behalf of Themselves and all Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CEMEX CORP., FLORIDA ROCK INDUSTRIES, INC., HOLCIM (US) INC., LAFARGE NORTH AMERICA, INC., LEHIGH CEMENT COMPANY, OLDCASTLE MATERIALS, SUWANNEE AMERICAN CEMENT LLC, TITAN AMERICA LLC, and VOTORANTIM CIMENTOS NORTH AMERICA, INC.,<br><br>Defendants. | Case No. _____<br><br># 09-23187<br><br>**CLASS ACTION COMPLAINT**<br><br>CIV-ALTONAGA  MAGISTRATE JUDGE<br>BROWN<br><br>**JURY TRIAL DEMANDED**<br><br>FILED by _____ D.C.<br>INTAKE<br><br>**OCT 2 1 2009**<br><br>STEVEN M. LARIMORE<br>CLERK U.S. DIST. CT.<br>S.D. OF FLA. MIAMI |

Action Ready Mix Concrete Inc., Superior Concrete and Florida Building Materials, Inc.,

Daniel Morgan Construction, Inc., Shear Construction and Development, Inc., and Square D.

Homes, Inc. ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this

action for treble damages, injunctive relief and costs of suit under Section 1 of the Sherman Act

and Section 4 of the Clayton Act against Cemex Corp., Florida Rock Industries, Inc., Holcim

(US) Inc., Lafarge North America, Inc., Lehigh Cement Company, Oldcastle Materials,

Suwannee American Cement LLC, Titan America LLC, and Votorantim Cimentos North

America, Inc., (collectively "Defendants"), and allege, on information and belief, but on personal

knowledge as to allegations relating to Plaintiffs, as follows:

## NATURE OF CLAIM

1.      This case arises from an unlawful conspiracy among Portland cement manufacturers to fix, raise, stabilize or maintain prices of and allocate customers and markets for Portland cement ("Cement") and ready-mix concrete ("Concrete") in the State of Florida in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

2.      As a result of this illegal conspiracy, Defendants charged supra-competitive prices for Cement and Concrete sold throughout the State of Florida, thereby injuring Plaintiffs and members of the proposed Classes (defined below).

3.      Defendants dominate and control the Florida Cement market.  They conspired to fix the prices of Cement at supra-competitive levels by agreeing on the amount and timing of price increases and by allocating customers and markets, among other anticompetitive acts, thus eliminating competition among themselves to the detriment of purchasers of Cement.

4.      Defendants also dominate and control the Florida Concrete market.  The primary ingredient of Concrete is Cement.  A substantial number of the Concrete producers in Florida are wholly-owned by the Defendant Cement manufacturers.  This allowed Defendants to successfully conspire to fix the prices of Concrete at supra-competitive levels by agreeing on the amount and timing of price increases and by allocating customers and markets, among other anticompetitive acts, thus eliminating competition among themselves to the detriment of purchasers of Concrete.

5.      In addition, Defendants' concerted actions in the Cement and Concrete markets were specifically aimed at eliminating their primary competitors in the Concrete market, independent Concrete producers ("ICPs"), thus further reducing competition.

6.      As a result of Defendants' unlawful conspiracy, Plaintiffs and the proposed Classes paid supracompetitive prices for Cement and Concrete throughout the Class Period (defined below).

## JURISDICTION AND VENUE

7.      This action arises under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 1, 15 and 26.

8.      This Court has jurisdiction under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and 28 U.S.C. §§ 1331 and 1337.

9.      Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c).  Defendants reside, transact business, are found, or have agents in this District.  Further, a substantial part of the events or occurrences giving rise to the claims alleged occurred in the District.

## PARTIES

10.      Plaintiff Action Ready Mix Concrete Inc. ("Action Ready Mix") is a Florida corporation with its principal place of business in Orlando, Florida.  During the Class Period, Action Ready Mix purchased Cement directly from one or more of the Defendants, including Cemex, Florida Rock, and Holcim, and was damaged as a result of Defendants' unlawful conduct.

11.      Plaintiff Superior Concrete and Florida Building Materials, Inc. ("Superior") is a Florida corporation with its principal place of business in Orlando, Florida.  During the Class Period, Superior purchased Cement directly from one or more of the Defendants, including Cemex, Titan, and Florida Rock, and was damaged as a result of Defendants' unlawful conduct.

12.     Plaintiff Daniel Morgan Construction, Inc. ("Morgan Construction") is a Florida corporation with its principal place of business in Orlando, Florida.  During the Class Period, Morgan Construction purchased Concrete directly from one or more wholly-owned subsidiaries of the Defendants, including Cemex, Florida Rock, and VCNA, and was damaged as a result of Defendants' unlawful conduct.

13.     Plaintiff Shear Construction and Development, Inc. ("Shear") is a Florida corporation with its principal place of business in Miami, Florida.  During the Class Period, Shear purchased Concrete directly from one or more wholly-owned subsidiaries of the Defendants, including Florida Rock, and was damaged as a result of Defendants' unlawful conduct.

14.     Plaintiff Square D. Homes, Inc. ("Square D") is a Florida corporation with its principal place of business in Alachua, Florida.  During the Class Period, Square D purchased Concrete directly from one or more wholly-owned subsidiaries of the Defendants, including Florida Rock, and was damaged as a result of Defendants' unlawful conduct.

15.     Defendant Cemex Corp. ("Cemex") is a Delaware corporation with its principal place of business in Houston, Texas.  Cemex Corp. is a wholly-owned subsidiary of CEMEX, S.A.B. de C.V., a Mexican corporation.  Cemex produces and distributes Cement, Concrete, aggregate, concrete block, concrete pipe, and related building materials throughout the United States.  Cemex operates three Cement plants, ten Cement import terminals, and approximately 71 Concrete suppliers in Florida.  During the Class Period, Cemex sold Cement and Concrete in the State of Florida.

16.     Defendant Florida Rock Industries, Inc. ("Florida Rock") is a New Jersey corporation with its principal place of business in Jacksonville, Florida.  Florida Rock is a

4

subsidiary of Vulcan Materials Company, a New Jersey corporation based in Alabama. Florida Rock manufactures and sells construction materials, including Cement, Concrete, aggregates, pre-stressed concrete, and concrete block. Florida Rock operates one Cement plant, two Cement import terminals, and approximately 63 Concrete suppliers in Florida. During the Class Period, Florida Rock sold Cement and Concrete in the State of Florida.

17.     Defendant Holcim (US) Inc. ("Holcim") is a Delaware corporation with its principal place of business in Waltham, Massachusetts. Holcim is a subsidiary of Holcim Ltd., a Swiss company. Holcim manufactures and sells Cement, Concrete, aggregates and asphalt. Holcim operates two Cement import terminals and at least one Concrete supplier in Florida. During the Class Period, Holcim sold Cement and Concrete in the State of Florida.

18.     Defendant Lafarge North America, Inc. ("Lafarge") is a Maryland corporation with its principal place of business in Herndon, Virginia. Lafarge is a part of Lafarge Group, a French entity. Lafarge manufactures and sells Cement, Concrete, gypsum wallboards, aggregates, asphalt, and related products and services. Lafarge operates one Cement import terminal and approximately four Concrete suppliers in Florida. During the Class Period, Lafarge sold Cement and Concrete in the State of Florida.

19.     Defendant Lehigh Cement Company ("Lehigh") is a Delaware corporation with its principal place of business in Allentown, Pennsylvania. Lehigh is a subsidiary of HeidelbergCement Group ("Heidelberg"), a German entity. Lehigh produces Cement, Concrete, aggregates, concrete pipe and block, and pre-cast and pre-stress concrete units throughout North America. In Florida, Lehigh obtains Cement from other manufacturers and imports Cement at the Port of Cape Canaveral through its subsidiary, Continental Florida Materials Inc. ("Continental"). Lehigh also sells Cement under the brand Continental. Lehigh operates three

Cement import terminals and at least one Concrete supplier in Florida. During the Class Period, Lehigh sold Cement and Concrete in the State of Florida.

