**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/BROWN

IN RE FLORIDA CEMENT AND         <u>**JURY TRIAL DEMANDED**</u>
CONCRETE ANTITRUST LITIGATION
_____/

## <u>CONSOLIDATED AMENDED COMPLAINT</u>

Action Ready Mix Concrete Inc., Advantage Concrete of Florida, Inc., Bay Area

Remodelers, Inc., Carpenter Contractors of America, Inc., Daniel Morgan Construction, Inc.,

Family Pools, Inc., Florida Block & Ready Mix, Hard Rock Materials, Kroeger Enterprises, Inc.,

and Liberty Concrete and Masonry, Inc. (collectively, "Plaintiffs"), on behalf of themselves and

all others similarly situated, bring this action for treble damages, injunctive relief and costs of

suit under Section 1 of the Sherman Act and Section 4 of the Clayton Act against Cemex Inc.,

Cemex Construction Materials Florida, LLC, Cemex Materials, LLC, Eastern Portland Cement

Corp., Eastern Cement Corp., Florida Rock Industries, Inc., Holcim (US) Inc., Lafarge North

America, Inc., Lehigh Cement Company, Oldcastle Materials, Prestige AB Management Co

LLC, Suwannee American Cement LLC, and Tarmac America LLC (collectively,

"Defendants"), and allege, on information and belief, but on personal knowledge as to

allegations relating to Plaintiffs, as follows:

## <u>NATURE OF CLAIM</u>

1.       This case arises from an unlawful conspiracy among Portland cement

manufacturers to fix, raise, stabilize or maintain prices of and allocate customers and markets for

Portland cement ("Cement") and ready-mix concrete and concrete block (together, "Concrete")

in the State of Florida in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

2.     As a result of this illegal conspiracy, Defendants charged supra-competitive prices for Cement and Concrete sold throughout the State of Florida, thereby injuring Plaintiffs and members of the proposed Classes (defined below).

3.     Defendants dominate and control the Florida Cement market. They conspired to fix the prices of Cement at supra-competitive levels by agreeing on the amount and timing of price increases and by allocating customers and markets, among other anticompetitive acts, thus eliminating competition among themselves to the detriment of purchasers of Cement.

4.     Defendants also dominate and control the Florida Concrete market. The primary ingredient of Concrete is Cement. A substantial number of the Concrete producers in Florida are Defendants or are wholly-owned by the Defendant Cement manufacturers. This allowed Defendants to successfully conspire to fix the prices of Concrete at supra-competitive levels by agreeing on the amount and timing of price increases and by allocating customers and markets, among other anticompetitive acts, thus eliminating competition among themselves to the detriment of purchasers of Concrete.

5.     In addition, Defendants' concerted actions in the Cement and Concrete markets were specifically aimed at eliminating their primary competitors in the Concrete market, independent Concrete producers ("ICPs"), thus further reducing competition.

6.     As a result of Defendants' unlawful conspiracy, Plaintiffs and the proposed Classes paid supra-competitive prices for Cement and Concrete throughout the Class Period (defined below).

## JURISDICTION AND VENUE

7.      This action arises under Section 1 of the Sherman Act and Sections 4 and 16 of

the Clayton Act, 15 U.S.C. §§ 1, 15 and 26.

8.      This Court has jurisdiction under Sections 4, 12 and 16 of the Clayton Act, 15

U.S.C. §§ 15(a), 22 and 26, and 28 U.S.C. §§ 1331 and 1337.

9.      Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act,

15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c).  Defendants reside, transact

business, are found, or have agents in this District.  Further, a substantial part of the events or

occurrences giving rise to the claims alleged occurred in the District.

## PARTIES

10.      Plaintiff Action Ready Mix Concrete Inc. ("Action Ready Mix") is a Florida

corporation with its principal place of business in Orlando, Florida.  During the Class Period,

Action Ready Mix purchased Cement directly from one or more of the Defendants, including

Cemex, Florida Rock, and Holcim, and was damaged as a result of Defendants' unlawful

conduct.

11.      Plaintiff Advantage Concrete of Florida, Inc. ("Advantage Concrete") is a Florida

corporation with its principal place of business in Melbourne, Florida. During the Class Period,

Advantage Concrete purchased Cement directly from one or more of the Defendants or their

wholly-owned subsidiaries, including Tarmac and Lehigh (Continental), and was damaged as a

result of Defendants' unlawful conduct.

12.      Plaintiff Bay Area Remodelers, Inc. ("Bay Area Remodelers") is a Florida

corporation with its principal place of business in Clearwater, Florida.  During the Class Period,

Bay Area Remodelers purchased Concrete directly from one or more Defendants or their wholly-

owned subsidiaries, including Cemex, Florida Rock, Oldcastle, Rinker, and Tarmac, and was damaged as a result of Defendants' unlawful conduct.

13.     Plaintiff Carpenter Contractors of America, Inc. ("CCA") is an Illinois corporation with its principal place of business in Winter Haven, Florida.  During the Class Period, CCA purchased Concrete directly from one or more Defendants or their wholly-owned subsidiaries, including Rinker, Oldcastle, Florida Rock, Tarmac, Cemex, and Lehigh (Continental), and was damaged as a result of Defendants' unlawful conduct.

14.     Plaintiff Daniel Morgan Construction, Inc. ("Morgan Construction") is a Florida corporation with its principal place of business in Orlando, Florida.  During the Class Period, Morgan Construction purchased Concrete directly from one or more Defendants or their wholly-owned subsidiaries, including Cemex, Florida Rock, and Prestige, and was damaged as a result of Defendants' unlawful conduct.

15.     Plaintiff Family Pools, Inc. ("Family Pools") is a Florida corporation with its principal place of business in Port St. Lucie, Florida.  During the Class Period, Family Pools purchased Concrete directly from one or more Defendants or their wholly-owned subsidiaries, including Cemex, Rinker, and Prestige, and was damaged as a result of Defendants' unlawful conduct.

16.     Plaintiff Florida Block & Ready Mix ("Florida Block") is a Florida corporation with its principal place of business in Tampa, Florida.  During the Class Period, Florida Block purchased Cement directly from one or more of the Defendants, including Florida Rock, Holcim, and Tarmac, and was damaged as a result of Defendants' unlawful conduct.

17.     Plaintiff Hard Rock Materials ("Hard Rock") is a Florida corporation with its principal place of business in Green Cove Springs, Florida.  During the Class Period, Hard Rock

purchased Cement directly from one or more of the Defendants or their wholly-owned subsidiaries, including Cemex, Lehigh (Continental), Florida Rock, Suwannee, and Tarmac, and was damaged as a result of Defendants' unlawful conduct.

18.     Plaintiff Kroeger Enterprises, Inc. ("Kroeger") is a Florida corporation with its principal place of business in Riviera Beach, Florida.  During the Class Period, Kroeger purchased Cement and Concrete directly from one or more of the Defendants or their wholly-owned subsidiaries, including Cemex and Rinker, and was damaged as a result of Defendants' unlawful conduct.

19.     Plaintiff Liberty Concrete and Masonry, Inc. ("Liberty") is a Florida corporation with its principal place of business in Naples, Florida.  During the Class Period, Liberty purchased Cement directly from one or more of the Defendants, including Cemex, Rinker, Florida Rock, Tarmac, Lafarge, and Oldcastle, and was damaged as a result of Defendants' unlawful conduct.

20.     Defendant Cemex Inc. ("Cemex") is a Louisiana corporation with its principal place of business in Houston, Texas.  Cemex Inc. is a subsidiary of CEMEX, S.A.B. de C.V., a Mexican corporation.  Cemex produces and distributes Cement, Concrete, aggregate, concrete pipe, and related building materials throughout the United States.  Cemex operates three Cement plants, ten Cement import terminals, and approximately 71 Concrete suppliers in Florida. During the Class Period, Cemex sold Cement and Concrete in the State of Florida.

21.     Defendants Eastern Portland Cement Corp. and Eastern Cement Corp. (collectively "Eastern") are Florida private corporations with their principal place of business in Ft. Myers, Florida.  Eastern is a subsidiary of Schwab Ready-Mix Inc., a Florida private

corporation based in Ft. Myers, Florida.  During the Class Period, Eastern sold Cement in the State of Florida.

22.      Defendant Florida Rock Industries, Inc. ("Florida Rock") is a Florida corporation with its principal place of business in Jacksonville, Florida.  Florida Rock is a subsidiary of Vulcan Materials Company, a New Jersey corporation based in Alabama.  Florida Rock manufactures and sells construction materials, including Cement, Concrete, aggregate, and pre-stressed concrete.  Florida Rock operates one Cement plant, two Cement import terminals, and approximately 63 Concrete suppliers in Florida.  During the Class Period, Florida Rock sold Cement and Concrete in the State of Florida.

23.      Defendant Holcim (US) Inc. ("Holcim") is a Delaware corporation with its principal place of business in Waltham, Massachusetts.  Holcim is a subsidiary of Holcim Ltd., a Swiss company.  Holcim manufactures and sells Cement, Concrete, aggregate and asphalt. Holcim operates two Cement import terminals and at least one Concrete supplier in Florida. During the Class Period, Holcim sold Cement and Concrete in the State of Florida.

24.      Defendant Lafarge North America, Inc. ("Lafarge") is a Maryland corporation with its principal place of business in Herndon, Virginia.  Lafarge is a part of Lafarge Group, a French entity.  Lafarge manufactures and sells Cement, Concrete, gypsum wallboards, aggregate, asphalt, and related products and services.  Lafarge operates one Cement import terminal and approximately four Concrete suppliers in Florida.  During the Class Period, Lafarge sold Cement and Concrete in the State of Florida.

25.      Defendant Lehigh Cement Company ("Lehigh") is a Delaware corporation with its principal place of business in Allentown, Pennsylvania.  Lehigh is a subsidiary of HeidelbergCement Group ("Heidelberg"), a German entity.  Lehigh produces Cement, Concrete,

aggregate, concrete pipe and block, and pre-cast and pre-stressed concrete units throughout

North America.  In Florida, Lehigh obtains Cement from other manufacturers and imports

Cement at the Port of Cape Canaveral through its subsidiary, Continental Florida Materials Inc.