20.     Defendant Oldcastle Materials ("Oldcastle") is a Delaware corporation with its principal place of business in Atlanta, Georgia. Oldcastle is a subsidiary of CRH, an Irish corporation. Oldcastle claims to be the leading vertically-integrated supplier of aggregates, asphalt, Concrete and construction and paving services in the United States. Oldcastle partners with American Cement Company to produce and deliver Cement in Florida, and supplies Concrete through its subsidiary, Preferred Materials, Inc. Oldcastle operates one Cement plant and approximately 26 Concrete suppliers in Florida. During the Class Period, Oldcastle sold Cement and Concrete in the State of Florida.

21.     Defendant Suwannee American Cement LLC ("Suwannee") is a Delaware limited liability company with its principal place of business in Branford, Florida. Suwannee's members are Anderson Columbia Company, a Florida corporation, and Votorantim Cimentos, part of the Brazilian Votorantim Group. Suwannee operates one Cement plant in Florida. During the Class Period, Suwannee sold Cement in the State of Florida.

22.     Defendant Titan America LLC ("Titan") is a Delaware Limited Liability Company with its principal place of business in Norfolk, Virginia. Titan's ultimate parent is Titan Cement Company S.A., a Greek company. Titan produces and sells Cement, Concrete and other building materials in the Eastern United States. Titan operates one Cement plant, one Cement import terminal and approximately 37 Concrete suppliers in Florida. During the Class Period, Titan sold Cement and Concrete in the State of Florida.

23.     Defendant Votorantim Cimentos North America, Inc. ("VCNA") is a Delaware corporation with its principal place of business in Toronto, Canada. VCNA is a subsidiary of

Votorantim Group, a Brazilian industrial group.  VCNA manufactures and sells Cement, Concrete, and aggregates in North America.  VCNA operates approximately 31 Concrete suppliers in Florida through its subsidiary Prestige AB Ready Mix, Inc. ("Prestige").  During the Class Period, VCNA sold Cement throughout the United States and Concrete in the State of Florida.

## UNNAMED CO-CONSPIRATORS

24.    Various other companies and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of, and performed acts and made statements in furtherance of the unlawful conduct.

## INTERSTATE TRADE AND COMMERCE

25.    Throughout the Class Period, there has been a continuous and uninterrupted flow of transactions in and shipments of Cement in interstate commerce throughout the United States and Florida.  Concrete, which has Cement as its primary ingredient, is part of a continuous and uninterrupted flow of transactions and shipments in interstate commerce.

26.    A significant volume of Cement and construction materials was transported into Florida from other states, including Georgia and Alabama, and/or from other countries. The unlawful activities of Defendants and their co-conspirators have been within the flow of interstate and international commerce.

## THE RELEVANT MARKETS

27.    There are two relevant product markets: Cement and Concrete.  The relevant geographic market is the State of Florida.

28.     Cement is the major ingredient of Concrete.  Since Cement is primarily sold to Concrete producers, demand for both products tends to rise and fall together.  In Florida, the changes in consumption of Cement and Concrete paralleled each other during the past five years.

29.     The vast majority of Concrete manufacturers in Florida are wholly-owned subsidiaries of the Defendant Cement manufacturers.  The Defendants control their respective wholly-owned subsidiary Concrete companies.

**Cement**

30.     Portland cement, the most common type of Cement, is the primary binding ingredient in a number of construction materials, including Concrete.

31.     Cement is a fine powder created by grinding clinker, the product of heating raw materials including limestone, in a kiln.  Raw materials for cement production include limestone, clay, sand, and gypsum, which are all added at different stages of production.

32.     Capital equipment for clinker production includes grinders to break down the raw materials, kilns or pre-heaters to begin the heating process for clinker production, and cooling stations to cool the clinker and prepare it for cement production.  To convert clinker into cement, steel tubes and steel balls break down the clinker and mix it with gypsum.

33.     Cement is stored in silos and shipped by truck, rails, and barge. For smaller projects, cement is stored in bags when shipped to customers.

34.     Cement is typically sold in bulk by the metric ton, priced in dollars per metric ton, or in 94 lb. bags, priced in dollars per bag.  Due to Cement's high weight and low cost relative to volumes shipped, freight is a significant factor in the price at which Cement is sold.

35.   In Florida in 2008, over 6.4 million metric tons of Cement, valued at approximately $960 million, were produced at seven Cement plants owned and/or operated by Defendants.

36.   Concrete producers – consisting of those that are (1) wholly-owned and operated by the Defendants, and (2) independently owned and operated (ICPs) – consume approximately 75% of the Cement used in Florida.  The remainder of the Cement produced by Defendants is sold to various types of concrete product manufacturers and contractors.

37.   In addition to being produced within Florida and elsewhere in the United States, Cement is imported into Florida and the United States from other countries, including China, Canada, Columbia, Mexico and the Republic of Korea, particularly during periods when demand for Cement is high, such as at the peak of the housing boom around 2005.

38.   Due to widespread acquisitions and consolidation, the Florida Cement market is now controlled by a small number of international companies, all of which are Defendants.

39.   In late 2007, Cemex acquired Rinker Materials ("Rinker"), an Australian Cement and construction materials company that had a significant presence in Florida and elsewhere. Following the acquisition, Cemex has become the largest supplier of Cement and Concrete in Florida.

**Ready-Mix Concrete**

40.   Ready-mix concrete is a mixture of Cement, its primary component, and other materials such as sand, gravel and water.

41.   Concrete is produced at batch plants, where the proportions of input materials are measured, combined with water in a rotating drum mounted on a truck, and then mixed in the truck's drum on the way to the construction site.  Because the addition of water begins an

irreversible chemical reaction, and because the Concrete is poured directly at the construction site, truck arrival must be timed so that the Concrete hardens at the appropriate time.

42.     The strength of the Concrete is determined by the amount of water added, and is measured in pounds per square inch ("psi").

43.     Concrete is sold by the cubic yard, and is priced in dollars per cubic yard.

44.     Concrete is used principally in commercial, governmental, and residential construction.  The primary purchasers of Concrete in Florida are construction companies.  There are thousands of construction companies in the State of Florida.  Absent the unlawful conspiracy, the Defendants' Concrete manufacturing subsidiaries would compete among themselves and with the ICPs for the sale of Concrete in Florida.

45.     Large projects, such as municipal and commercial construction projects, require Concrete suppliers with significant resources.  Suppliers must have access to a large amount of Concrete, as well as the ability to pour significant amounts of Concrete daily, to deliver Concrete of varying strength, to test the Concrete, and to send trucks to the construction site on a continuing basis to complete multiple pours.

46.     Concrete suppliers may also need to provide multiple batch plants in a geographic area, backup plants, many Concrete trucks, a well-trained workforce, the ability to produce Concrete for multiple specifications and large projects, and significant financial backing to remedy construction problems.

## THE CONSPIRACY

47.     This case involves a conspiracy by Defendants to eliminate competition in the markets for Cement and Concrete by charging artificially high prices for Cement and Concrete in Florida.

10

48.     Defendants effectuated their unlawful conspiracy by engaging in the following conduct: (1) agreeing to fix, raise, maintain and/or stabilize prices of Cement; (2) agreeing to fix, raise, maintain and/or stabilize prices of Concrete; and (3) allocating customers and markets, including: (i) allocating Defendants' customers for Concrete; (ii) allocating Defendants' customers for Cement; (iii) allocating ICPs' Customers for Concrete by territory; and (iv) dividing up the Florida Concrete market by territory.

49.     Defendants unlawfully conspired and agreed to artificially inflate prices for Cement and Concrete from at least January 1, 2000 to the present (the "Class Period").

50.     Through in-person meetings, telephone, and other communications, Defendants unlawfully agreed, among other things, to the magnitude and timing of price increases of Cement and Concrete and to refrain from competing for each others' Cement and Concrete customers throughout the Class Period.

51.     Defendants regularly met at trade association meetings, social events and even corporate meetings that were held at the same time in the same hotel.