("Continental").  Lehigh also sells Cement under the brand Continental.  Lehigh operates three

Cement import terminals and at least one Concrete supplier in Florida.  During the Class Period,

Lehigh sold Cement and Concrete in the State of Florida.

26.     Defendant Oldcastle Materials ("Oldcastle") is a Delaware corporation with its

principal place of business in Atlanta, Georgia.  Oldcastle is a subsidiary of CRH, an Irish

corporation.  Oldcastle claims to be the leading vertically-integrated supplier of aggregate,

asphalt, Concrete and construction and paving services in the United States.  Oldcastle partners

with American Cement Company to produce and deliver Cement in Florida, and supplies

Concrete through its subsidiary, Preferred Materials, Inc.  Oldcastle operates one Cement plant

and approximately 26 Concrete suppliers in Florida.  During the Class Period, Oldcastle sold

Cement and Concrete in the State of Florida.

27.     Defendant Prestige AB Management Co LLC ("Prestige") is a Florida corporation

with its principal place of business in Orlando, Florida.  Prestige is a subsidiary of Votorantim

Cimentos North America, Inc. ("VCNA"), which is a subsidiary of Votorantim Group, a

Brazilian industrial group.  Prestige manufactures and sells Concrete in the State of Florida,

where it operates approximately 31 Concrete suppliers.  During the Class Period, Prestige sold

Concrete in the State of Florida.

28.     Defendants Cemex Materials, LLC f/k/a Rinker Materials Corporation, a

Delaware limited liability corporation, and Cemex Construction Materials Florida, LLC f/k/a

Rinker Materials of Florida, Inc., a Florida corporation, (together "Rinker") are entities that

operated as Rinker in Florida prior to their acquisition by Cemex in 2007, and subsequent name change, but continue to sell products under the name Rinker. Rinker manufactures and sells Cement and Concrete in the State of Florida. During the Class Period, Rinker sold Cement and Concrete in the State of Florida.

29.     Defendant Suwannee American Cement LLC ("Suwannee") is a Delaware limited liability company with its principal place of business in Branford, Florida. Suwannee's shareholders are Anderson Columbia Company, a Florida corporation, and Votorantim Cimentos, part of the Brazilian Votorantim Group. Suwannee operates one Cement plant in the State of Florida. During the Class Period, Suwannee sold Cement in the State of Florida.

30.     Defendant Tarmac America LLC ("Tarmac") is a Delaware limited liability company with its principal place of business in Norfolk, Virginia. Tarmac is a subsidiary of Titan America LLC, whose ultimate parent is Titan Cement Company S.A., a Greek company. Tarmac produces and sells Cement, Concrete and other building materials in Florida. Tarmac operates one Cement plant, one Cement import terminal and approximately 37 Concrete suppliers in Florida. During the Class Period, Tarmac sold Cement and Concrete in the State of Florida.

## UNNAMED CO-CONSPIRATORS

31.     Various other companies and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of, and performed acts and made statements in furtherance of the unlawful conduct described.

## INTERSTATE TRADE AND COMMERCE

32.     Throughout the Class Period, there has been a continuous and uninterrupted flow of transactions in and shipments of Cement in interstate commerce throughout the United States

and Florida.  Concrete, which has Cement as its primary ingredient, is part of a continuous and uninterrupted flow of transactions and shipments in interstate commerce.

33.     A significant volume of Cement and construction materials was transported into Florida from other states, including Georgia and Alabama, and/or from other countries, including delivery at ocean ports. The unlawful activities of Defendants and their co-conspirators have been within the flow of interstate and international commerce.

34.     Construction projects in which Concrete is used are financed, at least in part, by lenders located outside the State of Florida.

## THE RELEVANT MARKETS

35.     There are two relevant product markets: Cement and Concrete.  The relevant geographic market is the State of Florida.

36.     Cement is a major ingredient of Concrete.  Since Cement is primarily sold to Concrete producers, demand for both products tends to rise and fall together.  In Florida, the changes in consumption of Cement and Concrete paralleled each other during the past five years, as alleged in paragraph 115.

37.     The vast majority of Concrete manufacturers in Florida are Defendants or wholly-owned subsidiaries of the Defendant Cement manufacturers.  The Defendants control their respective wholly-owned subsidiary Concrete companies.

### Cement

38.     Portland cement, the most common type of Cement, is the primary binding ingredient in a number of construction materials, including Concrete.

39.     Cement is a fine powder created by grinding clinker, the product of heating aggregate including limestone, clay, sand, and gypsum, in a kiln.  Quarries, the sources of

9

aggregate, are difficult to establish, especially near highly populated areas, due to zoning restrictions and objections from local residents.

40.     Capital equipment for clinker production includes grinders to break down the raw materials, kilns or pre-heaters to begin the heating process, and cooling stations to cool the clinker and prepare it for Cement production.  To convert clinker into Cement, steel tubes and steel balls break down the clinker and mix it with gypsum.

41.     Cement is stored in silos and shipped by truck, rails, and barge. For smaller projects, Cement is stored in bags for shipment to customers.

42.     Cement is typically sold in bulk by the metric ton, priced in dollars per metric ton, or in 94 lb. bags, priced in dollars per bag.  Due to Cement's high weight and low cost relative to volumes shipped, freight is a significant factor in the price at which Cement is sold.

43.     In Florida in 2008, over 6.4 million metric tons of Cement, valued at approximately $960 million, were produced at seven Cement plants owned and/or operated by Defendants.

44.     Concrete producers – consisting of those that are (1) Defendants or are wholly-owned and operated by the Defendants and (2) independently owned and operated ICPs – consume approximately 75% of the Cement used in Florida.  The remainder of the Cement produced by Defendants is sold to various types of concrete product manufacturers and contractors, including road pavers.

45.     Due to widespread acquisitions and consolidation between approximately 1990 and 2003, the Florida Cement market is now controlled by a small number of international companies, all of which are Defendants.

## Concrete

46.     Concrete is a mixture of Cement, aggregate (sand, gravel, and crushed stone) and water.  Cement is the most expensive input in Concrete.

47.     Ready-mix concrete is produced at batch plants, where the proportions of input materials are measured, combined with water in a rotating drum mounted on a truck, and then mixed in the truck's drum on the way to a construction site.  Because the addition of water begins an irreversible chemical reaction, and because the ready-mix concrete is placed directly at the construction site, the truck's arrival must be timed so that the ready-mix concrete hardens at the appropriate time.

48.     The strength of the ready-mix concrete is determined by the amount of water added, and is measured in pounds per square inch ("psi").

49.     Ready-mix concrete is sold by the cubic yard, and is priced in dollars per cubic yard.

50.     Ready-mix concrete is used principally in commercial, governmental, and residential construction.  The primary purchasers of ready-mix concrete in Florida are construction companies.  There are thousands of construction companies in the State of Florida.

51.     Large projects, such as municipal and commercial construction projects, require ready-mix concrete suppliers with significant resources.  Suppliers must have access to a large amount of ready-mix concrete , as well as the ability to place significant amounts of ready-mix concrete daily, to deliver concrete of varying strength, to test the ready-mix concrete , and to send trucks to the construction site on a continuing basis to complete multiple placements.

52.     Ready-mix concrete suppliers may also need to provide multiple batch plants in a geographic area, backup plants, many concrete trucks, a well-trained workforce, the ability to

produce concrete for multiple specifications and large projects, and significant financial backing to remedy construction problems.

53.     Concrete blocks are rectangular bricks widely made of Cement, aggregate, water, and other materials that are used as a building material in residential construction in Florida.

54.     Absent the unlawful conspiracy, the Defendants and their Concrete manufacturing subsidiaries would compete freely among themselves and with the ICPs for the sale of Concrete in Florida.

**THE CONSPIRACY**

55.     As explained herein, the Defendants engaged in an unlawful conspiracy and agreement to reduce or eliminate competition in the markets for Cement and Concrete in the State of Florida.

**Objects of the Conspiracy**

56.     The Defendants' conspiratorial agreement was multi-faceted and extended across a number of issues or "objects."  From at least January 2000 to the present (the "Class Period"), the Defendants unlawfully conspired and agreed to: (1) fix, raise, maintain and/or stabilize prices of Cement; (2) fix, raise, maintain and/or stabilize prices of Concrete; (3) fix, raise, maintain and/or stabilize fuel surcharges on shipments of Cement; (4) fix, raise, maintain and/or stabilize fuel and environmental surcharges on shipments of Concrete; (5) allocate customers and markets by:  (a) allocating Defendants' customers for Concrete; (b) allocating Defendants' customers for Cement; (c) allocating ICPs' customers for Concrete by territory; and (d) dividing up the Florida Concrete market by territory; and (6) engage in other anticompetitive conduct specified herein; all in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

## Purposes of the Conspiracy

57.     The purposes and goals of the Defendants' unlawful conspiracy included the following:  (1) the generation of supra-competitive profits for, and unjust enrichment of, the Defendants; (2) the restriction of lawful competition in the Florida markets for Cement and Concrete; (3) the elimination of competition from ICPs in the Florida Concrete market; and (4) the creation and maintenance of artificially high prices for Cement and Concrete in the State of Florida.

58.     Defendants sought to and did unlawfully profit from their anticompetitive conspiracy in at least three ways.  First, they profited from sales of Cement to customers at collusively-established supra-competitive prices.  Second, they profited from sales of Concrete they supplied, either directly or through wholly-owned subsidiaries, to their own customers at collusively-established supra-competitive prices.  Third, insofar as Defendants' conspiracy drove ICPs out of the market entirely, Defendants were able to increase their market power in a particular territory, and effectively eliminate all remaining price competition.

## Manners and Means of the Conspiracy

59.     Defendants sought to accomplish their conspiracy by the following manners and means, among others.

60.     Defendants frequently communicated through in-person meetings, telephone calls, and other means.  Defendants' meetings in furtherance of the conspiracy included those held at trade association meetings, social events, and corporate meetings.