52.     Close business and personal relationships among the executives employed by Defendants facilitated the formation and implementation of the conspiracy. For example, Karl Watson, Jr., president of Rinker Materials West and, after the acquisition by Cemex, the Regional President of the Cemex's East Region, was an architect of the conspiracy. Watson is or was a close friend of one or more officers at each of the other Florida Defendant Cement companies, including Jorge Wagner, President of Prestige/AB Ready Mix, Inc. ("Prestige," a subsidiary of VCNA), Rick Edwards, President of Florida Rock, and Harvey Johnson of Tarmac America LLC ("Tarmac," a subsidiary of Titan), as well as Robert "Frank" Craddock, Executive

Vice President of Commercial for Cemex. These individuals, among others, met on several occasions, including at least once during the Summer of 2008 over drinks in the Tampa area.

53.     Defendants' unlawful agreement served several illicit purposes: to fix prices of Cement and Concrete in Florida, and to eliminate Defendants' primary competitors for the sale of Concrete – the ICPs.

54.     Defendants fixed, raised, maintained or stabilized Cement prices to non-competitive, artificial levels in the State of Florida, and price competition among them was eliminated. Not only did Defendants fix the price of Cement through agreement, but also through customer and market allocation.

55.     By allocating customers of Cement, Defendants were able to maintain artificial prices and eliminate cheating by co-conspirators by preventing the purchasers of Cement, primarily the ICPs, from seeking out a better price for Cement from different Defendant manufacturers.

56.     Defendants also fixed, raised, maintained and/or stabilized Concrete prices to non-competitive, artificial levels in the State of Florida, and price competition among them was eliminated. Not only did Defendants fix the price of Concrete through agreement, but also through customer and market allocation.

57.     By allocating customers of Concrete, Defendants were able to maintain artificial prices and eliminate cheating by co-conspirators by preventing the purchasers of Concrete, primarily construction companies, from seeking out a better price for Concrete from different Defendants' wholly-owned concrete subsidiaries.

58.     Defendants' scheme placed the ICPs, who were the principal competitors of the Cement manufacturers' Concrete subsidiaries in Florida and not part of the conspiracy, at a

severe competitive disadvantage. Indeed, one of the Defendants' principal purposes of the conspiracy was to eliminate competition from the ICPs in the Concrete market.

59.     Fixing prices of both Cement and Concrete was an important element of the conspiracy. If they were able to buy Cement at prices set in a free and open market, the ICPs would be able to service customers of Concrete at competitive prices. Accordingly, any attempt by Defendants to collude only on sales of Concrete would be ineffective because the ICPs would be able to undercut the conspirators' prices. Thus, in order to successfully effectuate their conspiracy, Defendants collusively charged the ICPs (and other purchasers) supracompetitive prices for Cement.

60.     Because Cement is the main component of Concrete, by selling Cement to ICPs at artificially-inflated prices, Defendants were able, in effect, to increase prices that the ICPs had to charge their Concrete customers. Defendants' collusion on Cement prices thus kept ICP prices for Concrete artificially inflated and in line with the cartel prices for Concrete that Defendants themselves charged to customers, through their wholly-owned subsidiaries.

61.     Moreover, by artificially inflating the price of Cement to the ICPs, Defendants, through their Concrete subsidiaries, enabled themselves from time to time to offer lower Concrete prices (albeit at collusive levels) to the ICPs' customers, undercutting the ICPs' prices to a point that they could not compete. The purpose was to ultimately drive the ICPs from the market. This scheme permitted Defendants to gain control of an even greater share of the Concrete market in Florida.

62.     In other words, Defendants unlawfully profited from their anticompetitive conspiracy in at least three ways. First, they profited from sales of Cement to customers at collusively-established supra-competitive prices. Second, they profited from sales of Concrete

13

that they supply, through subsidiaries, to their own customers, again, at supra-competitive prices and without competing with each other. Third, insofar as Defendants' conspiracy drove ICPs out of the market entirely, Defendants were able to increase their market share and market power in a particular territory, and effectively eliminate all remaining price competition.

**Defendants' Unlawful Price Increases**

63.     Defendants met and agreed to artificially raise the prices for Cement and Concrete in Florida by agreeing on the magnitude and timing of price increases. As a result of the Defendants' conspiracy, prices for Cement and Concrete in Florida were fixed, raised, stabilized and/or maintained throughout the Class Period.

64.     Coordinated price increases for Cement and Concrete were regularly announced two times a year, typically in January and July. Each of the Defendants raised the price of Cement and Concrete by about the same amount and at the same time.

65.     For example, in 2008, the collapse of the housing market and the recession severely decreased demand for Concrete in Florida and elsewhere. Pursuant to their unlawful agreement, notwithstanding the substantial reduction in demand, Defendants announced a uniform *increase* in Concrete prices by $25 a cubic yard to $100/cubic yard, a 30% increase, and the elimination of their eight-year-old "fuel surcharge" on Concrete orders:

(a)     On August 4, 2008, Cemex announced that, effective October 1, it would increase its Concrete price to existing customers by $25 per cubic yard. Cemex also announced that it was ending its fuel surcharge.

(b)     On August 20, 2008, Tarmac announced a price increase of $25 per cubic yard for Concrete in Florida, thus raising the price to $100 per cubic yard. It also announced that

it would add or deduct $5 per cubic yard for each 1000 psi increment, effective September 25, 2008. Like Cemex, Tarmac announced that it was ending its fuel surcharge as well.

(c)     On September 12, 2008, Prestige announced a price increase for Concrete of $25 per cubic yard. It also announced that it would add or deduct $2.50 per cubic yard for each 500 psi increment, effective October 13, 2008. This brought Prestige's Concrete price to approximately $100 per cubic yard. Prestige announced that it was ending its fuel surcharge as well.

66.     Subsequent to these price announcements, Defendants implemented the agreed-upon price increases on Concrete sales to customers throughout Florida.

67.     Pursuant to their unlawful agreement, Defendants also agreed to fix the price of Cement. For example, in the fall of 2009, Defendants announced the same $15 per ton price increase for Cement in Florida:

(a)     On September 19, 2008, Lafarge issued a price announcement letter to customers signed by its District Sales Manager for Deep South Sales District and VP Marketing and Sales, U.S. East Business Unit, announcing a $15/ton price increase for Cement effective January 1, 2009.

(b)     On October 3, 2008, Cemex sent a letter to customers signed by Frank Craddock, Jr., Executive VP Commercial US Operations, announcing a $15/ton price increase for Cement effective January 1, 2009.

(c)     On October 8, 2008, Continental Florida Materials Inc. (owned by Lehigh) sent a letter to customers announcing a $15/ton price for Cement increase effective January 1, 2009.

(d)     On October 29, 2008, Titan sent a letter to customers announcing a $15/ton price increase for Cement effective January 1, 2009.

68.     Subsequent to their price announcements, Defendants implemented the agreed-upon price increases on Cement sales to customers throughout Florida.

69.     Beginning at least as early as 2000, Defendants also agreed to implement, and in fact implemented, uniform fuel surcharges on shipments of Cement and Concrete, tied to a published index, purportedly to compensate for increasing prices of fuel.  However, these surcharges did not correlate directly with the rise and fall of fuel prices, and previously had been simply included in the price of the Cement that Defendants sold.

70.     Also, in or about 2000, Defendants agreed to implement, and in fact implemented, uniform environmental surcharges on Concrete, purportedly to compensate Defendants for the cost of removing excess Concrete from a work site.  Previously, this cost had been incorporated into the price of Concrete.  The environmental surcharge was typically approximately $1 per cubic yard.

71.     As a result of Defendants' unlawful price-fixing conduct, Plaintiffs and the Classes were injured by paying supra-competitive prices for Cement and Concrete in Florida throughout the Class Period.

**Customer and Market Allocation**

72.     In addition to fixing Cement and Concrete prices in Florida through agreements, the Defendants also agreed to allocate customers and territories for Cement and Concrete, which further reduced or eliminated competition and supported their price-fixing agreement.  Among the methods Defendants used were: (i) allocating Defendants' customers for Concrete; (ii)

allocating Defendants' customers for Cement; (iii) allocating ICPs' Customers for Concrete by territory; and (iv) dividing up the Florida Concrete market by territory.