61.     Executives employed by Defendants formed close business and personal relationships.  These relationships furthered the execution and implementation of the conspiracy. For example, Karl Watson, Jr., President of Rinker Materials West and, after Cemex's

acquisition of Rinker, Regional President of Cemex's East Region, was an architect of the conspiracy.  Watson has or had a close personal relationship with of one or more officers at each of the other Defendant companies that were located in Florida, including Jorge Wagner, President of Prestige, Rick Edwards, President of Florida Rock, Harvey Johnson of Tarmac, and Robert "Frank" Craddock, Executive Vice President of Commercial for Cemex.

62.     Defendants fixed, raised, maintained and/or stabilized Cement prices to non-competitive, artificially high levels in the State of Florida, and price competition among them was effectively eliminated or substantially reduced.

63.     To further reduce competition, Defendants also allocated customers and markets among themselves, by among other things (i) allocating Defendants' customers for Concrete; (ii) allocating Defendants' customers for Cement; (iii) allocating ICPs' customers for Concrete by territory; and (iv) dividing up the Florida Concrete market by territory.

64.     By allocating customers of Concrete, Defendants were able to maintain artificially high prices and eliminate cheating by co-conspirators by preventing purchasers of Concrete, primarily construction companies, from seeking out a better price for Concrete from different Defendants or their wholly-owned Concrete subsidiaries.

65.     Defendants also specifically targeted the ICPs and attempted to place them at a competitive disadvantage by illegal means.  The ICPs were the principal competitors of the Cement manufacturers' Concrete subsidiaries in Florida and not part of the conspiracy.

66.     Fixing the price of Cement charged to the ICPs was a key part of the manner and means used by the conspirators.  Defendants understood that if the ICPs were able to buy Cement at prices set in a free and open market, the ICPs would be then able to compete with Defendants for Concrete customers by offering competitive prices.  Defendants further

understood that if they restricted their collusion to sales of Concrete, then the conspiracy would be ineffective because the ICPs, who had lower overhead expenses than Defendants, would have been able to undercut Defendants' prices for Concrete.  Thus, in order to successfully effectuate their conspiracy, Defendants collusively charged the ICPs (and other purchasers) supra-competitive prices for Cement.

67.     Because Cement is a critical component of Concrete, by selling Cement to the ICPs at artificially inflated prices, Defendants were able, in effect, to increase the prices that the ICPs had to charge their Concrete customers.  Defendants' collusion on Cement prices thus kept ICP prices for Concrete artificially inflated and in line with the cartel prices for Concrete that Defendants charged customers directly or through their wholly-owned subsidiaries.

68.     Moreover, by artificially inflating the price of Cement charged to the ICPs, Defendants enabled themselves, through their Concrete subsidiaries, to from time to time offer lower Concrete prices (albeit at collusive levels) to the ICPs' customers, undercutting the ICPs' prices to the point that they could not compete.

69.     The Defendants also monitored the volume of the ICPs' businesses and location of the ICPs' jobs.  Such monitoring was accomplished by means which included reviewing bills of lading (which are legally required to include delivery destinations under 49 C.F.R. §§ 373.101, 373.201) that were generated when an ICP ordered materials from a Defendant. Through this means, and by secretly surveilling and following ICPs' trucks to job sites, Defendants were able to keep apprised of the volume of the ICP businesses and locations of the ICPs' jobs.

70.     In furtherance of this conspiracy, Defendants and their co-conspirators undertook numerous overt acts.  Examples of such overt acts are identified in paragraphs 71 through 113 below.

### Examples of Collusion - Price Increases

71.     Defendants met and agreed to artificially raise the prices for Cement and Concrete in Florida by agreeing on the magnitude and timing of price increases.  As a result of the Defendants' conspiracy, prices for Cement and Concrete in Florida were fixed, raised, stabilized and/or maintained throughout the Class Period.

72.     Coordinated price increases for Cement and Concrete were regularly announced two times a year.  Each of the Defendants raised the price of Cement and Concrete by about the same amount and at about the same time pursuant to their unlawful agreement.

73.     Pursuant to their unlawful agreement, Defendants agreed to fix the price of Concrete.  For example, in 2008, the collapse of the housing market and the recession severely decreased demand for Concrete in Florida and elsewhere.  Pursuant to their unlawful agreement, notwithstanding the substantial reduction in demand, Defendants announced a nearly identical 30% increase in ready-mix concrete prices to $100/cubic yard, and most eliminated their eight-year-old "fuel surcharge" on ready-mix concrete orders:

(a)     On August 4, 2008, Cemex announced that, effective October 1, it would increase its ready-mix concrete price to existing customers by $25/cubic yard.  Cemex also announced that it was ending its fuel surcharge.

(b)     Shortly thereafter, at a meeting of Prestige sales staff, Prestige President Jorge Wagner announced that Prestige would also be increasing its ready-mix concrete price by $25/cubic yard, and that the other Defendants had agreed to go along with the increase.  Prior to

this meeting, Prestige had been drafting price increase letters announcing a more typical $5/cubic yard increase.

(c)     On August 11, 2008, Oldcastle's Preferred Materials announced that, effective October 1, it would increase its ready-mix concrete price to existing customers by $23/cubic yard, but it would not end its surcharges.

(d)     On August 20, 2008, Tarmac announced a price increase of $25/cubic yard for ready-mix concrete in Florida, thus raising the price to $100/cubic yard.  It also announced that it would add or deduct $5/cubic yard for each 1000 psi increment, effective September 25, 2008.  Like Cemex, Tarmac announced that it was ending its fuel surcharge.

(e)     On September 1, 2008, Florida Rock announced that, effective October 15, it would increase its ready-mix concrete price to existing customers by $26/cubic yard, and that it would end its fuel surcharges.

(f)     On September 12, 2008, Prestige announced a price increase for ready-mix concrete of $25/cubic yard.  It also announced that it would add or deduct $2.50/cubic yard for each 500 psi increment, effective October 13, 2008.  This brought Prestige's ready-mix concrete price to approximately $100/cubic yard.  Prestige announced that it was ending its fuel surcharge as well.

74.     Subsequent to these price announcements, Defendants implemented the agreed-upon price increases on ready-mix concrete sales to customers throughout Florida.  However, in the face of a sharp drop in commercial and residential construction, and a corresponding decline in the demand for Concrete, Defendants' agreed-upon announced price increase was not sustainable at the full amount.

75.     Pursuant to their unlawful agreement, Defendants also agreed to fix the price of Cement.  For example, in 2006, Defendants issued almost identical Cement price increases of $12/ton, effective January 1, 2007:

(a)     On or about July 5, 2006, Holcim announced a $12/ton price increase for Cement, effective January 1, 2007;

(b)     On or about July 17, 2006, Cemex announced a $12/ton price increase for Cement, effective January 1, 2007;

(c)     On or about July 19, 2006, Lafarge announced a $12/ton price increase for Cement, effective January 1, 2007;

(d)     On or about September 25, 2006, Rinker announced a $12/ton price increase for Cement, effective January 1, 2007;

(e)     On or about October 1, 2006, Florida Rock announced an $11/ton price increase for Cement, effective January 1, 2007; and

(f)     On or about October 16, 2006, Eastern announced an $11.50/ton price increase for Cement, effective January 1, 2007.

76.     In the fall of 2009, Defendants announced the same $15/ton price increase for Cement in Florida:

(a)     On September 19, 2008, Lafarge issued a price announcement letter to customers signed by its District Sales Manager for the Deep South Sales District and VP for Marketing and Sales, U.S. East Business Unit, announcing a $15/ton price increase for Cement effective January 1, 2009;

(b)    On October 3, 2008, Cemex sent a letter to customers signed by Frank Craddock, Jr., Executive VP for Commercial U.S. Operations, announcing a $15/ton price increase for Cement effective January 1, 2009;

(c)    On October 8, 2008, Continental Florida Materials Inc. (owned by Lehigh) sent a letter to customers announcing a $15/ton price for Cement increase effective January 1, 2009; and

(d)    On October 29, 2008, Titan sent a letter to customers announcing a $15/ton price increase for Cement effective January 1, 2009.

77.    Subsequent to their price announcements, Defendants uniformly implemented the agreed-upon price increases on Cement sales to customers throughout Florida.

78.    Beginning at least as early as 2000, Defendants also agreed to implement, and in fact implemented, uniform fuel surcharges on shipments of Cement and Concrete, tied to a published index, purportedly to compensate for increasing prices of fuel.  However, these surcharges did not correlate directly with the rise and fall of fuel prices, and previously had been incorporated into the Defendants' price for Cement.

79.    In or about 2000, Defendants also agreed to implement, and in fact implemented, uniform environmental surcharges on ready-mix concrete, purportedly to compensate Defendants for the cost of removing excess ready-mix concrete from a work sites.  Previously, this cost had been incorporated into the Defendants' price for ready-mix concrete.  The environmental surcharge was typically approximately $1/cubic yard.

80.    As a result of Defendants' unlawful price-fixing conduct, Plaintiffs and the Classes were injured by paying supra-competitive prices for Cement and Concrete in Florida throughout the Class Period.

<u>**Examples of Collusion - Customer and Market Allocation**</u>

81.     Due to the decrease in demand for Concrete, particularly during the last two years, Defendants also used a customer and market allocation scheme to drive ICPs, their primary competitors for Concrete sales, out of the market.

82.     <u>First</u>, Defendants agreed to allocate their customers for Concrete.  "Customer allocation" means that Defendants agreed not to compete for each other's customers, thereby eliminating price competition and permitting them to inflate prices.  Such customer allocation also allowed each Defendant to monitor the other Defendants' adherence to the conspiracy.

83.     A recent example in early 2009 highlights this allocation scheme.  Cemex believed that an ICP supplied Concrete to a particular construction site in Oxford, Florida.  Cemex salesmen appeared at the job site in an attempt to underbid the ICP and acquire the customer.  Upon arrival, they learned that the Concrete was in fact being supplied by a subsidiary of competitor Florida Rock.  As a result, the salesmen were instructed by Cemex to no longer compete for the customer.

84.     One of the largest purchasers of Concrete in Florida, Plaintiff CCA, was supplied by Rinker from 1990 or before this past year.  Every year or two, CCA's purchasing director contacted Rinker's Defendant competitors in the region (namely, Florida Rock and Tarmac, the only other companies that could handle the volume of Concrete CCA required), and attempted to secure better priced for Concrete.  In response to such overtures by CCA to purchase their Concrete, upon learning that CCA was supplied by Rinker, Florida Rock offered a non-competitive price and Tarmac would not even offer a price.  This means of allocating customers is similar to the Cement customer allocation described below.