73.     Due to the decrease in demand for Concrete, particularly during the last two years, Defendants also used their allocation scheme to drive ICP's, their primary competitors for Concrete sales, out of the market.

74.     First, Defendants agreed to allocate their customers for Concrete. A recent example in early 2009 highlights this allocation scheme. Cemex believed that an ICP supplied Concrete to a particular construction site in Oxford, Florida. Cemex salesmen appeared at the construction job site in an attempt to underbid the ICP and to acquire the customer. Upon arrival, they learned that the Concrete was in fact being supplied by a subsidiary of Florida Rock. As a result, the salesmen were instructed by Cemex to no longer compete for the customer.

75.     In addition, in a fall of 2008 meeting of Prestige sales personnel and senior management in the company's Orlando offices, Jorge Wagner (President of Prestige) reiterated an arrangement with Cemex that the two Defendants were to refrain from competing for each other's customers. Employees who did not adhere to this agreement, he said, would be fired. As a result, the two companies continued not to compete for each other's customers.

76.     Also as recently as 2008, sales personnel at Cemex were instructed by their superiors to get to know their competitors, and to call competitors to "verify" pricing of Concrete to customers.

77.     Despite Defendants' agreement not to compete for Concrete customers, opportunities to do so arose from time to time. For example, in March 2009, Prestige salesmen met with the officer of a major national homebuilder. The officer told the Prestige salesmen that Cemex had beaten Prestige on price for Concrete, and that the homebuilder would not take a

counteroffer from Prestige. Upon hearing this, Jorge Wagner (President of Prestige) told the Prestige salesman to retaliate against Cemex's cheating on the customer allocation agreement by stealing two of Cemex's customers. The salesman contacted a contracting company in Daytona Beach that was a Cemex customer and offered very favorable pricing. Before the deal was finalized, however, Wagner refused to approve the price, and insisted that the salesman quote the contracting company a different, non-competitively high, price, such that Prestige did not obtain the business. Thereafter, Cemex reneged on its agreement with the national homebuilder (who intended to buy from Cemex). The national homebuilder called the Prestige salesmen and said that he would never do business with Cemex again, and purchased from Prestige.

78.     Second, Defendants agreed to allocate their customers of Cement, primarily the ICP's, amongst themselves. An ICP seeking to purchase Cement from one of the Defendants would be routinely asked to identify its current Cement supplier, and if the customer requested Cement from a Defendant who was not the illegally allocated supplier for the Customer's business, the Defendant would refuse to supply the Cement or would offer it at prohibitively high prices.

(a)     In or about 2004, an ICP was refused Cement by Lafarge because it had previously bought from one of Lafarge's competitors.

(b)     On another occasion, one ICP called Cemex to place an order for Cement. The Cemex sales representative stated that it had product available to sell. The Cemex sales representative then the ICP asked who its current supplier was. Upon stating that his current supplier was a competitor Cement supplier, the Cemex sales representative required that the ICP employee speak to a Cemex regional sales manager. The Cemex regional sales manager then told the ICP that Cemex either did not have product to sell, or that Cemex's price of sale was

18

higher than originally quoted, thus forcing the ICP employee to continue to purchase from its existing supplier-Defendant.

79.     Third, Defendants agreed to allocate the ICPs' Concrete customers by territory. For example, in September 2009, Cemex, Florida Rock, Titan (through Tarmac), and VCNA (through Prestige), each agreed to cut their Concrete prices by $4-5 dollars/cubic yard to the customers of ICP's. While offering reduced Concrete prices to ICP's customers, Defendants did not make comparable lower price offers to each other's customers. Further, they agreed that a particular Defendant only target ICP customers in a specific region of Florida:

- Cemex targeted ICP customers on the South Coast and Central region;

- Florida Rock targeted ICP customers in the Jacksonville area;

- Titan targeted ICP customers on the Gulf Coast; and

- VCNA targeted ICP customers in the Orlando area.

80.     Fourth, Defendants, led by Karl Watson, Jr. (Regional President of the Cemex's East Region), allocated among themselves geographic territories by county in the State of Florida. This is reflected by the fact that different regions in Florida are dominated by individual Defendants, and that Defendants engaged in Cement swaps (as alleged below) with each other rather than forward-integrating and directly competing with each other for Concrete business that is close to their respective Cement plants.

**Conspiratorial "Swaps"**

81.     Another mechanism the Defendants used to implement their unlawful agreement is a practice known as a Cement "swap." As described below, this practice was against Defendants' independent economic self-interest and constituted coordinated action in furtherance of the conspiracy. The practice operated as follows:

82.     A Defendant ("Def A") would receive a customer order for Concrete from one of its batch plants, although Def A's Cement plant was farther from the customer's project site than the site was from a competitor's Cement plant (the "Def B"). Because Cement is expensive to transport long distances on land, when this happened, Def A routinely arranged a swap with Def B. The arrangement is diagrammed below.

83.     Under a Cement swap, Def B agreed to "sell" a fixed amount of Cement to Def A, and to deliver the Cement to Def A's Concrete batch plant so that Def A could meet the customer's order. The price that Def B charged Def A for the Cement was much less than the price that Def B charged an ICP for Cement purchased directly from that Defendant, often about one-half as much. In exchange, Def A agreed to sell and deliver an equal amount of Cement to Def B when the latter received a comparable customer order at a later date. From time to time, swapping defendants "settled" any imbalance in swap transactions by a cash transfer.



85.     Equally important, Defendants' swap practices are a means to maintain collusively-established customer and territorial allocations.  Although building a new Cement plant is time-consuming and expensive, establishing a Concrete batch plant is much easier.  All that is needed is to procure property, trucks and the necessary permits.  If Defendants were legitimate competitors of each other, rather than engaging in swap transactions at collusively "discounted" prices, Def B would simply set up its own nearby batch plant (forward integrate) to supply Concrete to customers such as the one whose order triggered the swap.  Because Def B's Cement plant would be near its own Concrete batch plant, Def B would have lower transportation costs and be able to undercut Def A on price.  Customers in general could recognize the price saving of ordering from Def B, and a competitive marketplace would emerge.

86.     The swap practice operates as a mechanism that Defendants have adopted to support their cartel and the supra-competitive prices that they charge.

87.     A similar practice took place when Defendants supplied each other with Cement for use in products other than Concrete.  For example, when Rinker, since acquired by Cemex, purchased Cement from Florida Rock for its materials division, which produced concrete block and other products, Florida Rock invoiced Rinker at the artificially inflated "market" price.  But at the end of the year, it credited Rinker with the difference between the inflated price and a lower price that Rinker and Florida Rock had agreed to charge each other for Cement.

**Other Anticompetitive Acts**

88.     In addition to fixing prices and allocating customers and markets, many of the Defendants engaged in other acts to thwart competition in the markets for Cement and Concrete.  These included: (i) coordinated supply restrictions; (ii) requiring concrete block purchasers to also purchase Defendants' Concrete; and (iii) supplying ICPs with inferior cement.

89.     At least some of the Defendants, including Titan, Cemex, and Florida Rock,
coordinated supply restrictions.  These Defendants increased prices three times within a short
time period during an alleged shortage of Cement in the spring of 2004.  These price increases
occurred in the context of Tarmac (a subsidiary of Defendant Titan) temporarily closing one of
its Florida Cement plant to rectify a mechanical problem.  The problem allegedly took six
months to fix, much longer than typically necessary in the industry.  At the time, Tarmac
supplied about 10% of the Florida market.  While the Tarmac plant was closed, Rinker (later
acquired by Cemex) and Florida Rock scheduled maintenance shut downs, instead of delaying
the maintenance to satisfy unmet demand.  The combined plant shutdowns reduced capacity in
Florida by about 33% during much of the second half of 2004.  Prices of Concrete increased
accordingly.

90.     At least some of the Defendants, including Florida Rock and Cemex, condition
the sale of concrete block on the simultaneous purchase of Concrete.  Cinder blocks, also known
as concrete block, are a widely used building material in Florida.  Defendants sell concrete block
as well as Concrete, and control the market.  During a period of shortage in concrete blocks
around 2005, some Defendants refused to sell concrete block to customers unless customers also
bought Concrete from Defendants at artificially inflated prices.