85.     In addition, in a fall 2008 meeting in the company's Orlando offices, Prestige President Jorge Wagner told Prestige sales personnel and senior management that pursuant to an

arrangement with Cemex, the two companies were not to compete for each other's existing customers. Employees who did not adhere to this agreement would be fired, Wagner said. As a result, the two companies continued not to compete for each other's customers.

86.     In 2008, sales personnel at Cemex were instructed by their superiors to get to know their competitors, and to call competitors to "verify" pricing of Concrete to customers.

87.     In order to guard against the possibility of cheating on the cartel, Defendants implemented monitoring and enforcement mechanisms. For example, in March 2009, Prestige salesmen met with Mike Foster, the Vice-President of Lennar Homes, a major national homebuilder. Foster told the Prestige salesmen that Cemex had offered a better price than Prestige for Concrete, and refused to consider a counteroffer from Prestige. The salesmen reported this exchange to Prestige President Jorge Wagner. In order to obtain some leverage against Cemex, Wagner told the Prestige salesmen to retaliate against Cemex's cheating on the customer allocation agreement by stealing a Cemex customer. The Prestige salesmen contacted GC Contracting, a Cemex customer in Daytona Beach, and offered very favorable pricing. When it was clear that Prestige would succeed in stealing Cemex's customer, but before the deal was finalized, Wagner refused to approve the price and insisted that the salesmen quote the contracting company a different, non-competitively high price, such that Prestige did not obtain the business. Thereafter, Cemex reneged on its agreement with Lennar Homes, which called the Prestige salesmen and said that it would never do business with Cemex again, and purchased from Prestige. In this way, GC Contracting continued to purchase from Cemex, its initial supplier, Lennar Homes continued to purchase from Prestige, and neither Defendant succeeded in cheating on the cartel.

88.     Second, Defendants agreed to allocate their customers of Cement, primarily the ICPs, among themselves. An ICP seeking to purchase Cement from one of the Defendants

would routinely be asked to identify its current Cement supplier, and if the customer requested Cement from a Defendant who was not the illegally allocated supplier for the customer's business, the Defendant would refuse to supply the Cement or would offer it at a prohibitively high price.

89.     Generally, Cement customers were allocated among Defendants once they were locked into a Cement manufacturer's supply line.  This is evident because when Cement purchasers solicited price quotes from competitors to their current supplier, Defendants either refused to quote a price or quoted a clearly non-competitive price.  Thus, the Cement purchaser would remain locked into its current supplier.  For example:

(a)     Florida Ready Mix (an ICP) was supplied by Eastern Cement.  From 2005 to 2008, Florida Ready Mix sought to buy Cement from some of Eastern's Defendant competitors, including Cemex, Holcim, and Rinker, calling them twice a year, usually in mid-January and again in the summer.  Florida Ready Mix was first asked to identify its current Cement supplier.  After responding that it was being supplied by Eastern, the Defendant competitors provided Florida Ready Mix with unusually high price quotes, approximately $105/ton.  For this reason, Florida Ready Mix was forced to stay with Eastern.

(b)     From 2004 to 2007, Plaintiff Advantage Concrete, which was supplied by Tarmac, attempted to switch Cement suppliers approximately twice a year.  Again, when Advantage Concrete sought to buy from Lehigh (Continental) and Rinker, sales representatives from Lehigh (Continental) and Rinker first asked who Advantage Concrete's current supplier was, and upon receiving an accurate response that it was their competitor Tarmac, either quoted non-competitively high prices or simply did not call back Advantage Concrete.

(c)     Similarly, Extreme Concrete (an ICP) contacted Cemex in the summer of 2009.  After being told that Extreme was being supplied by Tarmac, Cemex never returned its

22

call.  In late 2009, Extreme similarly reached out to Florida Rock, telling it that Extreme was

being supplied by Tarmac, and Extreme never received a response.

          (d)    On another occasion, an employee of Superior Concrete (an ICP) called

Florida Rock to place an order for Cement.  The Florida Rock sales representative stated that it

had product available to sell.  The Florida Rock sales representative then asked the Superior

employee asked who its current supplier was.  Upon stating that his current supplier was Rinker,

the Florida Rock sales representative asked the ICP employee to speak to a Florida Rock

regional sales manager.  The Florida Rock regional sales manager then told the Superior

employee that Florida Rock either did not have product to sell, or that Florida Rock's price of

sale was higher than originally quoted, thus forcing the Superior employee to continue to

purchase from its existing supplier, Rinker.

      90.    <u>Third</u>, Defendants agreed to allocate the ICPs' Concrete customers by territory.

For example, in September 2009, Cemex, Florida Rock, Tarmac, and VCNA (through Defendant

Prestige), each agreed to cut their Concrete prices by $4-5/cubic yard to the customers of ICPs.

While offering reduced Concrete prices to the ICPs' customers, Defendants did not make

comparable lower price offers to each others' customers.  Further, they agreed that each

particular Defendant would only target ICP customers in specific regions of Florida:

- Cemex targeted ICP customers on the South Coast and Central region;

- Florida Rock targeted ICP customers in the Jacksonville area;

- Tarmac targeted ICP customers on the Gulf Coast; and

- VCNA targeted ICP customers in the Orlando area.

      91.    <u>Fourth</u>, Defendants, led by Cemex (through Karl Watson, Jr., the Regional

President of Cemex's East Region), allocated geographic territories among themselves by county

in the State of Florida.  This is reflected by the fact that different regions in Florida are

23

dominated by individual Defendants, and that Defendants engaged in Cement swaps (as alleged below) with each other rather than forward-integrating and directly competing with each other for Concrete business within close proximity to their respective Cement plants.

92.     One region that is dominated by Defendant Cemex is the Florida Keys.  Due to lack of competition, prices for ready-mix concrete in the Keys are 60-70% higher than even the artificially inflated prices charged in the rest of Florida.

93.     One ICP, Plaintiff Advantage Concrete, attempted to supply ready-mix concrete to the Keys in the spring of 2008.  In order to do so profitably, Advantage Concrete needed a source of Cement in Miami and a trucking company to deliver the Cement.  The three major Defendants in the area, Cemex, Titan, and Lehigh (Continental), all quoted a Cement price $20/ton higher than the market rate after Advantage Concrete let it be known that the destination for the Cement was the Keys.

94.     Furthermore, trucking companies that Advantage Concrete attempted to retain to haul Cement to the Keys either refused to be retained at all, or quoted prices that were significantly higher than the distance merited.  One independent trucker told Advantage Concrete that if it hauled Cement for Advantage Concrete to the Keys, it would not be given any more work by the Defendants.  Because of this, Advantage Concrete was unable to supply ready-mix concrete to the Keys and Cemex maintained its hold over the region.

### Examples of Collusion - Conspiratorial "Swaps"

95.     Another mechanism the Defendants used to implement their unlawful agreement was a practice known as a Cement "swap."  As described below, this practice was against each Defendant's independent economic self-interest and constituted coordinated action in furtherance of the conspiracy.  The practice operated as follows:

96.     A Defendant ("Def A") would receive a customer order for ready-mix concrete from one of its batch plants, although Def A's Cement plant was farther from the customer's project site than the site was from a competitor's Cement plant (the "Def B"). Because Cement is expensive to transport long distances on land, when this happened, Def A routinely arranged a swap with Def B. The arrangement is diagrammed below in paragraph 97.

97.     Under a Cement swap, Def B agreed to "sell" a fixed amount of Cement to Def A, and to deliver the Cement to Def A's ready-mix concrete batch plant so that Def A could meet the customer's order. The price that Def B charged Def A for the Cement was much less than the price that Def B charged an ICP for Cement purchased directly from that Defendant, often about one-half as much. In exchange, Def A agreed to sell and deliver an equal amount of Cement to Def B when the latter received a comparable customer order at a later date. From time to time, swapping defendants "settled" any imbalance in swap transactions by a cash transfer.



98.     The fact that Def B charged Def A a price for Cement below that which ICPs paid demonstrates that the price charged to ICPs is artificially inflated and that each Defendant in the swap is aware of that inflation.  Put another way, if the price that the ICP paid was one determined by competitive market conditions, then that would be the price Def B would charge Def A in the swap, and that would be the price Def A would be willing to pay in an arm's-length transaction.  Absent the unlawful agreement, for Def B to sell to a bona fide competitor at substantially less than the market rate would be against its independent economic self-interest.

99.     Equally important, Defendants' swap practices are a means to maintain collusively-established customer and territorial allocations.  Although building a new Cement plant is time-consuming and expensive, establishing a ready-mix concrete batch plant is not as difficult as establishing a Cement plant.  Doing so requires a Defendant to procure property, trucks and the necessary permits, much of which the Defendant may already have.  If Defendants were actually competing with each other, rather than engaging in swap transactions at collusively "discounted" prices, Def B would simply set up its own nearby batch plant (forward integrate) to supply ready-mix concrete to those customers whose orders triggered the swaps.  Because Def B's Cement plant would be near its own ready-mix concrete batch plant, Def B would have lower transportation costs and be able to undercut Def A on price.  Customers in general could recognize the price saving of ordering from Def B, and a competitive marketplace would emerge.

100.    The swap practice operates as a mechanism that Defendants have adopted to support their cartel and the supra-competitive prices they charge.

101.    A similar practice took place when Defendants supplied each other with Cement for use in products other than ready-mix concrete.  For example, when Rinker, since acquired by Cemex, purchased Cement from Florida Rock for its materials division, which produced concrete

block and other products, Florida Rock invoiced Rinker at the artificially inflated "market" price. But at the end of the year, it credited Rinker with the difference between the inflated price and a lower price that Rinker and Florida Rock had agreed to charge each other for Cement.

## Other Examples of Anticompetitive Behavior

102.     In addition to fixing prices and allocating customers and markets, Defendants and their co-conspirators engaged in other acts to thwart competition in the markets for Cement and Concrete.  These included:  (i) coordinating supply restrictions; (ii) requiring concrete block purchasers to also purchase Defendants' ready-mix concrete; and (iii) supplying ICPs with inferior Cement.