91.     At least one Defendant, Cemex, has supplied ICP's with inferior Cement, causing
them to lose customers.  When Cement is delivered to a Concrete company, it is difficult to
know if it is the right type without sending a sample to a lab for testing, which is not generally
standard procedure on all jobs.  In April 2009, Cemex sent a number of bad loads of Cement to
Plaintiff Action.  As a result, Action began sampling every load to make sure it was the correct
Cement.  Once Cemex knew that Action was testing samples of the Cement, Cemex resumed

sending the appropriate type of Cement. However, in late September 2009, Cemex again supplied Plaintiff Action with the wrong type of Cement, which set at the wrong rate, causing Action's pumps to jam. This delayed their project and caused them to lose their last customer.

**The Cover-Up**

92.    When confronted by a concerned employee about the company's involvement in anticompetitive practices in the Cement and Concrete markets, one Defendant, VCNA (at its subsidiary Prestige), actively attempted to conceal the matter.

93.    In or about February 2009, the Prestige employee sent a letter to the U.S. Department of Justice ("DOJ") and to various other federal officials, asserting the existence of antitrust violations in the Florida Cement and Concrete markets. The employee also provided a copy of the letter to Prestige's general counsel.

94.    Prestige then allegedly began an internal investigation into its conduct. Prestige requested that the employee sign a confidentiality agreement forbidding him from discussing any of the anticompetitive behavior with anyone, except the DOJ, whom he had already contacted. When the employee refused to sign such an agreement, Prestige informed him that he must keep the alleged antitrust investigation confidential.

95.    In order to protect his career and to document what he believed to be anticompetitive conduct, the employee kept notes and collected materials relating to the company's involvement in the unlawful conspiracy.

96.    Around May 2009, the employee was placed on administrative leave, purportedly because he failed to get approval for prices charged on certain projects. The employee was forbidden to speak with any staff, customers, or suppliers of Prestige. Shortly thereafter, the employee resigned.

97.     After resigning, the employee requested that Prestige return his personal computer on which he had stored relevant correspondence and other evidence of admissions of price-fixing by Jorge Wagner, Prestige's president, as well as other documentation of the price-fixing and anticompetitive conduct.  Prestige never returned the computer or the information stored on it, nor did it return any of the other materials the employee had collected to support the existence of the conspiracy.

98.     Shortly after these events, the general counsel for Prestige, who was primarily in charge of the company's internal investigation, left the company.

**Effect of the Conspiracy**

99.     As a result of Defendants' unlawful conspiracy, prices for Cement and Concrete have been fixed, raised, maintained, and/or stabilized in Florida during the Class Period.

100.    For example, the prices of Cement and Concrete in Florida have consistently risen or remained stable since 2000 – even after the end of the housing boom in 2005, the decline in commercial construction, the crash of the economy and the attendant drop in demand for Cement and Concrete (see chart below).  The increases in the price of Cement during this period are even higher when the fuel surcharge is incorporated.

**Table 1**
**Florida Consumption of Cement and Concrete** [*]

|  | Cement Consumption in Florida ('000 Metric Tons) | Concrete Consumption in Florida ('000 Cubic Yards) | Growth of Cement and Concrete Consumption (%) |
|---|---|---|---|
| 2004 | 9,698 | 42,768 | 12.90 |
| 2005 | 11,233 | 49,536 | 15.80 |
| 2006 | 11,180 | 49,306 | - 0.50 |
| 2007 | 7,886 | 34,779 | -29.50 |
| 2008 | 6,186 | 27,280 | -21.60 |

[*] Source: Portland Cement Association website, available at http://www.cement.org/econ/ind_stats.asp

**Table 2**
**Production and Sales of Florida Portland Cement\***

| Year | Cement Shipped by Producers and Importers (Thousand Metric Tons) | Cement Total Value (Thousand Dollars) | Cement Average Price ($ per Metric Ton) |
|------|------|------|------|
| 2000 | 7,325 | $   549,569.00 | $75.02 |
| 2001 | 7,120 | $   516,000.00 | $72.50 |
| 2002 | 7,413 | $   558,389.00 | $75.32 |
| 2003 | 8,289 | $   638,000.00 | $77.00 |
| 2004 | 9,430 | $   776,000.00 | $82.50 |
| 2005 | 10,841 | $   982,819.00 | $90.65 |
| 2006 | 10,591 | $1,084,593.00 | $102.41 |
| 2007 | 7,693 | $   786,380.00 | $102.22 |

\* Based on annual survey of plants and importers conducted by the U.S. Geological Survey.

## OTHER MARKET FACTORS SUPPORT THE EXISTENCE OF THE CONSPIRACY

101.    Various other market factors make the Florida Cement and Concrete markets susceptible to anticompetitive practices and unlawful collusion.

### Concentrated Industry

102.    Concentration in a particular industry facilitates the operation of a price-fixing cartel because it makes it easier to coordinate behavior among co-conspirators, and it makes it more difficult for customers to avoid the effects of collusive behavior.

103.    The Cement market in Florida is concentrated.  At all relevant times during the Class Period, Defendants controlled virtually all of the sales of Cement in Florida.

104.    The Concrete market in Florida is also concentrated.  As a result of a series of acquisitions, seven of the Defendants: Cemex, Lafarge, Lehigh, Holcim, Votorantim, Vulcan, and Titan, also own approximately 235 Concrete companies – or approximately 90% of the Concrete companies -- in Florida.

## Significant Barriers To Entry

105.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

106.     There are significant barriers to entry in the Cement market.  Entry requires a company to incur significant start-up capital expenditures.  Assuming a suitable location for a Cement plant in close proximity to a source of raw materials could be located, a new entrant into the business would have to incur hundreds of millions of dollars in costs, including those for the Cement plant and equipment, energy, transportation, distribution infrastructure and labor.  Environmental laws increase the time, expense, and planning required.

107.     In addition, the backward vertical integration of existing Cement companies into quarries for supplies, and forward vertical integration of existing Cement companies into Concrete, impedes entry by new firms.  This is because a new entrant would be disadvantaged unless it is able to enter at the various levels where Defendants themselves operate.

108.     Although the barriers to entering the Concrete market are not as substantial as those for the Cement market, they are nonetheless significant, requiring substantial start-up capital expenditures and resources for sustained operations.  As noted earlier, in order to compete for large projects, a Concrete supplier must be able to provide multiple batch plants in a geographic area, backup plants, many Concrete trucks, a well-trained workforce, the ability to produce Concrete for multiple specifications, the demonstrated ability to handle large projects, and significant financial backing to remedy construction problems.

## Inelastic Demand

109.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small, if any, decline in the quantity sold of that product.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

110.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

111.    Demand for Cement and Concrete in Florida is highly inelastic.  Cement is the primary ingredient in Concrete – it does not have a ready replacement.  If there is an increase in the price of Cement, those needing Concrete are not likely to reduce their demand or to substitute other building materials.

112.    Similarly, Concrete is a major and necessary component of commercial, governmental, and residential construction.  A small but significant, non-transitory increase in the price of Concrete will not cause construction companies to switch to a different construction material, if such a material is even available and compatible with the needs of a given construction job.

113.    The Department of Justice found the Concrete industry highly inelastic when it challenged an industry merger as anticompetitive, "a small but significant post-acquisition increase in the price of ready mix concrete that meets the bid specifications would not cause the purchasers of ready mix concrete for large projects to substitute another building material in

sufficient quantities, or to utilize a supplier of ready mix concrete [who would otherwise not be considered a competitor for the business] with sufficient frequency so as to make such a price increase unprofitable." *U.S. v. Cemex, S.A.B. de C.V.*, Amended Complaint, D.D.C. No. 07-cv-006400, at 6-7.

### Standardized Product With High Degree Of Interchangeability

114.    When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form and sustain an unlawful cartel.

115.    Cement and Concrete are commodities, which are interchangeable across manufacturers. Although construction projects can be bid under various Cement and Concrete specifications, all of the Defendants have the equipment and expertise to meet these specifications.