103.     Defendants Titan, Cemex, and Florida Rock coordinated supply restrictions. These Defendants increased Cement prices three times within a short time period during an alleged shortage of Cement in the spring of 2004.  These price increases occurred in the context of Tarmac temporarily closing one of its Cement plants in Pennsuco, Florida, to rectify a mechanical problem.  The problem allegedly took six months to fix, much longer than typically necessary in the industry.  At the time, Tarmac supplied about 10% of the Florida market.  While the Tarmac plant was closed, Rinker (later acquired by Cemex) and Florida Rock also shut down plants for scheduled maintenance, instead of delaying the maintenance to satisfy unmet demand. The combined plant shutdowns reduced Cement production capacity in Florida by about 33% for much of the second half of 2004.  Prices of Concrete increased accordingly.

104.     In addition, in or about 2005, Defendants, including Florida Rock, Cemex, Rinker, and Suwannee coordinated their Cement plant cleaning cycles so that their Cement plants were off-line at the same time.  Cleaning cycles take 21-28 days, during which Cement manufacturers clean out their silos.  Typically, if one Defendant were planning to take its plant off-line, it would alert the other Defendants so that they could build up inventory and avoid a

Cement shortage during the cleaning cycle. By coordinating these cycles, Defendants were able to maintain supra-competitive prices for Cement and stop each other from cheating on the conspiracy.

105.    Florida Rock, Oldcastle, Cemex, and Rinker (prior to Cemex's acquisition of Rinker) conditioned the sale of concrete block on the simultaneous purchase of ready-mix concrete. Cinder blocks, also known as concrete block, are a widely used building material in Florida. Defendants sell concrete block as well as ready-mix concrete, and control the market. In or about 2005, Defendants created a shortage of concrete block by cutting back on production. Defendants then refused to sell concrete block to customers unless customers also bought ready-mix concrete from Defendants at artificially-inflated prices. If an ICP attempted to set up its own concrete block plant, at a cost of millions of dollars, Defendants were able to offer concrete block at significant discounts because the ICP needed to purchase Cement at the artificially high price set by Defendants. Acting in this manner, Defendants reduced competition from ICPs in the market for concrete block.

106.    At least one Defendant, Cemex, supplied ICPs with inferior Cement, causing them to lose customers. When Cement is delivered to a Concrete company, it is difficult to know if it is the right type without sending a sample to a lab for testing, which is not generally standard procedure on all jobs. From March through May 2009, Cemex sent a number of loads of the wrong type of Cement to Plaintiff Action Ready Mix in a sale brokered by Lehigh (Continental). When Action Ready Mix discovered these bad loads, it began sampling every load to ensure it received the correct type of Cement. When Cemex learned from transport company personnel that that Action was testing Cement samples, Cemex resumed sending the appropriate type of Cement. However, in late October 2009, Cemex once again supplied Action

Ready Mix with the wrong type of Cement, which set at the wrong rate and caused Action Ready Mix's pumps to jam. This delayed the project Action Ready Mix was working on and caused it to lose its only customer at the time, Adams Brothers Construction.

## The Cover-Up

107.     When confronted by a concerned employee about the company's involvement in anticompetitive practices in the Cement and Concrete markets, Defendant Prestige actively attempted to conceal the matter.

108.     In or about February 2009, Michael Lane, Prestige's General Manager, sent a letter to the U.S. Department of Justice ("DOJ") and to various other federal officials, asserting the existence of antitrust violations in the Florida Cement and Concrete markets. Lane also provided a copy of the letter to Prestige's general counsel.

109.     Prestige then allegedly began an internal investigation into its conduct. Prestige requested that Lane sign a confidentiality agreement forbidding him from discussing any of the anticompetitive behavior with anyone, except the DOJ, whom he had already contacted. When Lane refused to sign such an agreement, Prestige ordered him to keep the alleged antitrust investigation confidential.

110.     In order to protect his career and to document conduct that he believed to be both anticompetitive and criminal, Lane kept notes and collected materials relating to the company's involvement in the conspiracy.

111.     Around May 2009, Lane was placed on administrative leave, purportedly because he failed to get approval for prices charged on certain projects. Lane was forbidden to speak with any staff, customers, or suppliers of Prestige. Shortly thereafter, Lane resigned.

112.     After resigning, Lane requested that Prestige return his personal computer on which he had stored relevant correspondence and other evidence of the illegal price-fixing and

anticompetitive conduct, including admissions of price-fixing by Jorge Wagner, Prestige's president, as well as other documentation of the price-fixing and anticompetitive conduct. Prestige never returned the computer or the information stored on it, nor did it return any of the other materials Lane had collected to support the existence of the conspiracy.

113.    Shortly after these events, the general counsel for Prestige, who was primarily in charge of the company's internal investigation, left the company.

## Effect of the Conspiracy

114.    As a result of Defendants' unlawful conspiracy, prices for Cement and Concrete have been fixed, raised, maintained, and/or stabilized in Florida during the Class Period.

115.    For example, the prices of Cement and Concrete in Florida have consistently risen or remained stable since 2000 – even after the end of the housing boom in 2005, the decline in commercial construction, the crash of the economy and the attendant drop in demand for Cement and Concrete (see chart below).  The increases in the price of Cement during this period are even higher when the fuel surcharge is incorporated.

**Table 1**
**Florida Consumption of Cement and Ready-Mix Concrete**[*]

|  | Cement Consumption in Florida ('000 Metric Tons) | Ready-Mix Concrete Consumption in Florida ('000 Cubic Yards) | Growth of Cement and Concrete Consumption (%) |
|---|---|---|---|
| **2004** | 9,698 | 42,768 | 12.90 |
| **2005** | 11,233 | 49,536 | 15.80 |
| **2006** | 11,180 | 49,306 | - 0.50 |
| **2007** | 7,886 | 34,779 | -29.50 |
| **2008** | 6,186 | 27,280 | -21.60 |

[*] Source: Portland Cement Association website, available at http://www.cement.org/econ/ind_stats.asp

**Table 2**
**Production and Sales of Florida Portland Cement\***

| Year | Cement Shipped by Producers and Importers (Thousand Metric Tons) | Cement Total Value (Thousand Dollars) | Cement Average Price ($ per Metric Ton) |
|------|------|------|------|
| 2000 | 7,325 | $   549,569.00 | **$75.02** |
| 2001 | 7,120 | $   516,000.00 | **$72.50** |
| 2002 | 7,413 | $   558,389.00 | **$75.32** |
| 2003 | 8,289 | $   638,000.00 | **$77.00** |
| 2004 | 9,430 | $   776,000.00 | **$82.50** |
| 2005 | 10,841 | $   982,819.00 | **$90.65** |
| 2006 | 10,591 | $1,084,593.00 | **$102.41** |
| 2007 | 7,693 | $   786,380.00 | **$102.22** |

\* Based on annual survey of plants and importers conducted by the U.S. Geological Survey.

## OTHER MARKET FACTORS SUPPORT THE EXISTENCE OF THE CONSPIRACY

116.     Various other market factors make the Florida Cement and Concrete markets susceptible to anticompetitive practices and unlawful collusion.

### Concentrated Industry

117.     Concentration in a particular industry facilitates the operation of a price-fixing cartel because it makes it easier to coordinate behavior among co-conspirators and it makes it more difficult for customers to avoid the effects of collusive behavior.

118.     The Cement market in Florida is concentrated.  At all relevant times during the Class Period, Defendants controlled virtually all of the sales of Cement in Florida.

119.     The Concrete market in Florida is also concentrated.  As a result of a series of acquisitions, seven of the Defendants – Cemex, Lafarge, Lehigh, Holcim, Prestige, Vulcan, and Titan – own approximately 235 Concrete companies, approximately 90% of the Concrete companies in Florida.

## Significant Barriers To Entry

120.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  However, where there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

121.    There are significant barriers to entry in the Cement market.  Entry requires a company to incur significant start-up capital expenditures.  Assuming a suitable location for a Cement plant in close proximity to a source of raw materials could be located, a new entrant into the business would have to incur hundreds of millions of dollars in costs, including costs for the Cement plant and equipment, energy, transportation, distribution infrastructure and labor. Environmental laws also increase the time, expense, and planning required.

122.    In addition, the backward vertical integration of existing Cement companies into quarries for supplies, and forward vertical integration of existing Cement companies into Concrete, impedes entry by new firms.  This is because a new entrant would be disadvantaged unless it is able to enter at the various levels where Defendants themselves operate.

123.    Although the barriers to entering the Concrete market are not as substantial as those for the Cement market, they are nonetheless significant, requiring substantial start-up capital expenditures and resources for sustained operations.  As noted earlier, in order to compete for large projects, a Concrete supplier must be able to provide multiple batch plants in a geographic area, backup plants, many ready-mix concrete trucks, a well-trained workforce, the ability to produce ready-mix concrete for multiple specifications, the demonstrated ability to handle large projects, and significant financial backing to remedy construction problems.

**Inelastic Demand**

124.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in price.  Demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity of that product sold , or does not result in a decline at all. In other words, customers have nowhere to turn for cheaper substitute products of similar quality, and so continue to purchase despite a price increase.

125.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

126.    Demand for Cement and Concrete in Florida is highly inelastic.  Cement is the primary ingredient in Concrete, and does not have a ready replacement.  If there is an increase in the price of Cement, customers for Concrete are not likely to reduce their demand or to substitute other building materials.

127.    Similarly, Concrete is a major and necessary component of commercial, governmental, and residential construction.  A small but significant, non-transitory increase in the price of Concrete will not cause construction companies to switch to a different construction material, even if such a material is available and compatible with the needs of a given construction job.

128.    The Department of Justice found that demand in the Concrete industry was highly inelastic when it challenged an industry merger as anticompetitive because "a small but significant post-acquisition increase in the price of ready-mix concrete that meets the bid specifications would not cause the purchasers of ready-mix concrete for large projects to

substitute another building material in sufficient quantities, or to utilize a supplier of ready-mix

concrete [who would otherwise not be considered a competitor for the business] with sufficient

frequency so as to make such a price increase unprofitable." *U.S. v. Cemex, S.A.B. de C.V.*,

Amended Complaint, D.D.C. No. 07-cv-006400, at 6-7.