### Declining Demand and Rising Prices

116.    Although demand for Cement and Concrete in Florida has fallen significantly since 2005, average prices for Cement and Concrete in Florida have either increased or remained stable.

117.    Cement consumption in Florida peaked in 2005 at 11.2 million metric tons, a rise of 15.8% over the prior year, and then fell each year thereafter. Concrete consumption in Florida also peaked in 2005 at 49.5 million cubic yards, and then fell each year thereafter. Concrete consumption in 2008 was approximately 27.3 million cubic yards, down 21.6% from the prior year.

118.    Despite the decrease in demand in Florida for Cement and Concrete in recent years, prices of both products have been stable or increasing. See Tables 1 & 2, ¶ 94.

119.    A felt need to maintain profits in the face of falling demand creates incentives to conspire to fix prices and otherwise to avoid free and open competition.

120.    Although shipments of Cement in Florida have decreased significantly since 2005, the price of cement has risen or remained stable:



121.    Market factors like those presented here are consistent with anticompetitive conduct and are highly suggestive of collusion.

### Conspiracy Furthered Through Trade Associations and Inter-Competitor Communications

122.    Participation in trade associations can foster and facilitate an unlawful conspiracy. Defendants are members of various trade associations, including the Florida Concrete and Products Association ("FCPA").

123.    Throughout the Class Period, Defendants participated in numerous trade association activities and events together, which provided numerous opportunities to conspire and share information.

124.    In addition, employees in the Cement and Concrete industries frequently move from company to company, further facilitating their communication and strengthening their relationships with their competitors.

125.    During the Class Period, in-person meetings among the Defendants took place before and after industry trade association meetings and related social occasions, frequently shortly before price increase announcements. Some of these meetings include the following:

(a)    The Defendants regularly spoke with each other at meetings of the Florida Concrete and Products Association ("FCPA"), Southeastern Builder Conference ("SBC") and Associated Building Contractors ("ABC"). ABC frequently hosted evening cocktail get-togethers and monthly meetings, at which employees from many of the Defendants met.

(b)    The Voluntary Protection Program Association for Construction ("VPPAC") typically holds its annual meeting, World of Concrete, in Las Vegas, Nevada. The meeting is attended by thousands of industry officers and employees, including executives of the Defendants. The meeting has also been held in Orlando, Florida. At one of the meetings in Orlando, Watson, Wagner, Craddock and Edwards were seen speaking with each other. These and other individuals also stayed at the same hotel during this meeting, including the Peabody Orlando Hotel.

126.    During the Class Period, Defendants also met at private company meetings. For example, Cemex held a company meeting at the West Palm Beach Airport Hilton Hotel. VCNA held a meeting in the same hotel at the same time. While representatives of both companies were

at the hotel, Karl Watson, Sr. (then an officer of Cemex) met with Erik Madsen (CEO and President of VCNA) and Jorge Wagner (President of Prestige).

### Defendants' Multi-Market Contacts

127. Simultaneous interaction by firms in multiple markets makes collusion easier to sustain. Multi-market contact can mute market level asymmetries. For example, although a firm with a competitive advantage in one market may be tempted to defect from a price-fixing agreement, it will be deterred from doing so if it knows that another firm would respond in a different market in which that other firm has a competitive advantage. Additionally, multi-market contact increases the frequency of interaction, permitting one firm to discipline another more rapidly than would otherwise be possible.

128. Defendants are significant players in the Cement and Concrete markets in Florida, as well as in most other states, and in many other countries. This multi-market contact makes it both desirable and feasible for Defendants to sustain collusion in the Florida markets.

### Worldwide Antitrust Investigations and Fines

Worldwide Antitrust Investigations

129. Certain Defendants have previously been subject to antitrust fines in Europe, and are currently under investigation by the European Commission ("EC"), among other foreign competition authorities, for their anticompetitive activities in the Cement industry (see below).

130. The EC has been investigating certain Defendants for about a year for engaging in anticompetitive behavior in the Cement industry. In October 2008, the EC raided the offices of a number of Cement companies, including Cemex, Lafarge, Holcim, and Heidelberg, on suspicion of illegal cartel activity. The EC stated in a press release that it had "reason to believe" that the companies it raided may have violated Articles 81 and 82 of the EC Treaty, which prohibit price-fixing cartels and abuse of dominant position. The investigation seeks to uncover evidence of

coordinated price movements, discriminatory pricing and market sharing.  The EC has not yet filed formal charges against the companies.

131.    The Spanish offices of Cemex, Holcim, and several other Cement companies were raided in September 2009 by the EC for suspected price-fixing of Cement.

132.    In June 2009, the South African Competition Commission searched the offices of Cement companies, including Defendant Lafarge, for suspected price-fixing, customer and market allocation, and bid-rigging in the Cement market.

133.    In May 2009, the Mexican competition authority announced an investigation of cartel behavior by Defendant Cemex and other Cement companies.

Fines for Anticompetitive Conduct

134.    In December 2008, the Columbia antitrust regulator fined Cement companies, including Defendants Cemex and Holcim, for a conspiracy to fix prices.

135.    In December 2008, twenty Cement executives, including a Lafarge subsidiary executive, were found guilty of price-fixing by the Egyptian antitrust enforcement agency.

136.    In November 2007, Defendant Lafarge Brazil SA paid a fine of approximately $24 million to Brazil's antitrust administrative tribunal, the Council for Economic Defense ("CADE"), for violations of Brazil's competition laws and agreed to changes in its conduct.

137.    In December 2005, Taiwan fined twenty Cement companies, including Cemex, over $6.3 million for antitrust violations.

138.    In August 2005, Argentina fined six Cement companies fines totaling more than $28 million for antitrust violations.

139.    In 2003, the Federal Cartel Office of Germany fined Cement companies, including Defendants Lafarge, Cemex, HeidelbergCement (which controls Lehigh), and Holcim,

record-breaking fines of €660 million for engaging in a cartel. Those fines were halved in June 2009.

140.    In 1994, the EC fined Lafarge and other Cement companies for operating a cartel and dividing markets.

## ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFFS AND THE CLASSES

141.    In formulating and effectuating their conspiracy, Defendants and their co-conspirators engaged in anticompetitive practices, the purpose and effect of which were to artificially raise, fix, stabilize and/or or maintain the price of Cement and Concrete in the State of Florida. These activities included:

(a)     Attending meetings or otherwise engaging in discussions and communications in Florida and elsewhere in the United States, face-to-face and by telephone, facsimile and electronic mail, regarding the sale of Cement and Concrete in Florida;

(b)     Agreeing during those meetings, discussions and communications to fix, raise, stabilize and/or or maintain the price of Cement and Concrete in the State of Florida;

(c)     Agreeing during those meetings, discussions and communications not to compete for one another's customers, either by refraining from submitting prices or bids to certain customers, and by refusing to provide, or to bid to provide, Cement or Concrete to certain customers;

(d)     Agreeing during those meetings, discussions and communications to allocate the ICPs as Cement customers;

(e)     Agreeing during those meetings, discussions and communications to allocate the Concrete customers of ICPs;

(f)     Agreeing during those meetings, discussions and communications to drive ICPs from the market;

(g)     Exchanging price and customer information regarding Cement and Concrete in Florida with each other;

(h)     Selling Cement and Concrete to customers in Florida at collusive and noncompetitive prices pursuant to the agreement reached;

(i)     Accepting payment for Cement and Concrete sold in Florida at collusive and non-competitive prices;

(j)     Authorizing, directing, or consenting to the participation of subordinate employees in the conspiracy;

(k)     Engaging in cement swaps with competitors at collusively "discounted" prices; and

(l)     Concealing the conspiracy and conspiratorial contacts through various means.

142.    Defendants' unlawful conspiracy had and is having the following effects, among others:

(a)     Price competition in the sale of Cement and Concrete has been restrained, suppressed, and/or eliminated in Florida;

(b)     Prices for Cement and Concrete sold by Defendants and their co-conspirators have been fixed, raised, stabilized and/or maintained at artificially high, non-competitive levels throughout Florida; and

34

(c)     Customers who purchased Cement or Concrete directly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

143.    By reason of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs and the Classes have sustained injury to their business or property in amounts to be proven at trial. The injury sustained by Plaintiffs and the Classes is the payment of supra-competitive prices to Defendants for Cement and Concrete during the Class Period. This is an injury of the type that the antitrust laws were meant to punish, prevent, and redress.