### Standardized Product With High Degree Of Interchangeability

129.    When products offered by different suppliers are viewed as interchangeable by

purchasers, it is easier for the suppliers to unlawfully agree on the price for the product in

question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form

and sustain an unlawful cartel.

130.    Cement and Concrete are commodities, which are interchangeable across

manufacturers.  Although construction projects can be bid under various Cement and Concrete

specifications, all of the Defendants have the equipment and expertise to meet these

specifications.

### Declining Demand and Rising Prices

131.    Although demand for Cement and Concrete in Florida has fallen

significantly since 2005, average prices for Cement and Concrete in Florida have either increased

or remained stable.

132.    Cement consumption in Florida peaked in 2005 at 11.2 million metric tons, a rise

of 15.8% over the prior year, and then fell each year thereafter.  Ready-mix concrete

consumption in Florida also peaked in 2005 at 49.5 million cubic yards, and then fell each year

thereafter.  Ready-mix concrete consumption in 2008 was approximately 27.3 million cubic

yards, down 21.6% from 2007.

133.    Despite the decrease in demand in Florida for Cement and Concrete in recent

years, prices of both products have been stable or increasing.  See Tables 1 & 2, paragraph 115.

134.    The need to maintain profits in the face of falling demand creates incentives to conspire to fix prices and otherwise to avoid free and open competition.

135.    Although shipments of Cement in Florida have decreased significantly since 2005, the price of Cement has risen or remained stable:



136.    Market factors like those presented here are consistent with anticompetitive conduct and are highly suggestive of collusion.

**Conspiracy Furthered Through Trade Associations and Competitor Communications**

137.    Participation in trade associations can foster and facilitate an unlawful conspiracy. Defendants are members of various trade associations, including the Florida Concrete and Products Association ("FCPA").

138.    Throughout the Class Period, Defendants participated in numerous trade association activities and events together, which provided numerous opportunities to conspire and share information.

139.    In addition, employees in the Cement and Concrete industries frequently move from company to company, further facilitating their communication and strengthening their relationships with their competitors.

140.    The Defendants' senior executives, including Karl Watson, Jr. of Cemex and, previously, Rinker; Jorge Wagner of Prestige; Rick Edwards of Florida Rock; Harvey Johnson of Tarmac; and Robert "Frank" Craddock of Cemex, were long-time friends and associates, who met on several occasions, including at least once during the summer of 2008 over drinks in the Tampa area.

141.    During the Class Period, in-person meetings among the Defendants took place before and after industry trade association meetings and related social occasions, frequently shortly before price increase announcements.  Some of these meetings included the following:

(a)    The Defendants regularly spoke with each other at meetings of the FCPA, Southeastern Builder Conference and Associated Building Contractors ("ABC").  ABC frequently hosted evening cocktail get-togethers and monthly meetings, at which many of the Defendants' employees met.

(b)    Florida Independent Concrete & Associated Products, Inc. ("FICAP") was initially founded by ICPs as an association for independent ICPs.  However, they subsequently offered associate memberships to Defendants, who quickly turned FICAP meetings into yet another way to communicate with each other.

(c)    The Voluntary Protection Program Association for Construction typically holds its annual meeting, World of Concrete, in Las Vegas, Nevada.  The meeting is attended by thousands of industry officers and employees, including the Defendants' executives.  The meeting has also been held in Orlando, Florida.  At one of the meetings in Orlando, Watson,

Wagner, Craddock and Edwards were seen speaking with each other. These and other individuals also stayed at the same hotel during this meeting, the Peabody Orlando Hotel.

142. During the Class Period, Defendants also met at private company meetings. For example, Cemex held a company meeting at the West Palm Beach Airport Hilton Hotel. VCNA held a meeting in the same hotel at the same time. While representatives of both companies were at the hotel, Karl Watson, Sr. (then an officer of Cemex) met with Erik Madsen (CEO and President of VCNA) and Jorge Wagner (President of Prestige).

**Defendants' Multi-Market Contacts**

143. Simultaneous interaction by firms in multiple markets makes collusion easier to sustain. Multi-market contact can mute market level asymmetries. For example, although a firm with a competitive advantage in one market may be tempted to defect from a price-fixing agreement, it will be deterred from doing so if it knows that another firm would respond in a different market in which that other firm has a competitive advantage. Additionally, multi-market contact increases the frequency of interaction, permitting one firm to discipline another more rapidly than would otherwise be possible.

144. Defendants are significant players in the Cement and Concrete markets in Florida, as well as in most other states, and in many other countries. This multi-market contact makes it both desirable and feasible for Defendants to sustain collusion in the Florida markets.

**Worldwide Antitrust Investigations and Fines**

Worldwide Antitrust Investigations

145. Certain Defendants have previously been subject to antitrust fines in Europe, and are currently under investigation by the European Commission ("EC"), among other foreign competition authorities, for their anticompetitive activities in the Cement industry (see below).

146.    The EC has been investigating certain Defendants for about a year for engaging in anticompetitive behavior in the Cement industry.  In October 2008, the EC raided the offices of a number of Cement companies, including Cemex, Lafarge, Holcim, and Heidelberg, on suspicion of illegal cartel activity.  The EC stated in a press release that it had "reason to believe" that the companies it raided may have violated Articles 81 and 82 of the EC Treaty, which prohibit price-fixing cartels and abuse of dominant position. The investigation seeks to uncover evidence of coordinated price movements, discriminatory pricing and market sharing.  The EC has not yet filed formal charges against the companies.

147.    The Spanish offices of Cemex, Holcim, and several other Cement companies were raided in September 2009 by the EC for suspected Cement price-fixing.

148.    In June 2009, the South African Competition Commission searched the offices of Cement companies, including Defendant Lafarge, for suspected price-fixing, customer and market allocation, and bid-rigging in the Cement market.

149.    In May 2009, the Mexican competition authority announced an investigation of cartel behavior by Defendant Cemex and other Cement companies.

<u>Worldwide Fines for Anticompetitive Conduct</u>

150.    In December 2009, the Polish antitrust regulator fined six Cement companies for engaging in an 11-year price-fixing conspiracy.  Defendants involved in the conspiracy included Cemex, Heidelberg, Lafarge, and CRH (which controls Oldcastle).

151.    In December 2008, the Columbian antitrust regulator fined Cement companies, including Defendants Cemex and Holcim, for a conspiracy to fix prices.

152.    In December 2008, twenty Cement executives, including a Lafarge subsidiary executive, were found guilty of price-fixing by the Egyptian antitrust enforcement agency.

153. In November 2007, Defendant Lafarge Brazil SA paid a fine of approximately $24 million to Brazil's antitrust administrative tribunal, the Council for Economic Defense, for violations of Brazil's competition laws and agreed to changes in its conduct.

154. In December 2005, Taiwan fined twenty Cement companies, including Cemex, over $6.3 million for antitrust violations.

155. In August 2005, Argentina imposed fines of more than $28 million on six Cement companies for antitrust violations.

156. In 2003, the Federal Cartel Office of Germany fined Cement companies, including Defendants Lafarge, Cemex, HeidelbergCement (which controls Lehigh), and Holcim, record-breaking fines of €660 million for engaging in a cartel. Those fines were halved in June 2009.

157. In 1994, the EC fined Lafarge and other Cement companies for operating a cartel and dividing markets.

## ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFFS AND THE CLASSES

158. In formulating and effectuating their conspiracy, Defendants and their co-conspirators engaged in anticompetitive practices, the purpose and effect of which was to artificially raise, fix, stabilize and/or maintain the price of Cement and Concrete in the State of Florida. These activities included:

(a) Attending meetings or otherwise engaging in discussions and communications in Florida and elsewhere in the United States, face-to-face and by telephone, facsimile and electronic mail, regarding the sale of Cement and Concrete in Florida;

(b) Agreeing during those meetings, discussions and communications to fix, raise, stabilize and/or maintain the price of Cement and Concrete in the State of Florida;

(c)      Agreeing during those meetings, discussions and communications not to compete for one another's customers, either by refraining from submitting prices or bids to certain customers or refusing to provide, or to bid to provide, Cement or Concrete to certain customers;

(d)      Agreeing during those meetings, discussions and communications to allocate the ICPs as Cement customers;

(e)      Agreeing during those meetings, discussions and communications to allocate the Concrete customers of ICPs;

(f)      Agreeing during those meetings, discussions and communications to drive ICPs from the market;

(g)      Exchanging price and customer information regarding Cement and Concrete in Florida with each other;

(h)      Selling Cement and Concrete to customers in Florida at collusive and non-competitive prices pursuant to the agreement reached;

(i)      Accepting payment for Cement and Concrete sold in Florida at collusive and non-competitive prices;

(j)      Authorizing, directing, or consenting to the participation of subordinate employees in the conspiracy;

(k)      Engaging in Cement swaps with competitors at collusively "discounted" prices; and

(l)      Concealing the conspiracy and conspiratorial contacts through various means.

159.    Defendants' unlawful conspiracy had, and is having, the following effects, among others:

(a)    Price competition in the sale of Cement and Concrete has been restrained, suppressed, and/or eliminated in Florida;

(b)    Prices for Cement and Concrete sold by Defendants and their co-conspirators have been fixed, raised, stabilized and/or maintained at artificially high, non-competitive levels throughout Florida; and

(c)    Customers who purchased Cement or Concrete directly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

160.    By reason of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs and the Classes have sustained injury to their business or property in amounts to be proven at trial.  The injury sustained by Plaintiffs and the Classes is the payment of supra-competitive prices to Defendants for Cement and Concrete during the Class Period.  This is an injury of the type that the antitrust laws were meant to punish, prevent, and redress.

## CLASS ACTION ALLEGATIONS

161.    Plaintiffs bring this action as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and two classes.

162.    The "Cement Class" is defined as:

> All persons or entities who purchased Cement directly from one or more of the Defendants or their co-conspirators in the State of Florida at any time during the period January 1, 2000 to the present.  Excluded from the Florida Cement Class are Defendants and their subsidiaries, parents, or affiliates, Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and government entities.