## CLASS ACTION ALLEGATIONS

144.    Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and two classes.

145.    The "Cement Class" is defined as:

> All persons or entities who purchased Cement directly from one or more of the Defendants or their co-conspirators in the State of Florida at any time during the period January 1, 2000 to the present. Excluded from the Florida Cement Class are Defendants and their subsidiaries, parents, or affiliates, Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and government entities.

146.    The "Concrete Class" is defined as:

> All persons or entities who purchased Concrete directly from one or more of the Defendants or their co-conspirators in the State of Florida at any time during the period January 1, 2000 to the present. Excluded from the Florida Concrete Class are Defendants and their subsidiaries, parents, or affiliates, Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and government entities.

147.    Each Class is so numerous that joinder of all members is impracticable. Due to the nature of the trade or the commerce involved, Plaintiffs believe that the members of each

Class are geographically dispersed throughout Florida, and that joinder of all members of each Class would be impracticable. While the exact number of members of each Class is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least hundreds of members of each Class, and that their identities can be learned from Defendants' and their co-conspirators' books and records.

148. Plaintiffs Action and Superior's (collectively "the Cement Plaintiffs") claims are typical of the claims of the other members of the Cement Class. The Cement Plaintiffs and members of the Cement Class purchased Cement during the Class Period at artificially maintained, non-competitive prices, established by the unlawful actions of Defendants and their co-conspirators. The Cement Plaintiffs and members of the Cement Class have sustained damage in that they paid artificially inflated prices for Cement during the Class Period due to Defendants' conduct in violation of federal and state law as set forth below.

149. Plaintiff Morgan Construction, Shear, and Square D's (collectively "the Concrete Plaintiffs") claims are typical of the claims of the other members of the Concrete Class. The Concrete Plaintiffs and members of the Concrete Class purchased Concrete during the Class Period at artificially maintained, non-competitive prices, established by the unlawful actions of Defendants and their co-conspirators. The Concrete Plaintiffs and members of the Concrete Class have sustained damage in that they paid artificially inflated prices for Concrete during the Class Period due to Defendants' conduct in violation of federal and state law as set forth below.

150. Plaintiffs will fairly and adequately protect the interests of the members of each Class and have retained counsel competent and experienced in class action and antitrust litigation.

151.   Common questions of law and fact exist as to all members of each Class, which predominate over any questions affecting solely individual members of each Class. Among the questions of law and fact common to each Class are:

(a)   Whether Defendants conspired to raise, fix, maintain or stabilize the price of Cement and Concrete in the State of Florida, which members of each Class purchased;

(b)   the date the conspiracy began;

(c)   the identities of un-named co-conspirators;

(d)   whether Defendants' conduct violated the relevant federal antitrust laws and caused injury to the business and property of Plaintiff and the members of each Class and, if so, the proper measure of damages; and

(e)   whether Defendants undertook actions to conceal their unlawful conspiracy.

152.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of each Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to each Class. A class action, on the other hand, will achieve substantial economies of time, effort and expense, and will assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

153.   The interest of members of each Class in individually controlling the prosecution of separate actions is theoretical, rather than practical. Each Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at

stake for members of each Class, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## FRAUDULENT CONCEALMENT

154.    Defendants fraudulently concealed their participation in the conspiracy alleged by, among other things, engaging in secret meetings and communications in furtherance of the conspiracy, and by holding themselves out as competitors to the public, to Plaintiffs, and to each Class. Because of such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-concealing, Plaintiffs and the Classes could not have discovered the existence of this conspiracy absent the coming forward of industry participants who have provided relevant information.

155.    Throughout the Class Period, Defendants and their co-conspirators have affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs and the Classes to prevent Plaintiffs and the Classes from suing them for the anticompetitive behavior alleged in this Complaint.

156.    Defendants wrongfully concealed their conspiracy by various means and methods that precluded detection, including but not limited to, secret meetings, misrepresentations to their Cement and Concrete customers concerning the reasons for increases in the prices of Cement and Concrete and surreptitious communications among Defendants by the use of the telephone, in-person meetings or trade association gatherings (and elsewhere) in order to prevent the existence of written records, limit any explicit reference to competitor pricing communications on documents, and conceal the existence and nature of their competitor pricing discussions from non-conspirators.

157.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

158.    Defendants met and communicated secretly concerning customer and geographic allocation and pricing of Cement and Concrete so as to avoid detection of their illegal conspiracy.

159.    During the Class Period, Defendants repeatedly attributed dramatic price increases to rising fuel and input costs, when in fact these costs did not justify the price increases.  These statements were a pretext to conceal Defendants' conspiracy to fix prices of Cement and Concrete.

160.    Defendants' purported reasons for price increases of Cement and Concrete were materially false and misleading and were made for the purpose of concealing Defendants' anticompetitive scheme as alleged in this Complaint.

161.    Plaintiffs and members of the Classes reasonably relied on the materially false or misleading explanations by Defendants for increases in the prices of Cement and Concrete, and Plaintiffs and members of the Classes were lulled into believing that the increases were the result of normal competitive market forces, rather than the product of collusive activity by Defendants.

162.    Defendants' public statements about the reasons for the price increases were designed to, and did, put Plaintiffs and Class members off guard and caused them to accept the increases without undertaking further inquiry.  Even had such inquiry been undertaken, it would have proven futile because Plaintiffs and members of the Classes did not have access to contemporaneous information that would have allowed them to evaluate whether Defendants' claimed justifications for the price increases were valid.

163.    At the time, Plaintiffs and members of the Classes considered Defendants' articulated reasons for their price increases during the Class Period to be both normal and legitimate.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legality of Defendants' price increases.

164.    Moreover, by its very nature, Defendants' conspiracy was inherently self-concealing, and indeed the success of the conspiracy depended on its self-concealing nature.

165.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until shortly before the filing of this Complaint, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, did not know that they were paying artificially high prices for Concrete and Cement, and had no knowledge of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

166.    At all relevant times and in all relevant respects, Plaintiffs and other members of the Classes exercised reasonable diligence.

167.    None of the facts or information available to Plaintiffs and members of the Classes prior to shortly before the filing of this Complaint, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged in this Complaint.

168.    As a result of Defendants' conduct and concealment of their conspiracy, Plaintiffs and members of the Classes were prevented from suing for the anticompetitive conduct of the Defendants alleged in this complaint until shortly before the filing of this Complaint.

169.    Because of the active steps Defendants took, including fraudulent concealment of their conspiracy, to prevent Plaintiffs and members of the Classes from suing them for the

anticompetitive activities alleged in this complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

170.    The running of any applicable statute of limitations has been equitably tolled as to any claims of Plaintiffs and members of the Classes as a result of the anticompetitive conduct alleged in this complaint.

## COUNT ONE

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 4 OF THE CLAYTON ACT

171.    Plaintiffs incorporate by reference the preceding allegations.

172.    Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

173.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators unreasonably to restrain trade and commerce.  In furtherance of the conspiracy, Defendants fixed, raised, maintained, and stabilized prices for Cement and Concrete in the State of Florida, and refrained from competing with each other by allocating customers and geographic territories.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws.

174.    Defendants' conspiracy, and resulting impact on the market for Cement and Concrete, occurred in or affected interstate and international commerce.

175.    As a proximate result of Defendants' unlawful conduct, Cement Plaintiffs and the Florida Cement Class, and the Concrete Plaintiffs and the Florida Concrete Class, have suffered injuries in that they have paid supra-competitive prices for Cement and Concrete that they purchased during the Class Period.