163.    The "Concrete Class" is defined as:

> All persons or entities who purchased Concrete directly from one
> or more of the Defendants or their co-conspirators in the State of
> Florida at any time during the period January 1, 2000 to the
> present. Excluded from the Florida Concrete Class are Defendants
> and their subsidiaries, parents, or affiliates, Defendants' co-
> conspirators, whether or not named as a Defendant in this
> Complaint, and government entities.

164.    Each Class is so numerous that joinder of all members is impracticable.  Due to

the nature of the trade or the commerce involved, Plaintiffs believe that the members of each

Class are geographically dispersed throughout Florida, and that joinder of all members of each

Class would be impracticable.  While the exact number of members of each Class is unknown to

Plaintiffs at this time, Plaintiffs believe that there are at least hundreds of members of each Class,

and that their identities can be learned from Defendants' and their co-conspirators' books and

records.

165.    Plaintiffs Action Ready Mix, Advantage Concrete,  Florida Block, Hard Rock

Materials, and Liberty's (collectively, "the Cement Plaintiffs") claims are typical of the claims of

the other members of the Cement Class.  The Cement Plaintiffs and members of the Cement

Class purchased Cement during the Class Period at artificially maintained, non-competitive

prices, established by the unlawful actions of Defendants and their co-conspirators.  The Cement

Plaintiffs and members of the Cement Class have sustained damage in that they paid artificially

inflated prices for Cement during the Class Period due to Defendants' conduct in violation of

federal and state law as set forth below.

166.    Plaintiffs Bay Area Remodelers, CCA, Morgan Construction, Family Pools, and

Kroeger's (collectively, "the Concrete Plaintiffs") claims are typical of the claims of the other

members of the Concrete Class.  The Concrete Plaintiffs and members of the Concrete Class

purchased Concrete during the Class Period at artificially maintained, non-competitive prices,

established by the unlawful actions of Defendants and their co-conspirators.  The Concrete

Plaintiffs and members of the Concrete Class have sustained damage in that they paid artificially

inflated prices for Concrete during the Class Period due to Defendants' conduct in violation of

federal and state law as set forth below.

167.    Plaintiffs will fairly and adequately protect the interests of the members of each

Class and have retained counsel competent and experienced in class action and antitrust

litigation.

168.    Common questions of law and fact exist as to all members of each Class, which

predominate over any questions affecting solely individual members of each Class.  Among the

questions of law and fact common to each Class are:

(a)    whether Defendants conspired to raise, fix, maintain and/or stabilize the

price of Cement and Concrete in the State of Florida, which members of each Class purchased;

(b)    the date the conspiracy began;

(c)    the identities of un-named co-conspirators;

(d)    whether Defendants' conduct violated the relevant federal antitrust laws

and caused injury to the business and property of Plaintiff and the members of each Class and, if

so, the proper measure of damages; and

(e)    whether Defendants undertook actions to conceal their unlawful

conspiracy.

169.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy because joinder of all Class members is impracticable.  The

prosecution of separate actions by individual members of each Class would impose heavy

burdens upon the courts and Defendants, and would create a risk of inconsistent or varying

adjudications of the questions of law and fact common to each Class.  A class action, on the other hand, will achieve substantial economies of time, effort and expense, and will assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

170.    The interest of the members of each Class in individually controlling the prosecution of separate actions is theoretical, rather than practical.  Each Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for members of each Class, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## **FRAUDULENT CONCEALMENT**

171.    Defendants fraudulently concealed their participation in the conspiracy alleged by, among other things, engaging in secret meetings and communications in furtherance of the conspiracy, and by holding themselves out as competitors to the public, to Plaintiffs, and to each Class.  Because of such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-concealing, Plaintiffs and the Classes could not have discovered the existence of this conspiracy absent the contribution of industry participants who came forward and provided relevant information.

172.    Throughout the Class Period, Defendants and their co-conspirators have affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs and the Classes to prevent Plaintiffs and the Classes from suing them for the anticompetitive behavior alleged in this Complaint.

173.     Defendants wrongfully concealed their conspiracy by various means and methods that precluded detection, including but not limited to: secret meetings; misrepresentations to their Cement and Concrete customers concerning the reasons for increases in the prices of Cement and Concrete; and surreptitious communications among Defendants via telephone, in-person meetings or trade association gatherings (and elsewhere) in order to prevent the existence of written records, limit any explicit reference to competitor pricing communications on documents, and conceal the existence and nature of their competitor pricing discussions from non-conspirators.

174.     Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

175.     Defendants met and communicated secretly concerning customer and geographic allocation and the pricing of Cement and Concrete so as to avoid detection of their illegal conspiracy.

176.     During the Class Period, Defendants repeatedly attributed dramatic price increases to rising fuel and input costs, when in fact these costs did not justify the price increases.  These statements were a pretext to conceal Defendants' conspiracy to fix prices of Cement and Concrete.

177.     Defendants' purported reasons for price increases of Cement and Concrete were materially false and misleading and were made for the purpose of concealing Defendants' anticompetitive scheme as alleged in this Complaint.

178.     Plaintiffs and members of the Classes reasonably relied on the Defendants' materially false or misleading explanations for increases in the prices of Cement and Concrete,

and Plaintiffs and members of the Classes were lulled into believing that the increases were the result of normal competitive market forces, rather than the product of Defendants' collusive activity.

179.    Defendants' public statements about the reasons for the price increases were designed to, and did, put Plaintiffs and Class members off guard and caused them to accept the increases without undertaking further inquiry.  Even had such inquiry been undertaken, it would have proven futile because Plaintiffs and members of the Classes did not have access to contemporaneous information that would have allowed them to evaluate whether Defendants' claimed justifications for the price increases were valid.

180.    At the time, Plaintiffs and members of the Classes considered Defendants' articulated reasons for their price increases during the Class Period to be both normal and legitimate.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legality of Defendants' price increases.

181.    Moreover, by its very nature, Defendants' conspiracy was inherently self-concealing, and indeed the success of the conspiracy depended on its self-concealing nature.

182.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until shortly before the filing of this Complaint, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, did not know that they were paying artificially high prices for Concrete and Cement, and had no knowledge of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

183.    At all relevant times and in all relevant respects, Plaintiffs and other members of the Classes exercised reasonable diligence.

184.     None of the facts or information available to Plaintiffs and members of the Classes prior to shortly before the filing of this Complaint, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged in this Complaint.

185.     As a result of Defendants' conduct and concealment of their conspiracy, Plaintiffs and members of the Classes were prevented from suing for the anticompetitive conduct of the Defendants alleged in this complaint until shortly before the filing of the initial Complaint in this action.

186.     Because of Defendants' active steps, including fraudulent concealment of their conspiracy, to prevent Plaintiffs and members of the Classes from suing them for the anticompetitive activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

187.     The running of any applicable statute of limitations has been equitably tolled as to any claims of Plaintiffs and members of the Classes as a result of the anticompetitive conduct alleged in this Complaint.

## COUNT ONE

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 4 OF THE CLAYTON ACT

188.     Plaintiffs incorporate by reference the preceding allegations.

189.     From at least 2000 to the present, the Defendants and their co-conspirators, both known and unknown, did unlawfully contract, combine, and conspire together and with each other to suppress and eliminate competition in the Florida markets for Cement and Concrete in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

190.     The conspiracy consisted of a continuing agreement, understanding and concerted action between and among Defendants and their co-conspirators to fix, raise, maintain, and

stabilize prices for Cement and Concrete in the State of Florida, and to refrain from competing

with each other by allocating customers and geographic territories.   Such an agreement was in

and of itself an unreasonable restraint of trade in interstate and foreign commerce and a *per se*

violation of the federal antitrust laws.

191.    Defendants' conspiracy, and resulting impact on the markets for Cement and

Concrete, were within the flow of, were intended to, and did have, a substantial effect on the

foreign and interstate commerce of the United States.

192.    As a proximate result of Defendants' unlawful conduct, Cement Plaintiffs and the

Cement Class, and the Concrete Plaintiffs and the Concrete Class, have suffered injuries in that

they have paid supra-competitive prices for Cement and Concrete that they purchased during the

Class Period.

## RELIEF SOUGHT

Accordingly, Plaintiffs demand judgment as follows:

A.      That the unlawful conspiracy alleged in this Complaint be adjudged and decreed

to be an unreasonable restraint of trade or commerce, in violation of Section 1 of the Sherman

Act and Section 4 of the Clayton Act;

B.      That the Court determine that this action may be maintained as a class action

under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be appointed as class

representatives, and that Plaintiffs' counsel be appointed as counsel for the Classes;

C.      That Plaintiffs and each Class recover the damages determined to have been

sustained by them, trebled as provided by law, and that judgment be entered against Defendants,

jointly and severally, on behalf of Plaintiffs and each and every member of each Class;

D.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in this Complaint;

E.     That Plaintiffs and members of the Classes be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

F.     That Plaintiffs and each Class recover their costs of this suit, including attorneys' fees, as provided by law; and

G.     That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: January 7, 2010

Respectfully submitted,

 */s/ Robert C. Josefsberg*
Robert C. Josefsberg
Victor M. Diaz, Jr.
Katherine W. Ezell
Alexander Rundlet
**PODHURST ORSECK, P.A.**
City National Bank Building
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone: 305.358.2800
Fax: 305.358.2382
rjosefsberg@podhurst.com
vdiaz@podhurst.com
kezell@podhurst.com
arundlet@podhurst.com

***Plaintiffs' Interim Liaison Counsel***

Jay L. Himes
Hollis Salzman
Gregory S. Asciolla
Kellie Lerner
Ryan G. Kriger
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: 212.907.0700
Fax: 212.818.0477
hsalzman@labaton.com
jhimes@labaton.com
gasciolla@labaton.com
klerner@labaton.com
rkriger@labaton.com

Michael D. Hausfeld
William P. Butterfield
Brian A. Ratner
Ralph J. Bunche
**HAUSFELD LLP**
1700 K Street, NW
Suite 650
Washington, DC 20006
Telephone: 202.540.7200
Fax: 202.540.7201
mhausfeld@hausfeldllp.com
wbutterfield@hausfeldllp.com
bratner@hausfeldllp.com
rbunche@hausfeldllp.com