## RELIEF SOUGHT

Accordingly, Plaintiffs demand judgment as follows:

A.      That the unlawful conspiracy alleged in this Complaint be adjudged and decreed to be an unreasonable restraint of trade or commerce, in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

B.      That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as counsel for the Classes;

C.      That Plaintiffs and each Class recover the damages determined to have been sustained by them, trebled as provided by law, and that judgment be entered against Defendants, jointly and severally, on behalf of Plaintiffs and each and every member of each Class;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in this Complaint;

E.      Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      That Plaintiffs and each Class recover their costs of the suit, including attorneys' fees, as provided by law; and

G.      That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial as to all issues triable by a jury.

Dated:  October 21, 2009                          Respectfully submitted,


Robert C. Josefsberg (Fla. Bar No. 040856)
Victor M. Diaz, Jr. (Fla. Bar No. 503800)
Katherine W. Ezell (Fla. Bar No. 114771)
Alexander Rundlet (Fla. Bar No. 692301)
**PODHURST ORSECK, P.A.**
City National Bank Building
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone: 305.358.2800
Fax: 305.358.2382
rjosefsberg@podhurst.com
vdiaz@podhurst.com
kezell@podhurst.com
arundlet@podhurst.com

*Local Counsel for Plaintiffs*

Jay L. Himes
Hollis Salzman (Fla. Bar No. 947751)
Gregory S. Asciolla
Kellie Lerner
Ryan G. Kriger
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: 212.907.0700
Fax: 212.818.0477
hsalzman@labaton.com
jhimes@labaton.com
gasciolla@labaton.com
klerner@labaton.com
rkriger@labaton.com

Gerald J. Rodos
Jeffrey B. Gittleman
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: 215.963.0600
Fax: 215.963.0838
grodos@barrack.com
jgittleman@barrack.com

Patrick Barrett
**BARRETT LAW OFFICE, P.A.**
One Burton Hills Blvd., Suite 380
Nashville, TN 37215
Telephone: 615.665.9990
Fax: 615.665.9998
pmbarrett3@barrettlawoffice.com

Bryan L. Clobes
Ellen Meriwether
Nyran Rose Pearson
**CAFFERTY FAUCHER LLP**
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Telephone: 215.864.2800
Fax: 215.864.2810
bclobes@caffertyfaucher.com
emeriwether@caffertyfaucher.com
npearson@caffertyfaucher.com

Brian Campf
**BRIAN S. CAMPF, PC**
7243 SE 34th Ave.
Portland, OR 97202
Telephone: 503.849.9899
brian@bsclegal.com

Joseph G. Sauder
Benjamin F. Johns
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
Haverford, PA 19041
Telephone: 610.642.8500
Fax: 610.649.3633
JosephSauder@chimicles.com
bfj@chimicles.com

Bonny E. Sweeney
Carmen A. Medici
**COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619.231.1058
Fax: 619.231.7423
bonnys@csgrr.com

Kevin B. Love (Fla Bar No. 993948)
Michael E. Criden (Fla. Bar No. 714356)
**CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: 305.357.9000
Fax: 305.357.9050
mcriden@cridenlove.com
klove@cridenlove.com

Richard M. Volin
Stan M. Doerrer
**FINKELSTEIN THOMPSON LLP**
1050 30th Street NW
Washington, DC 20007
Telephone: 202.337.8000
Fax: 202.337.8090
rvolin@finkelsteinthompson.com
sdoerrer@finkelsteinthompon.com

Daniel E. Gustafson
Jason S. Kilene
**GUSTAFSON GLUEK PLLC**
608 Second Avenue South Ste 650
Minneapolis, MN 55402
Telephone: 612.333.8844
Fax: 612.339.6622
dgustafson@gustafsongluekcom
jkilene@gustafsongluek.com

Joseph C. Kohn
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: 215.238.1700
jkohn@kohnswift.com

W. Joseph Bruckner
Brian D. Clark
**LOCKRIDGE GRINDAL NAUEN**
 **P.L.L.P.**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: 612.339.6900
Fax: 612.339.0981
wjbruckner@locklaw.com
bdclark@locklaw.com

Noah Shube
**THE LAW OFFICES OF NOAH SHUBE**
434 Broadway, Sixth Floor
New York, NY 10013
Telephone: 212.274.8638
Fax: 212.966.8652
nshube@nsfirm.com

Robert S. Schachter
Jospeh Lipofsky
**ZWERLING, SCHACHTER**
 **& ZWERLING LLP**
41 Madison Avenue
New York, NY 10010
Telephone: 212.223.3900
Fax 212.371.5969
rschachter@zsz.com
jlipofsky@zsz.com

*Counsel for Plaintiffs*

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Refiled Cases Below.

**09-23187**

## I. (a) PLAINTIFFS

ACTION READY MIX CONCRETE, INC., SUPERIOR CONCRETE AND FLORIDA BUILDING MATERIALS, INC., DANIEL MORGAN CONSTRUCTION, INC., SHEAR CONSTRUCTION AND DEVELOPMENT, INC. and SQUARE D. HOMES, INC.

### DEFENDANTS

CEMEX CORP., FLORIDA ROCK INDUSTRIES, INC., HOLCIM (US) INC., LAFARGE NORTH AMERICA, INC., TARMAC AMERICA LLC, HIGH CEMENT COMPANY, OLDCASTLE MATERIALS, SUWANNEE AMERICAN CEMENT LLC, TITAN AMERICA LLC, and VOTORANTIM CIMENTOS NORTH AMERICA, INC.

**(b)** County of Residence of First Listed Plaintiff   Orlando, FL
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Harris County, TX
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

See Attached

MAGISTRATE JUDGE
CIV-ALTONAGA BROWN

Attorneys (If Known)

FILED by _____ D.C.
INTAKE

OCT 2 1 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

09-CV-23187-Altonaga/Brown

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☑ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☑ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability / ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability     Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine   **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product / ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle     Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability / ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment     Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/   **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations / ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities / ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | |
| | Employment / ☐ 550 Civil Rights | Application | | ☐ 950 Constitutionality of State |
| | ☐ 446 Amer. w/Disabilities / ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien | | Statutes |
| | Other | Detainee | | |
| | ☐ 440 Other Civil Rights | ☐ 465 Other Immigration | | |
| | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed- (see VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page): JUDGE _____   DOCKET NUMBER _____

a) Re-filed Case ☐ YES ☑ NO     b) Related Cases ☐ YES ☑ NO

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 1, 15 and 26

LENGTH OF TRIAL via  20  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE   October 21, 2009

FOR OFFICE USE ONLY

AMOUNT $1,350.00   RECEIPT # 1010522   IFP

10/21/09

**Civil Cover Sheet Attachment**
**Attached List of Plaintiffs Counsel**

**PODHURST ORSECK, P.A.**
City National Bank Building
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone: 305.358.2800

*Local Counsel for Plaintiffs*

**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: 212.907.0700

Noah Shube
**THE LAW OFFICES OF NOAH SHUBE**
434 Broadway, Sixth Floor
New York, NY 10013
Telephone: 212.274.8638
Fax: 212.966.8652

Patrick Barrett
**BARRETT LAW OFFICE, P.A.**
One Burton Hills Blvd., Suite 380
Nashville, Tennessee 37215
Telephone: 615.665.9990

**BRIAN S. CAMPF, PC**
7243 SE 34th Ave.
Portland, OR 97202
Tel: 503-849-9899

**LOCKRIDGE GRINDAL NAUEN**
 **P.L.L.P.**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900

**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: 215.963.0600

**COUGHLIN STOIA GELLER**
 **RUDMAN & ROBBINS LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-231-1058

**GUSTAFSON GLUEK PLLC**
608 Second Avenue South Ste 650
Minneapolis, MN 55402
Telephone: (612) 333-8844

Joseph C. Kohn
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel: 215-238-1700
Email:  jkohn@kohnswift.com

**FINKELSTEIN THOMPSON LLP**
1050 30TH Street NW
Washington, DC 20007
Tel: (202) 337-8000

**ZWERLING, SCHACHTER**
 **& ZWERLING LLP**
41 Madison Avenue
New York, NY 10010
Tel. 212-223-3900

**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
Haverford, PA 19041
Telephone: (610) 642-8500

**CAFFERTY FAUCHER LLP**
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Tel: (215) 864-2800

*Counsel for Plaintif*