William A. Isaacson
Matthew W. Friedrich
**BOIES, SCHILLER & FLEXNER LLP**
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C. 20015
Telephone: 202.237.2727
Fax: 202.237.6131
wisaacson@bsfllp.com
mfriedrich@bsfllp.com

Stephen N. Zack
**BOIES, SCHILLER & FLEXNER LLP**
100 SE Second Street, Suite 2800
Miami, Florida 33131
Telephone: 305.539.8400
Fax: 305.539.1307
szack@bsfllp.com

*Plaintiffs' Interim*
*Co-Lead Class Counsel*

Gerald J. Rodos
Jeffrey B. Gittleman
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: 215.963.0600
Fax: 215.963.0838
grodos@barrack.com
jgittleman@barrack.com

Patrick Barrett
**BARRETT LAW OFFICE, P.A.**
One Burton Hills Blvd., Suite 380
Nashville, TN 37215
Telephone: 615.665.9990
Fax: 615.665.9998
pmbarrett3@barrettlawoffice.com

Bryan L. Clobes
Ellen Meriwether
Nyran Rose Pearson
**CAFFERTY FAUCHER LLP**
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Telephone: 215.864.2800
Fax: 215.864.2810
bclobes@caffertyfaucher.com
emeriwether@caffertyfaucher.com
npearson@caffertyfaucher.com

Brian Campf
**BRIAN S. CAMPF, PC**
7243 SE 34th Ave.
Portland, OR 97202
Telephone: 503.849.9899
brian@bsclegal.com

Joseph G. Sauder
Benjamin F. Johns
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
Haverford, PA 19041
Telephone: 610.642.8500
Fax: 610.649.3633
JosephSauder@chimicles.com
bfj@chimicles.com

Bonny E. Sweeney
Carmen A. Medici
**COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619.231.1058
Fax: 619.231.7423
bonnys@csgrr.com

Kevin B. Love
Michael E. Criden
**CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: 305.357.9000
Fax: 305.357.9050
mcriden@cridenlove.com
klove@cridenlove.com

Daniel E. Gustafson
Jason S. Kilene
**GUSTAFSON GLUEK PLLC**
608 Second Avenue South Ste 650
Minneapolis, MN 55402
Telephone: 612.333.8844
Fax: 612.339.6622
dgustafson@gustafsongluekcom
jkilene@gustafsongluek.com

Joseph C. Kohn
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: 215.238.1700
jkohn@kohnswift.com

W. Joseph Bruckner
Brian D. Clark
**LOCKRIDGE GRINDAL NAUEN**
 **P.L.L.P.**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: 612.339.6900
Fax: 612.339.0981
wjbruckner@locklaw.com
bdclark@locklaw.com

Noah Shube
**THE LAW OFFICES OF NOAH SHUBE**
434 Broadway, Sixth Floor
New York, NY 10013
Telephone: 212.274.8638
Fax: 212.966.8652
nshube@nsfirm.com

Robert S. Schachter
Jospeh Lipofsky
**ZWERLING, SCHACHTER**
 **& ZWERLING LLP**
41 Madison Avenue
New York, NY 10010
Telephone: 212.223.3900
Fax: 212.371.5969
rschachter@zsz.com
jlipofsky@zsz.com

Robert C. Gilbert
**ALTERS, BOLDT, BROWN, RASH &**
**CULMO, P.A.**
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Telephone: 305.571.8550
Fax: 305.571.8558
bobby@abbrclaw.com

Steven A. Kanner
Douglas A. Millen
Freed Kanner London & Millen LLC
**FREED, KANNER, LONDON &**
**MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: 224.632.4500
Fax: 224.632.4521
skanner@fklmlaw.com
dmillen@fklmlaw.com

Vincent J. Esades
Renae Steiner
**HEINS, MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: 612.338.4605
Fax: 612.338.4692
vesades@heinsmills.com
rsteiner@heinsmills.com

Jeffrey J. Corrigan
Jay S. Cohen
**SPECTOR, ROSEMAN, KODROFF &**
**WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: 215.496.0300
Fax: 215.496.6611
jcorrigan@srkw-law.com
jcohen@srkw-law.com

Solomon B. Cera
**GOLD, BENNETT, CERA & SIDENER, LLP**
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: 415.777.2230
Fax: 415.777.5189
scera@gbcslaw.com

Lance A. Harke
Sarah Clasby Engel
Howard M. Bushman
**HARKE & CLASBY LLP**
155 South Miami Ave., Suite 600
Miami, FL 33130
Telephone: 305.536.8220
Fax: 305.536.8229
lharke@harkeclasby.com
sengel@harkeclasby.com
hbushman@harkeclasby.com

Adam M. Moskowitz
Thomas A. Tucker Ronzetti
**KOZYAK, TROPIN & THROCKMORTON, P.A.**
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134
Telephone: 305.372.1800
Fax: 305.372.3508
amm@kttlaw.com
tr@kttlaw.com

Kevin Landau
**TAUS, CEBULASH & LANDAU, LLP**
1515 Broadway, 11th Floor
New York, NY 10036
Telephone: 212.520.4310
klandau@tcllaw.com

Arthur N. Bailey, Sr.
**ARTHUR N. BAILEY & ASSOCIATES**
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone: 716.664.2987
Fax: 716.664.2983
artlaw@windstream.net

Craig C. Corbitt
Christopher T. Micheletti
Eric W. Bueztow
**ZELLE HOFMANN VOELBEL & MASON LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: 415.693.0700
Fax: 415.693.0770
ccorbitt@zelle.com
cmicheletti@zelle.com
ebueztow@zelle.com

Michael E. Utley, Esq.
**MICHAEL E. UTLEY P.C.**
5959 Blue Lagoon Drive
Suite 200
Miami, FL 33126-2052
Telephone: 305.552.9628
Mike.utley@meupc.com

Manuel J. Dominguez
William B. Lewis
**BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO**
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Telephone: 561.835.9400
Fax: 561.835.0322
mdominguez@bermandevalerio.com
Wlewis@bermandevalerio.com

Richard A. Koffman
Emmy L. Levens
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005
Telephone: 202.408.4600
Fax: 202.408.4699
rkoffman@cohenmilstein.com
elevens@cohenmilstein.com

Kenneth G. Gilman
**GILMAN AND PASTOR, LLP**
28100 Bonita Grande Drive
Suite 105
Bonita Springs, FL 34135
Telephone: 877.428.7374
Fax: 239.221.8274
kgilman@gilmanpastor.com

Natalie Finkelman Bennett
Jayne Arnold Goldstein
**SHEPHERD FINKELMAN**
**MILLER & SHAH LLP**
35 East State St.
Media, PA 19063
Telephone: 610.891.9880
Fax: 610.891.9883
nfinkelman@sfmslaw.com
jgoldstein@sfmslaw.com

Mark S. Goldman
**GOLDMAN SCARLATO**
**& KARON, P.C.**
101 West Elm St., Suite 360
Conshohocken, PA 19428
Telephone: 484.342.0700
Fax: 484.342.0701
goldman@gsk-law.com

Bruce L. Simon
Jessica L. Grant
Ashlei M. Vargas
**PEARSON SIMON WARSHAW**
**PENNY LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: 415.433.9000
Fax: 415.433.9008
bsimon@pswplaw.com
jgrant@pswplaw.com
avargas@pswplaw.com

Steven A. Asher
Mindee J. Reuben
Jeremy S. Spiegel
**WEINSTEIN KITCHENOFF**
**& ASHER LLC**
1845 Walnut Street, Suite 1100
Philadelphia, Pennsylvania 19103
Telephone: 215.545.7200
Fax: 215.545.6535
asher@wka-law.com
reuben@wka-law.com
spiegel@wka-law.com

J. Mitchell Clark
**LAW OFFICES OF J. MITCHELL**
**CLARK**
Frost Bank Plaza
802 N. Carancahua,  Suite 1400
Corpus Christi, TX 78470
Telephone: 361.887.8500
Fax: 361.882.4500
mitchell@txverdict.com

Dianne M. Nast
Erin C. Burns
**RODANAST, P.C.**
801 Estelle Drive
Lancaster, Pennsylvania 17601
Telephone: 717.892.3000
Fax: 717.892.1200
dnast@rodanast.com
eburns@rodanast.com

William C. Wright
Theodore J. Leopold
**LEOPOLD KUVIN, P.A.**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: 561.935.4801
Fax: 561.515.1401
wwright@leopoldkuvin.com
tleopold@leopoldkuvin.com

Christopher M. Burke
**SCOTT + SCOTT, LLP**
600 B Street, Suite 1500
San Diego, CA 92101
Telephone: 619.233.4565
Fax: 619.233.0508
cburke@scott-scott.com

H. Laddie Montague, Jr.
Merrill G. Davidoff
Eric Cramer
Michael Dell'Angelo
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, P A 19103
Telephone: 215.875.3000
Fax: 215.875.4604
hlmontague@bm.net
mdavidoff@bm.net
ecramer@bm.net
mdellangelo@bm.net

Ira Neil Richards
Gary M. Goldstein
**TRUJILLO RODRIGUEZ &
RICHARDS, LLC**
1717 Arch Street, Suite 3838
Philadelphia, Pa 19103
Telephone: 215.731.9004
Fax: 215.731.9044
Ira@trrlaw.com
ggoldstein@trrlaw.com

Anthony J. Bolognese
Joshua H. Grabar
Jonathan Stemennan
**BOLOGNESE & ASSOCIATES, LLC**
1500 JFK Boulevard, Suite 320
Philadelphia, P A 19102
Telephone: 215.814.6750
Fax: 215.814.6764
ABolognese@bolognese-law.com
JGrabar@bolognese-law.com
JStemerman@bolognese-law.com

Marc H. Edelson
**EDELSON & ASSOCIATES, LLC**
45 West Court Street
Doylestown, P A 18901-4223
Telephone: 215.230.8043
Fax: 215.230.8735
medelson@edelson-law.com

*Additional Plaintiffs' Counsel*