**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**IN RE FLORIDA CEMENT AND**        **MASTER DOCKET NO. 09-23187-**

**CONCRETE ANTITRUST LITIGATION**      **CIV-ALTONAGA/Brown**

_____/
*(DIRECT PURCHASER ACTION)*

**IN RE FLORIDA CEMENT AND**        **MASTER DOCKET NO. 09-23493-**

**CONCRETE ANTITRUST LITIGATION**      **CIV-ALTONAGA/Brown**

_____/
*(INDIRECT PURCHASER ACTION)*

**MEMORANDUM OF THE DIRECT PURCHASER PLAINTIFFS**

**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE**

**CONSOLIDATED AMENDED COMPLAINTS**

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................ 3

    A.  The Products:  Cement and Concrete ............................................... 3

    B.  The Defendants ................................................................................ 3

    C.  The Plaintiffs and the Proposed Classes ........................................ 5

    D.  The Conspiracy ................................................................................ 6

    E.  The Lane Allegations and Prestige's Cover-Up ............................ 13

    F.  Fraudulent Concealment ................................................................ 14

ARGUMENT .................................................................................................. 15

  I.   THE CAC SUFFICIENTLY PLEADS A SHERMAN ACT SECTION 1
      CONSPIRACY. ............................................................................. 18

    A.  The CAC Cannot Be Compartmentalized ..................................... 19

    B.  The CAC Alleges an Unlawful Conspiracy to Undertake a Wide Array of
        Anticompetitive Conduct. .............................................................. 22

    C.  The CAC Is Distinguishable from *Twombly*. ................................ 29

  II.  DEFENDANTS' ARGUMENTS THAT THE ALLEGED CONSPIRACY IS
      INHERENTLY IMPLAUSIBLE ARE WITHOUT MERIT ............... 31

  III.  THE ALLEGATIONS AGAINST EACH DEFENDANT CANNOT BE
       VIEWED IN ISOLATION. ............................................................. 36

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

IV.  PLAINTIFFS HAVE ADEQUATELY PLED FRAUDULENT
CONCEALMENT OF THE CONSPIRACY BY DEFENDANTS. ....................41

A.  Plaintiffs Have Adequately Pled Defendants' Concealment of Their
Conspiracy. ...................................................................................... 44

B.  Plaintiffs Have Also Adequately Pled Due Diligence. ................................... 49

CONCLUSION............................................................................................. 51

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

## TABLE OF AUTHORITIES

*Cases*

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*,
    525 F.3d 8 (D.C. Cir. 2008) ...................................................................... 32

*American Tobacco Co. v. United States*, 147 F.2d 93 (6th Cir. 1945) ............................ 38

*American Tobacco Co. v. United States*, 328 U.S. 781 (1946)........................................ 24

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................ 15, 17

*Behrend v. Comcast Corp.*, 532 F. Supp. 2d 735
    (E.D. Pa. 2007).................................................................................... 20, 31

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...... 15, 16, 17, 18, 19, 20, 29, 30, 31

*Beltz Travel Services v. Internationall Air Travel Association*,
    620 F. 2d 1360 (9th Cir. 1980)................................................................... 38

*Berkson v. Del Monte Corp.*, 743 F.2d 53 (1st Cir. 1984)................................................ 47

*Bethlehem Steel Corp. v. Fischbach & Moore, Inc.*, 641 F. Supp.
    271 (E.D. Pa. 1986)................................................................................. 49

*Boyle v. United States,* 129 S.Ct. 2237 (2009).............................................................. 38

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999)................................ 23, 32

*Chapple v. National Starch & Chemical Co.*, 178 F.3d 501
    (7th Cir. 1999) ....................................................................................... 44

*City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1 (D.D.C. 2008) ................. 15, 29

*Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499 (9th Cir. 1988) ................................... 43, 47

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ...................................................................... 17, 19, 36

*Erickson v. Pardus*, 551 U.S. 89 (2007) .................................................................. 15, 17

*Fair Isaac Corp. v. Equifax Inc.*, No. 06 Civ 4112, 2008 WL 623120
    (D. Minn. March 4, 2008) ..................................................................... 16, 29

*Flash Memory Antitrust Litigation*, No. 07 Civ. 00086, 2009 WL 1096602
    (N.D. Cal. March 31, 2009) ................................................................... 16, 37

*Flying J Inc. v. TA Operating Corp.*, No. 06 Civ. 00030, 2007 WL 3254765
    (D. Utah Nov. 2, 2007)............................................................................ 16

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

*Greenhaw v. Lubbock County Beverage Association*, 721 F.2d 1019

(5th Cir. 1983) ................................................................................................ 46

*Hamilton County Bd. of Commissioners v. National Football League*,

491 F.3d 310 (6th Cir. 2007) ........................................................................ 44

*Hendrickson Bros*. ............................................................................................ 44

*Hill v. Texaco, Inc*., 825 F.2d 333 (11th Cir. 1987) ........................................ 43, 45, 48, 49

*Holaway v. Broward Sheriff's Office Department of Detention*,

No. 09 Civ. 62049, 2010 WL 686517 (S.D. Fla. Feb. 18, 2010) .................. 15

*Hyland v. Homeservices of Am., Inc*., No. 05 Civ. 612, 2007 WL 2407233

(W.D. Ky. Aug. 17, 2007) ............................................................................ 16, 30

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc*., 253 F. Supp. 2d 262

(D. Conn. 2003) ............................................................................................. 37

*In re Aspartame Antitrust Litigation*, No. 2:06-CV-1732,

2007 WL 5215231 (E.D. Pa. Jan. 18, 2007) ............................................... 43, 49

*In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979) .................. 41, 42

*In re Catfish Antitrust Litigation*, 826 F. Supp. 1019 (N.D. Miss. 1993) ....... 45, 46, 50, 51

*In re Commercial Explosives Litigation*, 945 F. Supp. 1489

(D. Utah 1996) ............................................................................................... 46, 47

*In re Compact Disc Minimum Advertised Price Antitrust Litigation*,

138 F. Supp. 2d 25 (D. Me. 2001) ............................................................... 49

*In re Copper Antitrust Litigation*, 436 F.3d 782 (7th Cir. 2006) ...................... 44

*In re Elevator Antitrust Litigation,* No. 04 Civ. 1178, 2006 WL 1470994

(S.D.N.Y. May 30, 2006) ............................................................................. 21, 37

*In re Fine Paper Antitrust Litigation*, 685 F.2d 810 (3d Cir. 1982) ................. 36

*In re Gabapentin Patent Litigation*, 649 F. Supp. 2d 340 (D.N.J. 2009) ......... 20

*In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011

(N.D. Cal. 2007) ............................................................................................ 22

*In re Hawaiian & Guamanian Cabotage Antitrust Litigation*, 647 F.

Supp. 2d 1250 (W.D. Wash. 2009) .............................................................. 22

iv

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

*In re Hypodermic Products Antitrust Litigation*, No. 05 Civ. 1602,

    2007 WL 1959225 (D.N.J. June 29, 2007) ................... 16

*In re Infant Formula Antitrust Litigation*, No. MDL 878, 1992 WL

    503465 (N.D. Fla. Jan. 13, 1992) ................... 48, 49

*In re Intel Corp. Microprocessor Antitrust Litigation*, 496 F. Supp. 2d 404

    (D. Del. 2007) ................... 15

*In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*,

    No. 00 Civ. 7804 (LMM), 2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) ................... 50

*In re Kentucky Household Goods Carriers Association, Inc.*,

    139 F.T.C. 404 (F.T.C. 2005) ................... 33

*In re Late Fee & Over-Limit Fee Litigation*, 528 F. Supp. 2d 953

    (N.D. Cal. 2007) ................... 21

*In re LTL Shipping Services*, No. 08 Md 01895, 2009 WL 323219

    (N.D. Ga. Jan 28, 2009) ................... 21

*In re Mercedes-Benz Anti-Trust Litigation*, 157 F. Supp. 2d 355

    (D.N.J. 2001) ................... 41, 43, 46, 49, 50, 51

*In re Milk Products Antitrust Litigation*, 84 F. Supp. 2d 1016

    (D. Minn. 1997) ................... 47

*In re NASDAQ Market Makers Antitrust Litigation*, 894 F. Supp. 703

    (S.D.N.Y. 1995) ................... 37

*In re Neurontin Antitrust Litigation*, 02 Civ. 1390, 2009 WL 2751029,

    (D.N.J. August 20, 2009) ................... 20

*In re Nine West Shoes Antitrust Litigation*, 80 F. Supp. 2d 181

    (S.D.N.Y. 2000) ................... 41, 43, 50

*In re OSB Antitrust Litigation*, No. 06 Civ. 826, 2007 WL 2253419

    (E.D. Pa. Aug. 6, 2007) ................... 16, 37

*In re Pressure Sensitive Labelstock Antitrust Litigation,* 566 F. Supp. 2d 363

    (M.D. Pa. 2008) ................... 15, 20

*In re Pressure Sensitive Labelstock Antitrust Litigation*, MDL No. 1556,

    2006 WL 433891 (M.D. Pa. Jan 3, 2006) ................... 42

*In re Rail Freight Fuel Surcharge Antitrust Litigation*, 587 F.

    Supp. 2d 27 (D.D.C. 2008) ................................................................... 20, 37

*In re Rubber Chemical Antitrust Litigation*, 504 F. Supp. 2d 777

    (N.D. Cal. 2007) ................................................................... 41, 46, 47, 49

*In re Southeastern Milk Antitrust Litigation*, 555 F. Supp. 2d 934,

    (E.D. Tenn. 2008) ................................................................... 20, 31

*In re Static Random Access Memory (SRAM) Antitrust Litigation*,

    580 F. Supp. 2d 896 (N.D. Cal. 2008) ............................................. 15, 37

*In re Sumitomo Copper Litigation*, 120 F. Supp. 2d 328 (S.D.N.Y. 2000) ...................... 42

*In re Text Messaging Antitrust Litigation*, 08 Civ. 7082, 2009

    WL 5066652 (N.D.Ill. Dec. 10, 2009) ........................................... 21

*In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp.

    2d 1109 (N.D. Cal. 2008) ............................................... 47, 49, 51

*In re Travel Agent Commission Antitrust Litigation*, 03 Civ. 30000,

    2007 WL 3171675 (N.D. Ohio, Oct. 29, 2007) ............................... 22, 37

*In re Urethane Antitrust Litigation*, -- F. Supp. 2d --, 2010 WL 398094

    (D. Kan. Jan. 25, 2010) ............................................... 47

*In re Urethane Antitrust Litigation*, 235 F.R.D. 507 (D. Kan. 2006) ............................... 47

*In re Vitamins Antitrust Litigation*, No. Misc. 99-197 (TFH),

    2000 WL 1475705 (D.D.C. May 9, 2000) ........................... 37, 41, 46, 50, 51

*Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939) ........................... 35

*Jung v. Association of American Medical Colleges*, 300 F. Supp.

    2d 119 (D.D.C. 2004) ............................................... 37

*Kendall v. Visa USA*, 518 F.3d 1042 (9th Cir. 2008) ........................... 22

*L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414

    (11th Cir. 1984) ............................................... 34

LaFlamme v. Societe Air France, -- F.Supp.2d --, 2010 WL 1292262 (E.D.N.Y. Apr. 5,

    2010) ............................................... 30

*Legacy Crossing, LLC v. Travis Wolff & Co.*, 229 Fed. App'x 672,

    2007 WL 1041425 (10th Cir. 2007) ............................................... 44

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

*Masters v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911,

    2003 WL 145556 (S.D.N.Y. Jan.17, 2003) .................................................. 35

*Michigan Division-Monument Builders v. Michigan Cemetery Ass'n*,

    458 F. Supp. 2d 474 (E.D. Mich. 2006) ........................................................ 37

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823

    (11th Cir. 1999) .......................................................... 41, 42, 43, 44, 48, 50

*New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065

    (2d Cir. 1988) ................................................................................................ 43

*Pension Committee of the University of Montreal Pension Plan v.*

    *Banc of America Securities, LLC*, 568 F.3d 374 (2d Cir. 2009) ................... 32

*Pinney Dock & Transport Co. v. Penn Central Corp.*, 838 F.2d 1445

    (6th Cir. 1988) ........................................................................................ 43, 44

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211

    (4th Cir. 1987) ............................................................................................... 47

*Rx.com v. Medco Health Solutions, Inc.*, 332 Fed. App'x 394, 2009 WL

    1067954 (5th Cir. 2009) ............................................................................... 47

*Shames v. Hertz Corp.*, No. 07 Civ. 2174, 2008 WL 4103985

    (S.D. Cal. July 24, 2008) .............................................................................. 20

*Solomon v. Blue Cross & Blue Shield Association*, 574 F. Supp. 2d 1288

    (S.D. Fla. 2008) ............................................................................................ 37

*Standard Iron Works v. Arcelormittal*, 639 F. Supp. 2d 877

    (N.D. Ill. 2009) ............................................................................................. 20

*Starr v. Sony BMG Music Entertainment*, 592 F.3d 314

    (2d Cir. 2010) .................................................................................. 19, 30, 31

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,

    71 F.3d 119 (4th Cir. 1995) ................................................................... 42, 44

*Texas v. Allan Construction Co.*, 851 F.2d 1526 (5th Cir. 1988) .................. 43, 44, 45, 47

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross &*

    *Blue Shield*, 552 F.3d 430 (6th Cir. 2008) .................................................. 22

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

*Trans World Techs., Inc. v. Raytheon Co.*, No. 06 Civ. 5012,
2007 WL 3243941 (D.N.J. Nov. 1, 2007) ....................................................................... 16

*Transamerica Corp. v. Moniker Online Services, LLC*, 672 F.
Supp. 2d 1353 (S.D. Fla. 2009) .......................................................................... 17, 19, 32

*United National Records, Inc. v. MCA, Inc.*, 609 F. Supp. 33
(N.D. Ill. 1984) ................................................................................................................ 47

*United States v. Cabbell*, 35 F.3d 1255 (8th Cir.1994) ..................................................... 38

*United States v. Consolidated Packaging Corp.*, 575 F.2d 117
(7th Cir.1978) .................................................................................................................. 35

*United States v. Hayter Oil Co., Inc.*, 51 F.3d 1265 (6th Cir. 1995) ............................... 35

*United States v. Jenkins*, 419 F.3d 614 (7th Cir. 2005) ..................................................... 38

*United States v. Rea*, 958 F.2d 1206 (2d Cir.1992) .......................................................... 35

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)................................. 33, 35

*United States v. Swift*, 188 F. 92 (D.C.Ill. 1911) .............................................................. 38

*Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287
(11th Cir. 2003) ....................................................................................... 17, 19, 21, 36

**Statutes**

15 U.S.C. § 1 (2006) ......................................................................................................... 17

**Other Authorities**

Federal Trade Commission, *Gasoline Price Changes, The Dynamics
of Supply, Demand, and Competition* (2005) ................................................................. 24

**Rules**

Fed. R. Civ. P. 8(a)(2) ...................................................................................................... 16

**Treatises**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2008) ....................... 4, 33

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

## <u>PRELIMINARY STATEMENT</u>

Plaintiffs' Consolidated Amended Complaint ("CAC") alleges that Defendants conspired to unlawfully restrain competition in Florida's cement and concrete markets by fixing artificially high prices for both products and allocating customers and territories among themselves. The CAC is no boilerplate complaint: it sets forth page after page of allegations detailing the conspiracy, its objects and purposes, its participants, the manner and means used to carry it out, and Defendants' overt acts in furtherance thereof. The CAC alleges specific, agreed-upon price increases for cement and concrete, agreed-upon surcharges, allocations of customers and territories, particular conversations and actions through which such illicit agreements were implemented and enforced, and concerted efforts to place Independent Concrete Producers ("ICPs") at a competitive disadvantage. As alleged in the CAC, Defendants' conspiracy victimized direct purchasers and ICPs across the state of Florida over the course of the past decade.

Against this backdrop, Defendants move to dismiss the CAC, arguing that it fails to meet the applicable pleading standards. Defendants' arguments are without merit.

First, Defendants' attempt to label the CAC as a set of conclusory allegations (MTD[1] at 1) falls flat. The CAC is not a complaint based solely on publicly available information showing Defendants' parallel behavior within the marketplace. Defendants race to characterize the CAC as a complaint consisting of "mere allegations of parallel conduct," without addressing that which eviscerates this argument from the outset: the CAC is replete with specific allegations of actual agreement among Defendants. (*See, e.g.,* CAC ¶¶ 73(b), 83, 84, 87, 89, 93-94.) The CAC

---

[1] Defendants' Motion to Dismiss the Consolidated Amended Complaints, with Incorporated Memorandum of Law.

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

alleges specific statements and actions by individual conspirators in furtherance of the conspiracy, including statements explicitly acknowledging agreements not to compete and directions to employees that if they "did not adhere to this agreement [they] would be fired." (CAC ¶ 85.)  Such allegations are the antithesis of "conclusory."  If proven at trial, such statements would constitute direct, rather than circumstantial, evidence of the conspiracy.

Second, Defendants' critique of the CAC is completely undermined by its focus upon select allegations in isolation.  Under well-established law, allegations in a complaint must be read as a whole when considering a motion to dismiss.  For the same reason, the individual Defendants' attempts to evaluate Defendant-specific allegations in isolation are without merit.

Third, Defendants fail to distinguish between the standards for pleading a claim and the standards for proof at trial.  Defendants argue that certain allegations within the CAC are equally suggestive of lawful rather than unlawful behavior or could possibly be consistent with the rational business interests of each Defendant.  However, these arguments raise what are at most factual disputes.  Such factual disputes are proper fodder for a trial, rather than grounds for a motion to dismiss.  Further, the law is clear that well-plead allegations must be taken as true for purposes of assessing the plausibility of a complaint.

 Fourth, Defendants fail to acknowledge controlling law which runs contrary to the positions they urge this Court to accept.  In other instances, Defendants argue for pleading standards which are simply spun from whole cloth.  For example, Defendants ask this Court to find infirmity in the CAC based on its supposed failure to show "alignment of interest" among the Defendants.  (MTD at 39.)  Simply put, there is no such requirement that a complaint alleging an unlawful conspiracy plead alignment of interest.  It is sufficient that a complaint allege a conspiracy under the applicable pleading standards, as the CAC does.

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

Ultimately, Defendants' disjointed arguments do not and cannot overcome the gravamen of all of the allegations in the CAC when considered, as they must be, in totem.  Fairly read, the CAC sets forth a plausible conspiracy and exceeds the applicable pleading requirements.

## STATEMENT OF FACTS

### A.    The Products:  Cement and Concrete

Portland cement ("cement") is the primary binding ingredient in ready-mix concrete and concrete blocks.  (CAC ¶ 38, 53.)  Its production is capital intensive, requiring significant infrastructure investment.  (CAC ¶ 121.)  As a result, starting a new plant can cost hundreds of millions of dollars.  (*Id.*)  Concrete producers consume approximately 75% of the cement used in Florida.  (CAC ¶ 44.)  The remainder is sold to concrete product manufacturers and contractors. (*Id.*)

Concrete producers mix cement with aggregate and water at batch plants to make ready-mix concrete, which is delivered to job sites while being mixed.  (CAC ¶¶ 46-47.)  Establishing a new concrete batch plant is expensive, but much less so than a new cement plant.  (CAC ¶ 99.) Ready-mix concrete is primarily purchased by construction companies, and is used in commercial, government and residential construction.  (CAC ¶ 50.)  Concrete blocks – bricks of concrete – are a common residential building material in Florida.  (CAC ¶ 53.)

### B.    The Defendants

Defendants are cement and concrete producers who, collectively, control virtually all cement sales in Florida and own approximately 90% of all concrete producers in the state.  (CAC

¶¶ 45, 118-119.)  Almost all are vertically integrated[2] or part of a vertically-integrated corporate family selling both cement and concrete.  (CAC ¶¶ 20-30.)  Defendants are:

- Cemex Inc. ("Cemex"), a cement and concrete producer (CAC ¶ 20);

- Cemex Materials, LLC and Cemex Construction Materials Florida, LLC (together, "Rinker"), cement and concrete producers who operated as Rinker before they were acquired by Cemex in 2007 (CAC ¶ 28);

- Eastern Portland Cement Corp.[3] ("Eastern"), a cement producer (CAC ¶ 21);

- Florida Rock Industries, Inc. ("Florida Rock"), a cement and concrete producer (CAC ¶ 22);

- Holcim (US) Inc. ("Holcim"), a cement and concrete producer (CAC ¶ 23);

- Lafarge North America, Inc. ("Lafarge"), a cement and concrete producer (CAC ¶ 24);

- Lehigh Cement Company ("Lehigh"), a cement and concrete producer, which also operates through its subsidiary, Continental Florida Materials Inc. ("Continental") (CAC ¶ 25);

- Oldcastle Materials ("Oldcastle"), a cement and concrete producer (CAC ¶ 26);

- Prestige AB Management Co. LLC[4] ("Prestige"), an ICP acquired by Votorantim Cimentos North America, Inc. ("VCNA") in 2007 (CAC ¶ 27);

---

[2]  "Vertical integration occurs when a firm provides for itself some input that it might otherwise purchase on the market."  IIIB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 755, at 3 (3d ed. 2008).

[3]  Eastern Cement Corp., an affiliated cement producer, is also a Defendant.  However, proceedings against Eastern Cement Corp. were stayed due to its petition for bankruptcy.

- Suwannee American Cement LLC ("Suwannee"), a cement producer partially owned by VCNA (CAC ¶ 29); and

- Tarmac America LLC ("Tarmac"), a cement and concrete producer (CAC ¶ 30).

### C.        The Plaintiffs and the Proposed Classes

Six Plaintiffs purchased cement directly from one or more Defendants:  Action Ready Mix Concrete Inc.; Advantage Concrete of Florida, Inc.; Florida Block & Ready Mix; Hard Rock Materials; Kroeger Enterprises, Inc.; and Liberty Concrete and Masonry, Inc.  (CAC ¶¶ 10-11, 16-19.)  Five Plaintiffs purchased concrete directly from one or more Defendants:  Bay Area Remodelers, Inc.; Carpenter Contractors of America, Inc.; Daniel Morgan Construction, Inc.; Family Pools, Inc.; and Kroeger Enterprises, Inc.  (CAC ¶¶ 12-15, 18.)  Plaintiffs sue individually and on behalf of two proposed classes, consisting of all purchasers of cement or concrete who purchased directly from Defendants or their co-conspirators in Florida from January 1, 2000 to the present (the "Class Period").  (CAC ¶¶ 161-163.)

Defendants' conspiracy restrained competition and artificially inflated the prices of cement and concrete in Florida.  As a result, Plaintiffs and members of the proposed classes sustained injury to their businesses or property, including payments of supra-competitive prices to Defendants for cement and concrete throughout the Class Period.  (CAC ¶¶ 158-160.)

---

[4]  The CAC's specific allegations concerning Prestige all relate to the company's post-acquisition activities.  (*See* CAC ¶¶ 73(b)-(f), 85, 87, 90, 107-13, 142.)  Prestige has been a participant in the conspiracy at least since its acquisition by VCNA.  Whether it also was a co-conspirator before its acquisition is not resolvable on this motion to dismiss.  However, no one contends, as Defendants assert, that Prestige "must have been engaging in a conspiracy to *harm itself.*"  (MTD at 40.)

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

### D.     The Conspiracy

As alleged in the CAC, Defendants have engaged in a lengthy conspiracy to restrain competition in the sale of cement and concrete in Florida.  Defendants – most of whom produce both cement and concrete – agreed to fix prices for both products.  (CAC ¶¶ 56.)  They accomplished this price-fixing principally through coordinated price increases and agreements to allocate customers and territory, as described below.  (CAC ¶¶ 55-56, 62-94.)

Through this scheme, Defendants unlawfully profited in three ways:

- By selling cement at collusively-set, supra-competitive prices;

- By selling concrete at collusively-set, supra-competitive prices; and

- By driving independent concrete producers – who were forced to buy cement at artificially high prices while competing with Defendants – out of business, eliminating competition in the Florida concrete market.

(CAC ¶¶ 58, 65-68.)

Defendants' anticompetitive efforts were aided by several factors described in detail in the CAC, including:  (1) Defendants' domination of the Florida cement and concrete markets (CAC ¶¶ 45, 117-119); (2) close personal relationships between senior Defendant executives (CAC ¶¶ 61, 140); (3) contacts through industry trade associations (CAC ¶¶ 137-38, 141); (4) significant barriers to entry into the cement and concrete markets (CAC ¶¶ 120-123); and (5) other market conditions favoring the formation and maintenance of a cartel (CAC ¶¶ 124-130, 143-144.)

As a result of Defendants' conspiracy, prices of cement and concrete in Florida have risen or remained stable since 2000 – even after the end of the housing boom in 2005, the decline

in commercial construction, the crash of the economy and the attendant drop in demand for both products.  (CAC ¶¶ 114-115, 131-135.)

As explained below, Defendants accomplished their price-fixing conspiracy through the following manners and means:  (1) coordinated price increases for cement and concrete; (2) the allocation of customers among conspirators; (3) the allocation of territory among conspirators; (4) swaps of cement settled up at below-"market" prices; (5) and other competitive acts.

### 1.     Coordinated Price Increases for Cement and Concrete

Defendants coordinated price increases for both cement and concrete.  For example, in the summer of 2008, while the housing market collapsed and the country plunged into a recession, thus driving down demand for concrete, Defendants announced a nearly-identical and unprecedented 30% hike in the price of concrete.  (CAC ¶ 73.)  Several Defendants also announced the end of their eight-year "fuel surcharge" for concrete sales.  (*Id.*)

Specifically, on August 4, 2008, Cemex announced it would increase its concrete price by $25/cubic yard.  (CAC ¶ 73(a).)  Shortly thereafter, "Prestige President Jorge Wagner announced that Prestige would also be increasing its ready-mix concrete price by $25/cubic yard, and that the other Defendants had agreed to go along with the increase," even though Prestige, before Wagner's meeting, had been drafting price increase letters announcing a more modest increase of $5/cubic yard.  (CAC ¶ 73(b).)  Within weeks, Florida Rock, Oldcastle, Prestige and Florida Rock followed Cemex's lead and publicly announced virtually identical price increases.  (CAC ¶ 73(c)-(f).)  Each of the companies, with the sole exception of Oldcastle, also announced the end of their fuel surcharge.  (*Id.*)

Notwithstanding their public announcements of virtually identical price increases for concrete, Defendants were ultimately unable to sustain their announced price increases at the full

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

amount due to a sharp drop in demand for concrete.  (CAC ¶ 74.)  The mere fact that no Defendant even attempted to undercut this audacious plan strongly suggests a conspiracy.  In addition, Defendants' inability to fully implement this particular increase is immaterial, as a conspiracy to fix prices is a *per se* violation of the Sherman Act.

This summer 2008 concrete price hike detailed above is only one example of Defendants' coordinated price increases.  Throughout the Class Period, Defendants repeatedly agreed on and coordinated price increases for both cement and concrete, raising prices approximately twice per year.  (CAC ¶ 72.)  In addition to the summer 2008 concrete price increase, the CAC details similar coordinated cement price increases that became effective in 2007 and 2009.  (CAC ¶¶ 75-77.)

Defendants also agreed on and implemented uniform "fuel surcharges" for shipments of cement and concrete and "environmental surcharges" for shipments of concrete – supposedly to pay for increasing fuel and environmental cleanup costs.  (CAC ¶¶ 78-79.)  However, these "surcharges" did not reflect Defendants' true costs, and were in fact a pretense to disguise additional agreed-upon cement and concrete price increases.  (*Id.*)

### 2.     Allocation of Customers

Defendants also allocated cement and concrete customers among themselves.  (CAC ¶¶ 82-89.)  These allocations eliminated competition among Defendants, allowing them to inflate prices, and helped Defendants enforce each other's adherence to the conspiracy.  (CAC ¶¶ 82, 88.)

The CAC details several instances in which these customer allocations stifled price competition.  (CAC ¶¶ 83-84, 89.)  For example, Plaintiff Carpenter Contractors of America, Inc. ("CCA") was a Rinker customer from at least 1990 until this past year.  (CAC ¶ 84.)  CCA's

purchasing director repeatedly contacted Florida Rock and Tarmac – Rinker's competitors in the region who could provide the volume of concrete CCA required – and sought better prices for concrete.  (*Id.*)  Upon learning CCA was supplied by Rinker, Florida Rock offered a non-competitive price and Tarmac would not even offer a price.  (*Id.*)

Similarly, when an employee of Superior Concrete called Florida Rock to place a cement order, the sales representative replied that Florida Rock had product available to sell, but asked the Superior employee the identity of its current supplier.  (CAC ¶ 89(d).)  After Superior Concrete named Rinker, the Florida Rock sales representative asked the employee to speak to a Florida Rock regional sales manager.  (*Id.*)  The regional sales manager then told the Superior Concrete employee that Florida Rock either did not have product to sell or that Florida Rock's price was higher than originally quoted, forcing Superior to continue purchasing from Rinker.  (*Id.*)  Other ICPs trying to change suppliers or seek competitive bids had similar experiences.  (CAC ¶ 89(a)-(c).)

In at least one situation, a Defendant actively pursued a customer until it learned the customer had been allocated to another member of the cartel.  In early 2009, Cemex sales representatives approached a construction site in Oxford, Florida they believed was supplied by an ICP, intending to underbid the ICP and acquire new business for Cemex.  (CAC ¶ 83.)  When they learned the job was being handled by co-conspirator Florida Rock, rather than an ICP, the sales representatives were instructed by Cemex not to compete for the project.  (*Id.*)

These refusals to compete were the result of unlawful agreements between the Defendants.  For example, "in a fall 2008 meeting in the company's Orlando offices, Prestige President Jorge Wagner told Prestige sales personnel and senior management that pursuant to an arrangement with Cemex, the two companies *were not to compete* for each other's existing

customers.  Employees who did not adhere *to this agreement* would be fired, Wagner said."
(CAC ¶ 85; emphasis added.)

Defendants also used customer allocations to police each other's adherence to the
conspiracy.  (CAC ¶¶ 82, 87.)  For example, in March 2009, Prestige sales representatives
discovered that Cemex had offered Lennar Homes, a major national homebuilder and Prestige
customer, a better price than the one quoted by Prestige.  (CAC ¶ 87.)  To enforce the allocation
system, Wagner ordered Prestige representatives to retaliate and "steal" a Cemex customer.  (*Id.*)
They did so, contacting GC Contracting, a Cemex customer, and offering it favorable pricing.
(*Id.*)  Shortly before a deal with GC Contracting was finalized, Wagner ordered the Prestige
representatives to withdraw their offer and instead quote a non-competitively high price.  (*Id.*)
Soon after, Cemex reneged on its agreement with Lennar Homes.  (*Id.*)  Thus, the status quo was
maintained – Lennar Homes purchased from Prestige, GC Contracting purchased from Cemex,
and Prestige drove home to Cemex that cooperation, not competition, was in their collective
interest.  (*See id.*)

### 3.    Allocation of Territories

Defendants agreed to carve up the state of Florida and allocate territories among
themselves, ensuring they could each raise prices in "their" territories without fear of price
competition.  (CAC ¶¶ 64, 90-94.)  This allowed individual Defendants to dominate regions of
the state through allocation and the use of cement swaps (described below), rather than by
forward-integrating and competing for concrete customers near their cement plants.  (CAC ¶ 91.)

For example, Cemex controls the Florida Keys – and due to the lack of competition, is
able to levy concrete prices up to 70% higher than the already-inflated prices charged in the rest
of the state.  (CAC ¶ 92.)  Advantage Concrete attempted to enter the Keys to conduct business

10

in the spring of 2008, seeking out a cement supplier in nearby Miami and a trucking company able to deliver to the Keys.  (CAC ¶¶ 93-94.)  However, when it approached Titan, Lehigh (Continental) and Cemex, the three Defendants selling cement in the area, all three quoted a price $20/ton above the going rate upon learning the cement was ultimately bound for the Keys.  (CAC ¶ 93.)  Similarly, when Advantage Concrete approached trucking companies, they declined to haul the loads or quoted prices significantly higher than the distance to the Keys merited.  (CAC ¶ 94.)  "One independent trucker told Advantage Concrete that if it hauled Cement for Advantage Concrete to the Keys, it would not be given any more work by the Defendants."  (*Id.*)

Defendants also allocated ICPs' customers among themselves as part of a coordinated campaign against ICPs.  For example, in September 2009, Cemex, Florida Rock, Tarmac and VCNA (through Defendant Prestige) agreed to reduce their concrete prices by $4-5/cubic yard for ICP customers – but not for each other's customers.  (CAC ¶ 90.)  They agreed each Defendant would only target ICP customers in a specific region:

- Cemex targeted ICP customers on the South Coast and in the Central region;

- Florida Rock targeted ICP customers in the Jacksonville area;

- Tarmac targeted ICP customers on the Gulf Coast; and

- VCNA targeted ICP customers in the Orlando area.

(*Id.*)  This allowed each Defendant to expand its market share and eliminate ICP competition without competing against other members of the conspiracy.  By attempting to collectively drive out ICP competitors, while refraining from competition with each other, Defendants sought to reinforce their ability to charge concrete customers collusively-set, supra-competitive prices.

11

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

### 4. Cement Swaps Settled at Below-"Market" Prices

Defendants also used cements swaps to cooperate and further their conspiracy. A swap took place when a customer purchased from a vertically-integrated Defendant concrete producer that was closer to a co-conspirator's cement plant than the Defendant's own cement plant. The Defendant obtained the cement it needed from its co-conspirator, purportedly in exchange for an equivalent swap elsewhere. (CAC ¶¶ 95-97.) Because the Defendants typically did not swap precisely equal amounts of cement with each other, at the end of each year they settled up the difference with cash payments. (CAC ¶ 97.)

Crucially, when Defendants settled up, they charged each other cement prices far below the "market" rates they charged ICPs – often about one-half the price they charged non-conspirators. (CAC ¶¶ 97-98, 101.) That a Defendant would charge a supposed competitor this significantly discounted price, against its economic self-interest, demonstrates that the "market" prices charged to Plaintiffs and other ICPs were artificially inflated. (CAC ¶ 98.) These swaps also furthered Defendants' conspiracy by facilitating their territorial allocations and eliminating their individual incentives to expand into new areas. (CAC ¶ 99.)

### 5. Other Anticompetitive Acts

Defendants engaged in various other anticompetitive activities in furtherance of their conspiracy. For example, Tarmac, Cemex and Florida Rock created an artificial cement shortage in 2004 by coordinating their cement plant cleaning cycles, reducing statewide cement production by approximately 33% for much of the second half of 2004. (CAC ¶ 103.) During the "shortage," which was extended by the Tarmac plant's unusually long downtime, Defendants implemented three cement price hikes as well as increases in the price of concrete. (*Id.*)

12

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

Defendants also used their control of the concrete block market to bolster their dominance of the concrete market. After reducing production and creating a shortage of concrete blocks in or about 2005, Cemex, Florida Rock, Oldcastle and Rinker required customers to purchase their ready-mix concrete from Defendants in order to obtain concrete blocks. (CAC ¶ 105.) Thus, customers who needed concrete blocks were forced to purchase ready-mix concrete from Defendants, rather than from ICPs. (*See id.*) Additionally, "[i]f an ICP attempted to set up its own concrete block plant, at a cost of millions of dollars, Defendants were able to offer concrete block at significant discounts because the ICP needed to purchase Cement at the artificially high price set by Defendants." (*Id.*) Thus, Defendants kept ICPs from competing in the market for concrete blocks. (*Id.*)

### E.     The Lane Allegations and Prestige's Cover-Up

In February 2009, Michael Lane, Prestige's General Manager, reported Prestige's anticompetitive conduct to the U.S. Department of Justice ("DOJ") and Prestige's general counsel. (CAC ¶ 108.) Specifically, he expressed concerns that, "[i]n a concerted effort along with CEMEX," Wagner had ordered him and other Prestige employees "not to seek Cemex customers." (MTD Ex. A.)[5] Prestige allegedly began an internal investigation. (CAC ¶ 109.)

Around May 2009, Lane was placed on administrative leave, purportedly for a failure to obtain approval for prices he charged on certain products. (CAC ¶ 111.) He was forbidden to

---

[5] Plaintiffs join Defendants in asking the Court to take notice of the Lane letter. Its terms, the fact of its issuance, and the events it caused within Prestige are all devastating to Defendants' arguments. Lane's letter, taken at face value, can only be read as an attempt by a percipient fact witness to bring to the attention of federal law enforcement his firm belief that executives within his company, in concert with others, were violating the antitrust laws. Defendants' hairsplitting attacks on Lane and his letter miss this fundamental point.

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

speak with any staff, customers, or suppliers of Prestige.  (*Id.*)  Shortly thereafter, Lane resigned.
(*Id.*)

Lane asked Prestige to return his personal computer, on which he had stored evidence of Defendants' illegal price-fixing and anticompetitive conduct, including admissions of price-fixing by Prestige President Wagner.  (CAC ¶ 112.)  Prestige never returned Lane's computer, its contents, or any of the other materials Lane had collected documenting Defendants' conspiracy. (*Id.*)

Shortly after these events, Prestige's general counsel, who had been in charge of the company's alleged internal investigation, left Prestige.  (CAC ¶ 113.)[6]

### F.    Fraudulent Concealment

Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.  (CAC ¶¶ 171-177, 179.)  Among other acts, Defendants met and communicated secretly in furtherance of the conspiracy and repeatedly misrepresented to their customers the reasons for cement and concrete price increases, falsely attributing their price hikes to fuel and input costs.  (CAC ¶¶ 171, 173-177.)  Plaintiffs and Class members reasonably relied on Defendants' acts of affirmative concealment, believing that Defendants' price increases were the result of normal competitive market forces, rather than collusive activity.  (CAC ¶ 178.)  As a result, Plaintiffs were unable, despite their exercise of due diligence, to discover the alleged conspiracy until shortly before they filed their initial Complaints.  (CAC ¶¶ 178-185.)  Accordingly, the statute of limitations should be tolled.

---

[6]  Prestige's seizure of Lane's *personal* property – preventing Lane from providing evidence on his computer to law enforcement authorities – and the resignation of Prestige's general counsel shortly after Prestige's internal investigation began are most assuredly not "standard practice[s]" (MTD at 14) in internal investigations.

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

## ARGUMENT

In painstaking detail, the CAC describes a long-standing and unlawful conspiracy to restrain competition in the markets for cement and concrete in Florida.  The CAC sets forth a fulsome recitation of the objects, manner and means, and economic effects of the conspiracy.  It alleges with specificity (1) statements by identified conspirators in furtherance of the conspiracy; (2) coordinated price increases; (3) allocations of customers and territory; (4) cement swaps between conspirators settled at below-"market" prices; and (5) other anticompetitive acts.

These allegations exceed what is required here.  To withstand a motion to dismiss, all that is required is that the CAC "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To be plausible, a complaint must "plead[ ] factual content that allows the court to draw the reasonable *inference* that the defendant[s] [are] liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556) (emphasis added).  A complaint need not spell out each and every detail of the alleged conspiracy, as the "Court's inquiry at this stage focuses on whether the challenged pleadings 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Holaway v. Broward Sheriff's Office Dep't of Det.*, No. 09 Civ. 62049, 2010 WL 686517, at *2 (S.D. Fla. Feb. 18, 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam)).[7]

---

[7]  *Accord, In re Static Random Access Memory (SRAM) Antitrust Litig.* ("*SRAM*"), 580 F. Supp. 2d 896, 900 (N.D. Cal. 2008) (complaint need only present a short and plain statement of the claim; no detailed factual recitations are needed); *In re Pressure Sensitive Labelstock Antitrust Litig.,* 566 F. Supp. 2d 363, 370 (M.D. Pa. 2008) (Rule 8 pleading standards continue to apply after *Twombly*; no heightened pleading standard is applied to antitrust complaints); *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 408 n.2 (D. Del. 2007) (court read *Twombly* liberally in declining to dismiss most of the indirect purchaser antitrust claims at issue); *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 5 (D.D.C. 2008) ("[A] complaint need

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

Consequently, all that is required is "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Twombly*, 550 U.S. at 555 (quoting Fed. R. Civ. P. 8(a)(2)).

Recognizing the strength of Plaintiffs' allegations, Defendants advance three broad attacks on the CAC.  First, Defendants attempt to dismember the CAC and dispute the sufficiency of each allegation, standing on its own, to plead a plausible price-fixing conspiracy. (*See* MTD at 16-38.)  Second, Defendants compartmentalize the allegations against each individual Defendant, as if these allegations were pled against each in isolation.  (*See* MTD at 62-83.)  Finally, Defendants argue that the alleged conspiracy is factually implausible.  (*See* MTD at 38-43.)

---

not be dismissed where it does not exclude the possibility of independent business action.  Such a requirement at this stage in the litigation would be counter to Rule 8's requirement of a short, plain statement with enough heft to show that the pleader is entitled to relief.") (internal citation and quotations omitted); *In re Flash Memory Antitrust Litig.*, No. 07 Civ. 00086, 2009 WL 1096602, at *4 (N.D. Cal. March 31, 2009) (specific factual allegations are not necessary; the statement in a complaint need only give the defendants "fair notice" of what the claim is and the grounds upon which it rests); *Fair Isaac Corp. v. Equifax Inc.*, No. 06 Civ. 4112, 2008 WL 623120, at *5-6 (D. Minn. March 4, 2008) (*Twombly* does not require specific pleading of the evidentiary details of a conspiracy); *Flying J Inc. v. TA Operating Corp.*, No. 06 Civ. 00030, 2007 WL 3254765, at *1 (D. Utah Nov. 2, 2007), *interlocutory appeal denied*, 2007 WL 4165749, at *2 (D. Utah Nov. 20, 2007) (*Twombly* imposed no heightened pleading standard; a short and plain statement of a claim is still all that is needed); *Trans World Techs., Inc. v. Raytheon Co.*, No. 06 Civ. 5012, 2007 WL 3243941, at *4 (D.N.J. Nov. 1, 2007) ("[A]s long as the complaint alleges that the alleged co-conspirators had a plausible reason to participate in the conspiracy, the complaint is sufficient."); *Hyland v. Homeservices of Am., Inc.*, No. 05 Civ. 612, 2007 WL 2407233, at *3 (W.D. Ky. Aug. 17, 2007) (complaint sufficed where "[p]laintiffs had alleged more than parallel business conduct and a 'bare' assertion of a 'belief' of a conspiracy"); *In re OSB Antitrust Litig.* (*"OSB Antitrust"*), No. 06 Civ. 826, 2007 WL 2253419, at *3 (E.D. Pa. Aug. 6, 2007) (in denying a motion to dismiss a price-fixing conspiracy claim, "[p]laintiffs situate these allegations of parallel conduct in a context that suggests preceding agreement"); *In re Hypodermic Prods. Antitrust Litig.*, No. 05 Civ. 1602, 2007 WL 1959225, at *6, *8 (D.N.J. June 29, 2007) (liberal antitrust pleading standards apply after *Twombly*; allegations of anticompetitive exclusive dealing arrangements stated a claim under Section 1 of the Sherman Act).

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

These arguments are without merit.  Defendants' attempt to isolate the allegations in the CAC – both as to each specific allegation and as to each Defendant – run afoul of the long-standing principle that a reviewing court must avoid "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1304 (11th Cir. 2003) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).  Similarly, Defendants' selective reading of the CAC for purposes of evaluating plausibility ignores another clear rule – that the Court accept as true all well-plead factual allegations within the CAC.  *Erickson*, 551 U.S. at 93-94 (citing *Twombly*, 550 U.S. at 555-56)*; see also Iqbal*, 129 S. Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

This Court has recognized that to prevail on a motion to dismiss, Defendants must point to "specific counts in [the Consolidated] Amended Complaint that fail to allege specific facts, or which are merely formulaic recitations of the elements of a cause of action." *Transamerica Corp. v. Moniker Online Servs., LLC*, 672 F. Supp. 2d 1353, 1359 (S.D. Fla. 2009).  Defendants have manifestly failed to meet this standard.  Fairly read, the CAC puts forward a compelling picture of a pervasive and unlawful conspiracy that victimized a wide swath of Florida businesses and consumers, and exceeds the applicable pleading requirement for an antitrust complaint.

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

## I.   THE CAC SUFFICIENTLY PLEADS A SHERMAN ACT SECTION 1 CONSPIRACY.

Section 1 of the Sherman Act renders unlawful "[e]very contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1 (2006). Agreements among competitors to fix prices and to restrict the supply of goods available to customers – for example, through agreements not to compete – are *per se* antitrust violations, illegal in and of themselves.

In a Sherman Act Section 1 case, a reasonable inference of conspiracy can be created either by specific allegations of actual conspiracy or by specific circumstantial allegations that place parallel conduct in a factual context that plausibly suggests an agreement to restrain competition. Indeed, the Supreme Court in *Twombly* noted that "[a]n allegation of parallel conduct . . . gets the complaint *close to stating a claim*." *Twombly*, 550 U.S. at 557 (emphasis added). Allegations of parallel conduct need only be placed in the context of facts that "nudge[ ]" the conspiracy claim "across the line from conceivable to plausible." *Id.* at 570.

The CAC contains a plethora of allegations separate and apart from its allegations of parallel conduct. It alleges, for example, a direct statement by one of the conspirators that there was an agreement not to compete. (CAC ¶ 85.) The CAC alleges allocations of territory and customers. It presents a detailed analysis of market conditions showing that the market for cement is susceptible to anticompetitive conduct, and that the prevailing market conditions in Florida are highly suggestive of an agreement to restrict competition. The CAC also describes Defendants' other anticompetitive conduct – such as joint efforts to target ICP customers, cements swaps, and supply restrictions – which lend additional weight to Plaintiffs' claims.

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

## A.    The CAC Cannot Be Compartmentalized.

Rather than point to any "specific counts in [the Consolidated] Amended Complaint that fail to allege specific facts, or which are merely formulaic recitations of the elements of a cause of action," *Transamerica*, 672 F. Supp. 2d at 1359, Defendants pick apart the CAC's allegations and question whether each allegation, standing on its own and in isolation from any others, gives rise to a plausible inference of a price-fixing conspiracy.[8]  Defendants' approach runs contrary to the long-established principle that plaintiffs in a price-fixing case are entitled to "'the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'"  *Williamson Oil*, 346 F.3d at 1301 (quoting *Cont'l Ore*, 370 U.S. at 699); *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010) ("taken together," allegations "'raise[d] a suggestion of a preceding agreement.'" (quoting *Twombly*, 550 U.S. at 557)).

The Supreme Court's decision in *Twombly* "did not change this principle:  '[T]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and

---

[8]  *See, e.g.,* MTD at 16 ("[C]onsciously parallel pricing itself is not enough to support an inference of conspiracy."); *id.* at 20 ("Even if Plaintiffs did allege actual parallel conduct with respect to the surcharges, that alone would be insufficient to infer a conspiracy under *Twombly*."); *id.* at 23 (a "single allegation relating to a purported incident in the concrete industry" concerning an "arrangement" for customer allocation between Defendants "does not plausibly suggest an agreement"); *id.* at 25 ("[i]n and of themselves, swap agreements are not anticompetitive"); *id.* at 27 ("[R]ather than suggesting a conspiracy among Defendants to restrict supply, it is far more plausible" that the Defendants "each unilaterally proceeded with the scheduled shutdowns alleged."); *id.* 30 (allegations of market characteristics are "insufficient as a matter of law to give rise to a reasonable inference of a conspiracy"); *id.* at 32 ("[C]ourts repeatedly have held that 'opportunities to conspire' are an insufficient ground from which to infer an agreement.") (citation omitted); *id.* at 36 ("The Second Circuit squarely rejected the argument that plaintiffs could rely upon allegations of worldwide antitrust investigations to support an allegation of a conspiracy . . . ."); *id.* at 37 (Plaintiffs' allegations concerning a former Prestige employee's complaint to the Department of Justice and Prestige's subsequent internal investigation "not only fail to raise a plausible inference of conspiracy, but actually suggest the absence of an illegal agreement").

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

viewing its separate parts.'" *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 33 n.4 (D.D.C. 2008) (quoting *In re S.e. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008)).  The *Twombly* Court itself emphasized that "the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible." *Twombly*, 550 U.S. at 569, n.14.  The importance of considering a complaint as a whole, rather than its individual allegations in isolation, has been recognized by numerous courts post-*Twombly*. *See, e.g.*, *Pressure Sensitive Labelstock*, 566 F. Supp. 2d at 373 ("[A] district court must consider a complaint in its entirety without isolating each allegation for individualized review"); *Rail Freight Fuel Surcharge,* 587 F. Supp. 2d at 32-33 (court must consider the allegations of the complaint as a whole when evaluating plausibility under *Twombly*).[9]

---

[9] *See also Se. Milk*, 555 F. Supp. 2d at 943-44 ("Moreover, defendants attempt to parse and dismember the complaints, contrary to the Supreme Court's admonition that the character and effect of a Sherman Act conspiracy are not to be judged by dismembering it and viewing its separate parts.") (internal quotations omitted); *In re Neurontin Antitrust Litig.*, 02 Civ. 1390, 2009 WL 2751029, at *15 (D.N.J. August 20, 2009) ("When determining antitrust liability based on a collection of factual allegations, courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation.") (internal quotations omitted); *In re Gabapentin Patent Litig.*, 649 F. Supp. 2d 340, 358 (D.N.J. 2009) ("When determining antitrust liability based on a collection of factual allegations, such as those made by Purepac, courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation.") (internal quotations omitted); *Standard Iron Works v. Arcelormittal*, 639 F. Supp. 2d 877, 901 (N.D. Ill. 2009) ("Defendants' attempt to parse the complaint and argue that none of the allegations (i.e., quoted public statements, parallel capacity decisions, trade association and industry meetings) support a plausible inference of conspiracy is contrary to the Supreme Court's admonition that the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts.") (internal quotations omitted); *Shames v. Hertz Corp.*, No. 07 Civ. 2174, 2008 WL 4103985, at *6 (S.D. Cal. July 24, 2008) (denying a motion to dismiss as to certain claims even though the allegations as to those claims on their own "would not overcome the original Complaint's flaw of alleging mere parallel conduct."); *Behrend v. Comcast Corp.*, 532 F. Supp. 2d 735, 741 (E.D. Pa. 2007) ("A Complaint warrant[s] dismissal only where it fail[s] *in toto* to render plaintiffs' entitlement to relief plausible.") (internal quotations omitted).

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

The cases cited by Defendants likewise fail to countenance the evaluation of a complaint's allegations in isolation.  For example, while the court in *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007), stated that the market concentration in the credit card market "would not render the asserted conspiracy plausible," the court dismissed the complaint in question after considering its allegations *as a whole*.  *Id.* at 963-64.  The court granted the motion to dismiss because the complaint only made generalized allegations related to the nature of the market and parallel conduct, without any specific indication that the defendants did not act independently.  *Id.*[10]

The cases cited by Defendants, in fact, support the proposition that the CAC's allegations must be read as a whole.  Moreover, these cases are readily distinguishable from this case because in each instance the plaintiffs only pled generalized allegations of market structure and economics, parallel conduct and opportunities to conspire.  None made any claims akin the CAC's specific allegations of agreements to coordinate price hikes, agreements not to compete, refusals to deal because of agreements to allocate markets and customers, and retaliation against conspirators attempting to cheat on the cartel.[11]

---

[10] Similarly, in *In re Text Messaging Antitrust Litigation*, 08 Civ. 7082, 2009 WL 5066652 (N.D.Ill. Dec. 10, 2009), the court expressly recognized that it "must avoid compartmentalizing plaintiffs' allegations but rather consider the allegations as a whole and in combination."  *Id.* at *6 (internal quotations omitted).  The complaint dismissed in *Text Messaging* is clearly distinguishable from the CAC, which alleges a specific whistleblower statement and refusals to deal because of an agreement to allocate markets and customers.

[11] *See e.g. In re Elevator Antitrust Litig.,* No. 04 Civ. 1178, 2006 WL 1470994, at *10 (S.D.N.Y. May 30, 2006) ("There are no facts alleged to suggest that defendants did not compete against one another in regard to the sale of elevators and the pricing of such sales"); *Williamson Oil*, 346 F.3d at 1317-18 (allegations merely concerned market characteristics, such as market concentration, inelastic demand, high entry barriers and a fungible product); *In re LTL Shipping Servs.*, No. 08 MD 01895, 2009 WL 323219, at *13 (N.D. Ga. Jan 28, 2009) (plaintiffs at most alleged parallel pricing conduct, the sharing of surcharge price information publicly using

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

**B.     The CAC Alleges an Unlawful Conspiracy to Undertake a Wide Array of Anticompetitive Conduct.**

As described below, the CAC alleges many diverse examples of the manner and means in which the conspiracy was undertaken and implemented.  It is unfair to characterize the CAC, as do Defendants, as a complaint limited essentially to parallel conduct.  The CAC goes well beyond "bare" allegations of parallel conduct and provides specific allegations of actual agreement among Defendants.

**1.     Coordinated Price Increases**

The CAC alleges that Defendants agreed to fix prices by coordinating price increases.  In the summer of 2008, Cemex announced an unprecedented 30% increase in its price for ready-mix concrete – a hike of $25/cubic yard.  (CAC ¶ 73(a).)  Shortly thereafter, Prestige President

---

websites, and that opportunities arose at which the Defendants could have met and hatched a price-fixing conspiracy); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("The sum of [Plaintiffs'] allegations of agreement is that executives from ATI and Nvidia attended the same conferences and trade meetings."); *In re Travel Agent Comm'n Antitrust Litig.*, 03 Civ. 30000, 2007 WL 3171675, at *9 (N.D. Ohio, Oct. 29, 2007) (plaintiffs supported their parallel conduct allegations merely with statements that the conduct was against Defendants' self-interest, that the Defendants had knowledge of each others' actions, that there were opportunities to conspire at trade association meetings and that there was industry history of collusive behavior); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (plaintiffs' allegations were merely "generic," with no factual description of the substance of the statements that plaintiffs allege defamed, coerced and blacklisted them, nor any indication of where or when any unlawful agreements might have occurred); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1255-60 (W.D. Wash. 2009) (dismissed because the sum of plaintiffs' allegations was that there were parallel increases of fuel surcharges that outstripped the market rate, that there has been proven price fixing in other regions and that there was opportunity to conspire through trade associations); *Kendall v. Visa USA*, 518 F.3d 1042, 1047-48 (9th Cir. 2008) ("Appellants do not allege any facts to support their theory that the Banks conspired or agreed with each other or with the Consortiums to restrain trade.  Although appellants allege the Banks knowingly, intentionally and actively participated in an individual capacity in the alleged scheme to fix the interchange fee or the merchant discount fee, this allegation is nothing more than a conclusory statement.  There are no facts alleged to support such a conclusion.") (internal quotations omitted).

Jorge Wagner told his company's sales staff that Prestige would increase its concrete price by $25/cubic yard, and that the other Defendants "had agreed to go along with the increase."[12] (CAC ¶ 73(b).)  In the face of an historic economic collapse that affected the construction market in particular, five of the Defendants – Cemex, Florida Rock, Oldcastle, Prestige and Tarmac announced a virtually lock-step price increase of unprecedented magnitude.  (CAC ¶ 73.)

The CAC alleges Defendants implemented similar lock-step price increases – typically twice each year – throughout the Class Period, beginning no later than the coordinated implementation of uniform fuel and environmental surcharges in or about 2000.  (CAC ¶¶ 56, 71-79.)  The CAC also specifically describes price increases in 2006, summer 2008 and fall 2008 involving ten of the Defendants:  Cemex, Eastern, Florida Rock, Holcim, Lafarge, Lehigh, Oldcastle, Prestige, Rinker and Tarmac.  (CAC ¶¶ 73, 75-76.)

These lock-step price increases occurred in a market that – even absent the CAC's specific allegations of agreements to collude – would suggest a conspiracy.  The CAC makes it clear that the markets for cement and concrete, in Florida and worldwide, are highly susceptible to collusion.  The cement and concrete markets are concentrated (CAC ¶¶ 117-119), have high barriers to entry, (CAC ¶¶ 120-123), and offer numerous opportunities for producers to conspire through frequent trade association meetings and strong, long-lasting personal friendships (CAC

---

[12]  Defendants assert that Wagner's statement was "*apparently* based on by-then already public price announcements of other Defendants."  (MTD at 8; emphasis added.)  Defendants also imply that Wagner's statement may have come after all of Defendants' price increases had become public.  (MTD at 19.)  The CAC affords no basis for Defendants' distortion, which ignores the pleading's plain meaning and flies in the face of the bedrock principle that "[a]t the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are constructed in the light most favorable to the plaintiff."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 n.1 (11th Cir. 1999).  Furthermore, even if Wagner did make his statement after the price announcements took place, that would not negate the fact that Wagner attributed the price increase to an agreement among competitors.

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

¶¶ 60-61, 137-142).  Further, demand for cement and concrete is highly inelastic – meaning that a price increase results in only a small decline in demand – because there are no effective substitutes for cement and concrete.  (CAC ¶¶ 124-128.)  As a result, buyers of cement and concrete are forced to accept whatever prices they are presented with.

However, the standardized nature of the products sold means suppliers are virtually interchangeable from a customer's point of view.  (CAC ¶¶ 129-130.)  Thus, customers are generally able to shop for better prices and change suppliers.  This is especially true when, as here, there has been an unprecedented decline in demand.  In a *competitive* market, as demand falls, producers who seek to preserve their market position must reduce their prices or risk losing their share of a shrinking market to competitors who do.[13]  Similarly, when a producer raises its prices in a declining market, its competitors have an incentive to keep their prices stable or lower them in order to gain its share of the market.

When, instead of following these trends, competitors collectively *increase* prices in the face of plummeting demand, it is plausible to infer that the price hike is the result of collusion.  (*See* CAC ¶¶ 131-136.)

Defendants argue that such an inference should not be made because their input costs continued to rise, making price increases necessary.  (MTD at 11-12, 31-32.)  First, this argument raises issues of fact to be determined at a later stage of litigation.  Second, Defendants' focus on this allegation, in isolation, ignores the fact that the CAC specifically alleges that one of

---

[13]  Contrary to Defendants' assertions otherwise, in a market where demand is decreasing, "prices are likely to fall, all else being equal."  Federal Trade Commission, *Gasoline Price Changes, The Dynamics of Supply, Demand, and Competition* 9 (2005), *available at* http://www.ftc.gov/reports/gasprices05/050705gaspricesrpt.pdf; *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 804 (1946) (raising prices in the face of falling demand was "circumstantial evidence of the existence of a conspiracy and of a power and intent to exclude competition").

the Defendants explicitly informed its sales force that there was an agreement to coordinate price increases and ordered them to comply with it.  (CAC ¶ 73(b).)

In short, Plaintiffs have amply pled facts to show that Defendants – instead of acting in their individual self-interest by holding down prices – were able to attempt a 30% price increase despite the unprecedented drop in demand only by collusively banding together.  (*See* CAC ¶ 73.)

### 2.  Agreements Not to Compete and Territorial Allocation

In addition, the CAC specifically points to evidence of an agreement between Defendants to allocate cement and concrete customers among themselves.  (CAC ¶¶ 81-94.)  This agreement had two purposes:  (1) to support Defendants' ability to raise prices for cement and concrete in Florida; and (2) to help Defendants drive competing ICPs out of the concrete business.

The CAC alleges that in a fall 2008 meeting at Prestige's Orlando offices, Prestige President Jorge Wagner told company sales personnel and senior management that under an arrangement with Cemex, the two companies would not compete for each other's customers. (CAC ¶ 85.)  According to Wagner, employees who did not adhere to the agreement would be fired.  (*Id.*)  At the same time, Cemex sales personnel were instructed by their superiors to get to know their competitors, and to call competitors to "verify" pricing of concrete to customers. (CAC ¶ 86.)

The CAC also alleges that, in September 2009, Cemex, Florida Rock, Tarmac and VCNA (through Defendant Prestige) agreed to cut their concrete prices by $4-5/cubic yard when selling to customers of ICPs.  (CAC ¶ 90.)  Further, they agreed that each particular Defendant would only target ICP customers in a specific region of Florida:

- Cemex targeted ICP customers on the South Coast and in the Central region;

25

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

- Florida Rock targeted ICP customers in the Jacksonville area;

- Tarmac targeted ICP customers on the Gulf Coast; and

- VCNA targeted ICP customers in the Orlando area.

(*Id.*)

This "targeted" competition with ICPs allowed each Defendant to increase its concrete market share, while reducing that of the ICPs, in particular parts of Florida. Competing against ICPs, of course, is not illegal. But an agreement among competitors to coordinate their competition is. By collectively driving out their ICP competitors, while agreeing among themselves to refrain from competing with each other, Defendants reinforced their ability to charge their concrete customers supra-competitive prices – the very evil the antitrust laws are intended to prevent.

These allegations of agreement are further supported in the CAC by specific instances in which Defendants, in accordance with their agreements, refused to compete. (*See* CAC ¶¶ 83-84, 89, 93-94.)

For example, Plaintiff Advantage Concrete sought to compete with Cemex in the Florida Keys and tried to buy cement in Miami that it would deliver to the Keys through an independent trucking company. (CAC ¶ 93.) Lehigh and Titan, supposedly Cemex's competitors in the area, demanded a significantly higher price for cement – $20/ton above the going rate – only when they discovered it was ultimately destined for the Keys rather than the Miami region. (CAC ¶ 93.) There was no economic justification for such action.

Defendants argue that transportation costs to the Florida Keys provided a legitimate justification for the higher prices Lehigh and Titan quoted. This ignores the clear statement of the CAC that Advantage Concrete was not paying Lehigh or Titan to deliver to the Keys.

26

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

Advantage Concrete simply wanted the cement, and planned to separately pay an independent trucking company to deliver it to the Keys. (CAC ¶¶ 93-94.) Thus, the cement's ultimate destination should have played any role in Defendants' pricing.

The existence of a market allocation conspiracy is further supported by the fact that Advantage Concrete could not find a single trucking company willing to haul to the Keys at competitive prices. (CAC ¶ 94.) To the contrary, the trucking companies Advantage Concrete approached "quoted prices that were *significantly higher than the distance merited*." (*Id.*; emphasis added.) One trucking company even told Advantage "that if it hauled Cement for Advantage Concrete to the Keys, *it would not be given any more work by the Defendants*." (*Id.*; emphasis added). These recitations plausibly allege an allocation of markets and customers as an object of this conspiracy.

### 3.    Swap Agreements

Defendants' swap agreements demonstrate that Defendants maintained two sets of prices for cement: the supra-competitive "market" prices Defendants charged ICPs and Plaintiffs, and much lower prices Defendants charged each other. These swaps were not procompetitive agreements to provide one Defendant with a certain amount of cement in one area in exchange for an equal amount of cement elsewhere. They were purchases of cement from one Defendant by another, at below-"market" rates, settled periodically by means of a cash transfer. (CAC ¶ 97.) If the price charged to Plaintiffs and other ICPs was the product of a competitive market, there would be no rational reason for Defendants to sell their cement to each other at half that rate. In truth, the lower prices paid by Defendants in these swap agreements indicates what the

27

real price of cement would be, absent a conspiracy, and shows just how artificially inflated the "market" price was.  (*See* CAC ¶ 98.)[14]

### 4.    Enforcement of Anti-Competitive Agreements

In addition, the CAC alleges that Defendants vigorously enforced their anticompetitive agreements.  In one instance in March 2009, Mike Foster, the Vice-President of Lennar Homes, a major national homebuilder, met with salesmen from Prestige, its existing concrete supplier. (CAC ¶ 87.)  Foster told the Prestige salesmen Cemex had offered him a better price for concrete, and refused to consider a counteroffer from Prestige.  (*Id.*)  The salesmen reported this exchange to Prestige President Jorge Wagner.  (*Id.*)  To obtain leverage over Cemex, Wagner told the salesmen to retaliate against Cemex's cheating on the customer allocation agreement and steal a Cemex customer.  (*Id.*)

The Prestige salesmen contacted GC Contracting, a Cemex customer in Daytona Beach, and offered it very favorable prices.  (*Id.*)  When it was clear Prestige would win over Cemex's customer, but before the deal was finalized, Wagner refused to approve the price quote and ordered Prestige's salesmen to quote GC Contracting a non-competitively high price instead. (*Id.*)  In other words, Wagner rigged the bid so Prestige would not actually win GC Contracting's business.  Thus chastised, Cemex reneged on its agreement with Lennar Homes, which called the Prestige salesmen to say it would never do business with Cemex again.  (*See id.*)  As a result,

---

[14]    Defendants argue that the swap agreements should have provided the "procompetitive benefits of allowing Defendants to supply customers in regions distant from a cement plant or terminal while minimizing transportation costs" and that swap agreements are not, in and of themselves, unlawful.  (MTD at 25.)  Whether or not swap agreements, generally, could have a procompetitive basis, is a factual issue that is not the proper subject of a motion to dismiss. However, Defendants do not address at all why they would engage in swaps where the price paid is significantly below the "market" price.

Prestige retained Lennar Homes as a customer and Cemex continued to sell to GC Contracting. (*Id.*)  The customer allocation persisted.  (*Id.*)

Read as a whole, therefore, the CAC is readily distinguishable from the cases cited by Defendants, limited to "bare" allegations of parallel conduct.  *See supra* notes 10-11 and accompanying text.

### C.  The CAC Is Distinguishable from *Twombly*.

In *Twombly*, the Supreme Court considered "whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement."  *Twombly*, 550 U.S. at 548-49.  The plaintiffs – customers of their local telephone company – alleged that major local exchange carriers had conspired not to compete with each other for customers outside their respective market areas where they had previously been regulated monopolies.  *Id.* at 550-51.  In support of their claims, plaintiffs pointed to the fact that the defendants had not engaged in the competition expected after approval for their monopolies was withdrawn, and made some generalized allegations of conspiracy.  *Id.* at 548-51.  The *Twombly* court held that their claims should have been dismissed because their complaint sought to "proceed *exclusively* via allegations of parallel conduct."  *Id.* at 565 n.11 (emphasis added). Courts have consistently recognized that the allegations in *Twombly* constituted nothing more than unsupported allegations of parallel conduct.[15]

---

[15]  *See, e.g.*, *City of Moundridge*, 250 F.R.D. at 3 ("Unlike in *Twombly*, the plaintiffs here do not rely on only bare allegations of parallel behavior, or assume that there is a conspiracy because there is an 'absence of any meaningful competition.'") (citing *Twombly*, 550 U.S. at 564-65); *Fair Isaac Corp.*, 2008 WL 623120, at *5 ("The *Twombly* plaintiffs' allegations of an illegal § 1 agreement rested exclusively on the parallel conduct of the defendant regional telecommunications providers.").

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

Defendants misconstrue Twombly and its application here.  It is critical to understand that while Twombly made clear what must be shown for claims of parallel conduct to provide a plausible suggestion of an agreement, it also made clear that "a plausible suggestion of agreement can be derived from specific allegations of actual agreement among defendants." LaFlamme v. Societe Air France, --- F.Supp.2d ----, 2010 WL 1292262, at *7 (E.D.N.Y. Apr. 5, 2010) (quoting Twombly, 550 U.S. at 564-65).  Here, the CAC meet either basis for satisfying Twombly.  The CAC alleges parallel conduct by Defendants, but also a plethora of factual averments creating a clear inference that such conduct was unlawful in nature.  See supra pp. 25-27.  The CAC also includes specific allegations of actual agreement among the Defendants. Such specific allegations include statements and actions by individual co-conspirators in furtherance of the conspiracy (See, e.g., CAC ¶¶ 73(b), 83, 84, 87, 89, 93-94), including statements explicitly acknowledging the existence of agreements not to compete, and including directions to employees that if they "did not adhere to this agreement [they] would be fired." (CAC ¶ 85).  Defendants attack on the CAC under Twombly rests solely on the rubric of parallel conduct, and ignores the CAC's specific allegations of actual conspiracy.

There can be no doubt that when such specific allegations of actual agreement are considered in totem with the allegations of parallel conduct, as they must be, a plausible suggestion of an agreement is shown.

Since Twombly, courts have repeatedly upheld complaints with significantly less factual detail than in the CAC here.[16]  The recent decision in Starr v. Sony BMG Music Entertainment,

---

[16] See, e.g., Hyland, 2007 WL 2407233, at *3 ("Plaintiffs . . . have properly put the Defendants on notice of its alleged antitrust claims by setting out facts of an alleged a conspiracy [sic] to price-fix between the Defendants, supported by actions of parallel conduct.  Accordingly, the

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

592 F.3d 314 (2d Cir. 2010), is a good example of the type of case that satisfies the *Twombly* pleading standard and further illustrates the strength of the allegations made in the CAC. The allegations in *Starr* described how the defendants set prices that were substantially higher than what they would have charged in a competitive market. *Id.* at 323. These allegations were placed within the context of the defendants' control over 80% of the market for digital music and their membership in a trade association through which they could discuss pricing. *Id.* at 318. The Second Circuit held that, "taken together," the allegations "'raise[d] a suggestion of a preceding agreement.'" *Id.* at 323 (quoting *Twombly*, 550 U.S. at 557).

In sum, the CAC goes far beyond allegations of parallel conduct. Taken as a whole, the CAC sufficiently pleads an unlawful conspiracy to fix prices and allocate customers and markets in violation of Section 1 of the Sherman Act.

## II. DEFENDANTS' ARGUMENTS THAT THE ALLEGED CONSPIRACY IS INHERENTLY IMPLAUSIBLE ARE WITHOUT MERIT.

Defendants assert the CAC should be dismissed because the alleged conspiracy is inherently implausible. In support of this argument, Defendants pose a litany of doubts about inferences which may be drawn from the allegations in the CAC. None of these "doubts" equate to a showing of implausibility, and most are pedestrian factual disputes which should be resolved

---

Court finds that the Plaintiffs have 'nudged' their claims across the line from conceivable to plausible."); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 943 ("These Complaints, while not answering all specific questions about who, what, when, and where, do put defendants on notice concerning the basic nature of their Complaints . . . and the grounds on which their claims exist.") (internal quotations omitted); *Behrend*, 532 F. Supp. 2d at 741 ("'[A]n antitrust Complaint would certainly meet the *Twombly* criteria if the Complaint constitutes notice to the defendant of the legal claims asserted and includes a statement of the elements of those claims, along with allegations of the defendant's underlying conduct that, if proven, would plausibly demonstrate such elements.") (internal citations omitted).

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

at trial, rather than on a motion to dismiss.  Further, Defendants ignore the fact that any inferences should be interpreted in the light most favorable to Plaintiffs.  *Avado Brands*, 187 F.3d at 1274 n.1 ("At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.").

First, Defendants argue that the conspiracy is implausible because Plaintiffs allege "nothing more than some random instances of conduct."  (MTD at 39.)  As a threshold matter, this argument wholly mischaracterizes the CAC, which alleges "instances of conduct" which, far from being random, were the result of a conspiratorial agreement between Defendants and intentional acts and statements by conspirators in furtherance thereof.  (*See, e.g.*, CAC ¶¶ 73, 78-79, 87, 89, 93-94.)  This defect aside, whether Plaintiffs' allegations indeed constitute only "random instances of conduct," as Defendants assert, or instead reflect evidence of a conspiracy "goes to matters of proof."  *Transamerica*, 672 F. Supp. 2d at 1363.  Such issues of fact cannot be resolved on a motion to dismiss.

It is critical to consider that *Twombly* "was concerned with the plausibility of an *inference of conspiracy*, not with the plausibility of a *claim*."  *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (emphasis added).  Defendants' attempt to have this Court determine the plausibility of Plaintiffs' underlying *claim* prior to discovery runs contrary to longstanding precedent that it is inappropriate at the pleading stage to resolve disputed facts alleged in the CAC.  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 568 F.3d 374, 382 (2d Cir. 2009).

Second, on the issue of the temporal scope of the conspiracy, Defendants cite *Total Benefits Planning Agency*, 552 F. 3d 430, for the proposition that the case should be dismissed because of a purported failure to allege a time frame for the complaint.  (MTD at 39.)  Plaintiffs

in that case, however, made no allegations at all of any specific actions within the purported conspiracy period.  *See Total Benefits Planning Agency*, 552 F.3d at 436-37.

Here, Plaintiffs have alleged a multitude of specific actions within the time frame of the conspiracy, as alleged.  For example, Plaintiffs specifically allege that, beginning at least as early as 2000, certain Defendants implemented fuel surcharges in a coordinated fashion and then eliminated them in 2008 while increasing prices significantly.  (CAC ¶¶ 73, 78.)  The CAC makes specific factual allegations during this period relating to customer allocation, price increases, supply reductions and the other features of the alleged conspiracy.

Third, Defendants advance a "market definition" argument, asserting that there is no relevant statewide market here.  This argument fails as a matter of law, since there is no requirement to plead market definition in the context of a case such as this.  Plaintiffs allege a Sherman Act Section 1 conspiracy among competitors to unlawfully restrain trade by, among other methods, fixing prices and allocating customers and territories.  These are *per se* antitrust violations – illegal in and of themselves, without any need to demonstrate an anticompetitive effect in a particular geographic "market."  "As the Supreme Court has long recognized, an analysis of market power – of which market definition is the typical starting point – is unnecessary in a per se price-fixing case . . . ."  *In re Ky. Household Goods Carriers Ass'n, Inc.*, 139 F.T.C. 404 (F.T.C. 2005) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940)).  Accordingly, the CAC is not required to allege a relevant market with the type of precision called for in a merger or monopolization case, or even where a Section 1 rule of reason claim is pleaded.  *See id.* (noting that because the challenged conduct was "horizontal price-fixing that is *per se* unlawful," relevant markets were not required to be defined); *see also* XI Areeda & Hovenkamp, *Antitrust Law* ¶ 1910, at 280 (in a *per se* case, "neither a relevant market

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

nor an estimate of defendants' market power must be established in order to prove that the restraint is unlawful").[17]

The authority Defendants cite does not support their market definition argument.  For example, *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414 (11th Cir. 1984), came before the Eleventh Circuit on the plaintiff's appeal from a directed verdict the district court entered against it in a case against a competitor for unfair and anticompetitive practices. Applying a rule of reason analysis to the plaintiff's claims, the district court found – after plaintiff presented his evidence in thirteen days of a jury trial – that the plaintiff had failed to prove a relevant geographic market.  *Id.* at 421-26.  The Eleventh Circuit affirmed.  *Id.* at 426. Thus, the ruling in *L.A. Draper* not only arose in rule of reason case – not a *per se* case such as the one here – but also came after a trial, not on a motion to dismiss.  The very fact that Defendants cite this inapposite authority demonstrates that their argument is devoid of merit. Indeed, even if market definition were relevant here – and it is not – all *L.A. Draper* shows is that the matter involves fact issues that are insusceptible of resolution on a motion to dismiss.

Fourth, Defendants argue that the "overarching conspiracy makes no sense" because the Defendants' interests are not aligned.  (MTD at 39-40.)  In support of this claim, Defendants assert that they differ in size and that some of them only sell cement, others sell only concrete, and still others sell both.  (*Id.*)  Significantly, Defendants cite no authority that this supposed

---

[17]  Defendants also argue that Plaintiffs "selectively quoted" from the *U.S. v. Cemex, S.A.B. de C.V.* Amended Complaint (MTD at 5) and ignored that complaint's geographic market definition for concrete.  However, that definition was for the purposes of opposing a merger, not a *per se* antitrust violation.  In contrast, the quotation from that complaint which Plaintiffs did use related to demand inelasticity for concrete, which actually is relevant to the complaint.

circumstance makes one whit of difference in a conspiracy case.  Nor can they:  there is no doctrine of conspiracy law requiring an "alignment of interests" among conspirators.

Under well-established law, all that need be shown to prove a price-fixing conspiracy under Section 1 of the Sherman Act is (1) the existence of an unlawful agreement during the limitations period; and (2) that the defendant knowingly joined this agreement.  *See Socony-Vacuum Oil*, 310 U.S. at 223-224 & n.59; *United States v. Hayter Oil Co., Inc.*, 51 F.3d 1265, 1270 (6th Cir. 1995).  Differences among defendants as to the manner, nature, or duration of their participation in a conspiracy do not negate the existence of the conspiracy.  As courts have recognized, conspirators may join a conspiracy at different times, play completely different roles, and need not even know each other.[18]

Here, the CAC adequately alleges that Defendants agreed to fix prices and to eliminate competition by collective action.  The objective of the conspiracy was to realize supra-competitive profits that Defendants could not achieve in a free and open market.  All the Defendants benefited from the artificially high prices that they created for cement and concrete

---

[18]  *See United States v. Consolidated Packaging Corp.*, 575 F.2d 117, 125, 127 (7th Cir.1978) ("That many of the conspirators did not know each other, had no direct contact with each other, and were not always interested in the same customers was probably as immaterial to the conspirators as it is to us now . . . . Because of the nature of this conspiracy, it could not reasonably be expected that any one conspirator would have full knowledge."); *Masters v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911, 2003 WL 145556, at *5 (S.D.N.Y. Jan.17, 2003) ("It is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period.") (citing *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939)); *Interstate Circuit*, 306 U.S. at 227 ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators.") (citation omitted); *United States v. Rea*, 958 F.2d 1206, 1214 (2d Cir.1992) ("A defendant need not have joined a conspiracy at its inception in order to incur liability for the unlawful acts of the conspiracy committed both before and after he or she became a member") (citations omitted).

and from the elimination of ICPs as competitors that Defendants collectively accomplished. The fact that some Defendants may sell both cement and concrete – and thus benefit from the sale of both products, rather than from just one – is immaterial. It is similarly immaterial that Defendants selling concrete may arguably benefit more from elimination of ICPs than "cement only" Defendants. No doctrine of antitrust law, or conspiracy law generally, requires that each conspirator participate or benefit equally.

Although Defendants' "alignment of interests" argument fails as a matter of law, even if did not, it would at most raise fact issues. Again, resolution of these issues on a motion to dismiss would be inappropriate.

## III.   THE ALLEGATIONS AGAINST EACH DEFENDANT CANNOT BE VIEWED IN ISOLATION.

All Defendants attempt to challenge the specific allegations against them on an individualized, Defendant-by-Defendant basis. (MTD at 62-83.) In attempting to do so, Defendants disregard the allegations in the CAC taken as a whole and urge this Court to focus upon the specific allegations against each Defendant in isolation. Here again, such evaluation in isolation must fail because plaintiffs in a price-fixing case are entitled to "'the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *Williamson Oil*, 346 F.3d at 1301 (quoting *Cont'l Ore*, 370 U.S. at 699). A district court should not approach a plaintiff's claims against multiple defendants "as if they were . . . completely separate and unrelated lawsuits." *Cont'l Ore*, 370 U.S. at 698-99.[19]

---

[19]  *See also In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (3d Cir. 1982) (district court should not compartmentalize an antitrust conspiracy claim by conducting "a seriatim examination of the claims against each . . . conspiracy Defendant[] as if they were separate

None of the cases cited by Defendants support such a myopic approach.[20]  In *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119 (D.D.C. 2004), the court recognized that plaintiffs "need not allege overt acts committed by each defendant in furtherance of a conspiracy."  *Id.* at 164 n.27.  This is "because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits."  *In re Vitamins Antitrust Litig.*, No. Misc. 99-197 (TFH), 2000 WL 1475705, at *11 (D.D.C. May 9, 2000) (quoting *In re NASDAQ Market Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995)).  Likewise, it is not necessary to plead that each defendant had a role in "every detail in the execution of the

---

lawsuits."); *Rail Freight Fuel Surcharge*, 587 F. Supp. 2d at 33 n.4 ("When considering an antitrust complaint, the allegations cannot be compartmentalized and considered in isolation as if they were separate lawsuits, thereby overlooking the conspiracy claim itself.") (internal quotation marks, brackets, and citations omitted); *OSB Antitrust*, 2007 WL 2253419, at *5 ("Antitrust conspiracy allegations need not be detailed defendant by defendant."); *Flash Memory*, 2009 WL 1096602, at *5 n.7 ("In addition to the joint motion to dismiss, [five defendants] filed their own, separate motions to dismiss . . . Their central point of contention appears to be the lack of specific allegations directed at their particular company.  This argument fails.  For pleading purposes, allegations of antitrust conspiracy need not be detailed on a "defendant by defendant" basis.") (citing *SRAM*, 580 F. Supp. 2d at 903-907 (N.D. Cal. 2008) (rejecting argument that plaintiffs must allege each defendant's specific role in an antitrust conspiracy); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc*., 253 F. Supp. 2d 262, 278 (D. Conn. 2003) (plaintiffs are not "required to specify individual acts of each defendant in an antitrust conspiracy allegation").

[20]  In *Jung*, plaintiffs used the term "defendants" without distinguishing among various groups of defendants "situated very differently from one another in the context of general and global allegations."  *Jung*, 300 F. Supp. 2d at 163.  In *Travel Agent Comm'n*, 2007 WL 3171675, at *4, plaintiffs failed to allege a defendant engaged in *any parallel conduct*.  In *Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1292 (S.D. Fla. 2008), the complaint failed to make any of the allegations necessary to plead a RICO conspiracy.  *In re Elevator Antitrust Litig.*, 502 F.3d 47 and *Michigan Division-Monument Builders v. Michigan Cemetery Ass'n*, 458 F. Supp. 2d 474, 485 (E.D. Mich. 2006) stand only for the proposition that a complaint must make *some* specific allegations of particular conduct by *some* defendants.  These cases fail to support Defendants' argument, and addressed complaints clearly distinguishable from the CAC.

conspiracy . . . for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv. v. Int'l Air Travel Ass'n*, 620 F. 2d 1360, 1367 (9th Cir. 1980).[21]

The CAC clearly meets this standard, and each individual Defendant can have no doubt about the conduct that Plaintiffs intend to prove against it. Defendants are each alleged to have engaged in a unlawful conspiracy to restrain competition and raise prices, implemented by such means as coordinated price increases, allocations of customers and territories, collective targeting of ICPs, and restrictions of supply. Moreover, as set forth below, the CAC alleges the acts that each Defendant performed in furtherance of the conspiracy.

The CAC, for example, contains specific allegations against Cemex/Rinker concerning its participation in coordinated price increases in 2006, summer 2008 and fall 2008. (CAC ¶¶ 73(a), 75(b), 75(d), 76(b).) The company also allocated customers and refused to compete against Defendants. As stated above, in a fall 2008 meeting in the company's Orlando offices, Prestige President Jorge Wagner told Prestige sales personnel and senior management that pursuant to an arrangement with Cemex, the two companies were not to compete for each other's existing customers. (CAC ¶ 85.) Employees who did not adhere to this agreement would, according to

---

[21] *See also Boyle v. United States,* 129 S.Ct. 2237, 2246 (2009) ("Members of the group need not have fixed roles; different members may perform different roles at different times."); *United States v. Jenkins*, 419 F.3d 614, 620 (7th Cir. 2005) ("Different people play different roles in a drug conspiracy, be it supplier, lookout, courier, or enforcer."); *United States v. Cabbell*, 35 F.3d 1255, 1262 (8th Cir.1994) (holding that a jury finding of a single conspiracy was not precluded by evidence that coconspirators entered the conspiracy at different times and assumed different roles); *Am. Tobacco Co. v. United States*, 147 F.2d 93, 119 (6th Cir. 1945) ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish guilt, as each may have been performing different tasks to bring about the desired result, or have used different methods to aid in accomplishing the common purpose.") (citing *United States v. Swift*, 188 F. 92, 98 (D.C.Ill. 1911) ("It is quite consistent with a charge of combination or conspiracy or monopoly that the individuals concerned therein should each have been assigned to different tasks, aimed to bring about the result planned by all.").

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

Wagner, be fired.  (*Id.*)  As a result, the two companies continued not to compete for each other's customers.  (*Id.*)

Cemex also targeted ICP customers on the South Coast and in the Central region as part of Defendants' plan to eliminate ICP competition in Florida.  (CAC ¶ 90.)  It also coordinated cement plant shut-downs as a method of restricting supply, including an incident in late 2004 when Tarmac closed down one of its cement plants in Pennsuco, Florida, purportedly to address a mechanical problem.  (CAC ¶ 103.)  At that time, Rinker and Florida Rock also shut down plants for scheduled maintenance, instead of delaying their maintenance to satisfy unmet demand for cement created by Tarmac's shut-down.  (*See id.*)

Eastern participated in the 2006 coordinated price increase (CAC ¶ 75(f)) and in the customer allocation scheme (CAC ¶ 89(a)).

Florida Rock participated in the 2006 and summer 2008 price increases.  (CAC ¶¶ 73(e), 75(e).)  It also took part in the scheme to target customers of ICPs on a regional basis, targeting ICP customers in the Jacksonville area.  (CAC ¶ 90.)  Additionally, Florida Rock participated in the allocation of customers by refusing to offer competitive quotes to Plaintiffs CCA and Superior Concrete because they were Cemex/Rinker customers.  (CAC ¶¶ 84, 89(d).)  It also joined in the supply reduction scheme.  (CAC ¶ 103.)

Holcim participated in the 2006 coordinated price increase.  (CAC ¶ 75(a).)  It was also one of the companies that refused, as part of the customer allocation scheme, to offer competitive prices to Plaintiff Florida Ready Mix.  (CAC ¶ 89(a).)

Defendant Lafarge participated in the 2006 and fall 2008 coordinated price increases. (CAC ¶¶ 75(c), 76(a).)

39

Lehigh (Continental) participated in the fall 2008 price increase.  (CAC ¶ 76(c).)  Lehigh also participated in the customer allocation scheme and refused to offer competitive prices to Plaintiff Advantage Concrete after learning that that Tarmac supplied Advantage Concrete.  (CAC ¶ 89(b).)  Lehigh also refused to supply Advantage Concrete when it sought cement to compete in the Florida Keys, an area the conspirators had allocated to Cemex.  (CAC ¶ 93.)

Oldcastle participated in the coordinated price increase in summer 2008.  (CAC ¶ 73(c).)  It was also one of the companies that agreed to condition the sale of concrete blocks on the purchase of ready-mix concrete as part of the plan to eliminate ICPs.  (CAC ¶ 105.)

Prestige participated in the coordinated price increase in summer 2008.  (CAC ¶ 73(f).)  Prestige President Jorge Wagner, for example, told the company's sales staff that Prestige would increase its ready-mix concrete price by $25/cubic yard, and that the other Defendants "had agreed to go along with the increase."  (CAC ¶ 73(b).)  Moreover, Prestige participated in the customer allocation scheme, with Wagner telling employees expressly not to compete with Cemex by virtue of an arrangement between Prestige and Cemex.  (CAC ¶ 85.)  Finally, Prestige agreed to target ICP customers in the Orlando area in furtherance of conspirators' joint campaign to eliminate ICPs.  (CAC ¶ 90.)

Suwannee participated in the supply reduction scheme.  (CAC ¶ 104.)  For example, in 2005 certain Defendants, including Florida Rock, Cemex, Rinker, and Suwannee, coordinated their cleaning cycles to take place at the same time, so that Defendants could manufacture a supply shortage.  (*Id.*)

Finally, Tarmac participated in the coordinated summer 2008 price increase (CAC ¶ 73(d)), allocated customers by, for example, refusing to quote competitive prices to Plaintiff

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

CCA (CAC ¶¶ 84), agreed to target ICP customers on the Gulf Coast (CAC ¶ 90), and participated in the scheme to restrict supply (CAC ¶ 103).

The CAC provides sufficient notice to all Defendants about both the nature of the overall conspiracy in which they allegedly participated and their specific acts in furtherance of the conspiracy.  The CAC is legally sufficient with respect to each Defendant.

## IV.    PLAINTIFFS HAVE ADEQUATELY PLED FRAUDULENT CONCEALMENT OF THE CONSPIRACY BY DEFENDANTS.

The statute of limitations for an antitrust violation is tolled if a plaintiff can show fraudulent concealment.  *See Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999) (citing *In re Beef Indus. Antitrust Litig. ("Beef Industry")*, 600 F.2d 1148, 1169 (5th Cir. 1979)).  In the current procedural context – a motion to dismiss – Plaintiffs are required only to *plead*, not to prove, fraudulent concealment.  *See, e.g.*, *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000).

Fraudulent concealment is an equitable doctrine, and "[a]s such it is intimately bound up with the facts of the case."  *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 374 (D.N.J. 2001) (citing *Beef Industry*, 600 F.2d at 1171).  As a result, courts generally disfavor motions to dismiss allegations of fraudulent concealment.  *See In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007) ("As many courts have noted in the antitrust conspiracy context, it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly where the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators."); *Vitamins*, 2000 WL 1475705, at *8 ("This court agrees with the many courts

which have held that the issues of fraudulent concealment and due diligence are questions of fact that should not be decided on a motion to dismiss.") (collecting cases).[22]

Under well-established law and as explained below, a complaint properly pleads fraudulent concealment by alleging that (1) defendants concealed their wrongful conduct; and (2) plaintiffs, exercising due diligence, were unable to discover the facts giving rise to their claims. *See Morton's Market*, 198 F. 3d at 832 (quoting *Beef Industry*, 600 F.2d at 1169).  Here, the CAC provides ample allegations in support of both factors.  (*See* CAC ¶¶ 60-61, 137-42, 171-185.)  Thus, Plaintiffs have adequately pled fraudulent concealment.

Defendants' attack on the sufficiency of the CAC's pleading of fraudulent concealment is based upon several mistaken characterizations of governing law.

First, Defendants' argument that Plaintiffs must allege fraudulent conduct "above and beyond" the Defendants' wrongdoing (MTD at 46) is mistaken.  The majority of Courts that have considered the question decline to require that the acts of fraudulent concealment be separate and apart from the underlying antitrust violation.  *See Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 124-26 (4th Cir. 1995) (acts of fraudulent concealment "need not be separate and apart from the acts of concealment involved in the antitrust

---

[22]   *See also In re Pressure Sensitive Labelstock Antitrust Litig.*, MDL No. 1556, 2006 WL 433891, at *4 (M.D. Pa. Jan 3, 2006) ("As a general rule, rejection of a fraudulent concealment claim on the pleadings for failure to allege due diligence is not appropriate."); *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 346-67 (S.D.N.Y. 2000) (need for factual determinations placed "extraordinary" burden on defendants moving to dismiss fraudulent concealment claims and justified dismissal "only in 'extreme circumstances.'") (citation omitted).

violation"); *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1531-32 (5th Cir. 1988) (acts of concealment may be "intertwined with the acts of price-fixing").[23]

Second, Defendants fail to acknowledge that the controlling law of this Circuit holds that where the defendants' underlying wrongdoing is inherently self-concealing, plaintiffs are relieved of the obligation to plead defendants' affirmative acts of concealment.  *See Hill v. Texaco, Inc.*, 825 F.2d 333, 335 & n.2 (11th Cir. 1987).  Compounding this error, Defendants cite case law for the proposition that the "self-concealing doctrine cannot apply to assertions of price-fixing."  (MTD at 49.)[24]  But Defendants fail, again, to disclose that "the *majority* of courts examining price-fixing conspiracies have deemed such conspiracies self-concealing."  *In re Aspartame Antitrust Litig.*, No. 2:06-CV-1732, 2007 WL 5215231, at *6 (E.D. Pa. Jan. 18, 2007) (collecting cases) (emphasis added); *see Pressure Sensitive Labelstock*, 2006 WL 433891 at *4; *Mercedes-Benz*, 157 F. Supp. 2d at 372; *Nine West*, 80 F. Supp. 2d at 192-93.

Third, Defendants contend that in the CAC, Plaintiffs "never identify what *they did* to attempt to discover the purported conspiracy."  (MTD at 50; emphasis added.)  Defendants, however, fail to inform the Court of controlling authority that "[t]he actual exercise of diligence is irrelevant because the standard is an objective one."  *Morton's Market*, 198 F. 3d at 836.  Thus, the relevant inquiry is what reasonable plaintiffs could have discovered through the

---

[23]  *See also Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 502 (9th Cir. 1988) (requiring plaintiffs to allege affirmative acts of concealment, but not requiring acts "above and beyond" defendants' underlying wrongdoing); *Pinney Dock & Transp. Co. v. Penn Central Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988) (same); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083-85 (2d Cir. 1988) (allowing plaintiffs to allege affirmative acts of concealment or a self-concealing wrong).

[24]  *Hill* (MTD at 49) involved a claim that a petroleum franchisor failed to make its franchisee a bona fide offer to sell a service station.  825 F.2d at 334.  *Hill* did not address the question of whether price-fixing conspiracies are inherently self-concealing.  *See id.* at 335 n.2.

exercise of due diligence once on notice of Defendants' wrongful acts, regardless of what diligence Plaintiffs here undertook.  *See id.* at 832-36.

### A.      Plaintiffs Have Adequately Pled Defendants' Concealment of Their Conspiracy.

As explained below, Plaintiffs have adequately pled the first element of fraudulent concealment – that Defendants concealed their wrongful conduct – by alleging, with particularity, Defendants' affirmative acts to conceal their conspiracy.  Alternatively, Plaintiffs have pled that Defendants engaged in a self-concealing conspiracy.

### 1.      Governing Law

Where an antitrust plaintiff alleges that the defendants fraudulently concealed their price-fixing conspiracy, the majority of courts which have considered the issue require the plaintiff to allege that defendants engaged in "affirmative acts" of concealment, and holds further that such acts need not be separate from the underlying allegations of wrongful conduct.  *See, e.g.*, *Supermarket of Marlinton*, 71 F.3d at 125-26 (4th Cir.); *Conmar*, 858 F.2d at 502 (9th Cir.); *Allan*, 851 F.2d at 1531-32 (5th Cir.); *Pinney Dock*, 838 F.2d at 1472 (6th Cir.).  In other courts, plaintiffs who allege the existence of a conspiracy are not required to plead affirmative acts of concealment at all because price-fixing conspiracies are inherently self-concealing.  *See Hendrickson Bros.*, 840 F.2d at 1083-85.  A few courts, including several cited by Defendants, require plaintiffs to plead that defendants engaged in acts of concealment "separate and apart" from or "above and beyond" their antitrust conspiracy.  (*See* MTD at 46-47, 49.)[25]  The Fifth Circuit has criticized this approach as "misperceiv[ing] the doctrine of equitable tolling" and

---

[25]   *See Legacy Crossing, LLC v. Travis Wolff & Co.*, 229 Fed. App'x 672, 2007 WL 1041425, at *8 (10th Cir. 2007); *Hamilton County Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310, 319 (6th Cir. 2007); *In re Copper Antitrust Litig.*, 436 F.3d 782, 791 (7th Cir. 2006); *Chapple v. Nat'l Starch & Chem. Co.*, 178 F.3d 501, 506-07 (7th Cir. 1999).

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

lacking "a principled way to determine what acts of concealment are 'independent' from the underlying wrong." *Allan*, 851 F.2d at 1532.

Against this backdrop, in the Eleventh Circuit, plaintiffs pleading fraudulent concealment must allege either defendants' affirmative acts of concealment or a self-concealing conspiracy. *See Hill*, 825 F.2d at 335 & n.2.  Here, Plaintiffs have adequately pled the first element of fraudulent concealment under both the "affirmative acts" standard adopted by the majority of courts and the self-concealing conspiracy standard.

**2. Plaintiffs Have Pled Defendants' Affirmative Acts of Concealment With the Requisite Particularity.**

Plaintiffs have alleged Defendants' affirmative acts of concealment with particularity. Pleading fraudulent concealment is "no tall order." *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1031 (N.D. Miss. 1993).  Plaintiffs need only allege "any evidence of efforts designed to keep price-fixing activities secret." *Id.*  (citations omitted).

Plaintiffs have alleged that Defendants and their co-conspirators affirmatively concealed their wrongful conduct throughout the Class Period.  (CAC ¶¶ 171-187.)  Specifically, the CAC alleges Defendants:

- Met and communicated secretly in furtherance of the conspiracy, with meetings and communications concerning customer and geographic allocations and the pricing of cement and concrete (CAC ¶¶ 171, 173, 175);

- Communicated surreptitiously via telephone, in-person meetings and trade association gatherings to prevent the existence of written records, limit explicit references to competitor pricing in documents, and conceal the existence and nature of their competitor pricing discussions from non-conspirators (CAC ¶ 173);

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

- Agreed not to discuss publicly or otherwise reveal the nature and substance of their acts and communications in furtherance of their conspiracy (CAC ¶ 174);

- Repeatedly misrepresented to their customers the reasons for cement and concrete price increases, falsely and misleadingly attributing dramatic price hikes to rising fuel and input costs when those costs did not in fact justify their price increases (CAC ¶¶ 173, 176-177); and

- Held themselves out as competitors to the public, Plaintiffs and each Class.  (CAC ¶ 171).

These allegations are more than sufficient to satisfy Rule 9(b), particularly where the details of Defendants' secret meetings and communications are within Defendants' exclusive control.[26]

Under well-established law, Defendants' efforts to maintain secrecy by agreement, through secret meetings and surreptitious methods of communication constitute affirmative acts of concealment.  *See, e.g.*, *Greenhaw v. Lubbock County Beverage Ass'n*, 721 F.2d 1019, 1030 (5th Cir. 1983), *overruled on other grounds*, *Int'l Woodworkers v. Champion Int'l*, 790 F.2d 1174, 1181 n.8 (5th Cir. 1986) (evidence of "secret agreements and covert price-setting sessions" supported fraudulent concealment); *Rubber Chems.*, 504 F. Supp. 2d at 788-89 (secret meetings and agreement to maintain secrecy); *Mercedes-Benz*, 157 F. Supp. 2d at 372 (conspirators urged to maintain secrecy); *Vitamins*, 2000 WL 1475705 at *3 (secret meetings and instructions to maintain secrecy); *In re Comm. Explosives Litig.*, 945 F. Supp. 1489, 1493 (D. Utah 1996) (same); *Catfish*, 826 F. Supp. at 1031 (face-to-face meetings and telephone calls).

---

[26]  While the CAC meets even a stringent 9(b) standard, because the facts involving fraudulent concealment are uniquely in the control of Defendants, a "relaxed" 9(b) standard should apply. *See Catfish*, 826 F. Supp. at 1029-30; *see also Mercedes-Benz*, 157 F. Supp. 2d at 375 ("[T]he Court gives weight to the argument that the facts are uniquely in defendants' control and more comprehensive discovery of those facts will better sort out this issue.").

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

The weight of authority is that Defendants' pretextual justifications for price increases also constitute affirmative acts of concealment. *Compare In re Urethane Antitrust Litig. ("Urethane IV")*, -- F. Supp. 2d --, 2010 WL 398094, at *18 (D. Kan. Jan. 25, 2010) (pretextual explanations for price increases constituted acts of concealment); *In re TFT-LCD (Flat Panel) Antitrust Litig. ("Flat Panel")*, 586 F. Supp. 2d 1109, 1119 (N.D. Cal. 2008) (pretextual explanations for inflated prices); *Rubber Chems.*, 504 F. Supp. 2d at 788-89 (same); *In re Urethane Antitrust Litig. ("Urethane II")*, 235 F.R.D. 507, 518-20 (D. Kan. 2006) (pretextual explanations for price increases); *Comm. Explosives*, 945 F. Supp. at 1493 ("fabricating taxes and other surcharges to mislead purchasers about the reason for higher prices"); *United Nat'l Records, Inc. v. MCA, Inc.*, 609 F. Supp. 33, 36 (N.D. Ill. 1984) (pretextual explanations for parallel pricing and price increases) *with In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022-23 (D. Minn. 1997), *aff'd* 195 F.3d 430 (8th Cir. 1999) ("attributing price increases to market factors" not concealment); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987) (failure to admit to wrongdoing not concealment).[27]  Here again, Defendants cite this Court to a minority viewpoint without alerting the Court to clear authority to the contrary.  (MTD at 47-48, citing *Pocahontas*, 828 F.2d 211, and *Milk Products*, 84 F. Supp. 2d 1016.)

Defendants' argument that Plaintiffs must identify specific acts of concealment prior to October 2005 (MTD at 48) is simply mistaken.  For the purposes of pleading fraudulent concealment, the relevant date is when Plaintiffs learned or should have learned of the facts

---

[27]  *See also Rx.com v. Medco Health Solutions, Inc.*, 332 Fed. App'x 394, 2009 WL 1067954, at *3 (5th Cir. 2009) (quoting *Allan*, 851 F.2d at 1532) (denial of wrongdoing an act of concealment where it is reasonable for plaintiffs to rely on the denial); *Conmar Corp.*, 858 F.2d at 505 (same); *Allan*, 851 F.2d at 1532-33 (same); *Berkson v. Del Monte Corp.*, 743 F.2d 53, 56 (1st Cir. 1984) (same).

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

giving rise to their claims. *See Morton's Market*, 198 F.3d at 832-35. No party in the Plaintiffs' positions could have learned of these facts until industry participants came forward with information. (*See* CAC ¶¶ 171, 180, 182-184.) Plaintiffs have also identified and described the affirmative acts through which Defendants concealed their conspiracy. (CAC ¶¶ 171-180.)

Nothing more is required at this stage of the litigation. Thus, the CAC sufficiently pleads Defendants' affirmative acts to conceal their conspiracy and fulfills the first element of fraudulent concealment.

### 3. Alternatively, Plaintiffs Have Pled a Self-Concealing Conspiracy.

Further, the CAC alleges Defendants' participation in a self-concealing conspiracy to fix prices. (CAC ¶¶ 171, 181-182.) Although the Eleventh Circuit's decision in *Hill*, 825 F.2d 333, recognized that plaintiffs facing a self-concealing wrong are relieved of the obligation to plead affirmative acts of concealment, the Court of Appeals has not specifically addressed whether price-fixing conspiracies are inherently self-concealing. However, at least one district court in this Circuit has held an alleged price-fixing conspiracy to be self-concealing and, for this reason, dispensed with the need for plaintiffs to plead affirmative acts of concealment. In *In re Infant Formula Antitrust Litig.*, No. MDL 878, 1992 WL 503465, at *2 (N.D. Fla. Jan. 13, 1992), the Court noted:

> While it is true that the allegations of fraudulent concealment forwarded by the various plaintiffs are absent many specifics, it is similarly true that such details cannot be ascertained until discovery is undertaken. At the heart of plaintiffs claims regarding fraudulent concealment is an allegation that any price-fixing was kept secret. This secrecy forms the basis of the claim, and cannot be used as a way to defeat the claim.

48

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

Thus, the Court implicitly relied on the self-concealing pleading standard to allow plaintiffs to assert fraudulent concealment without pleading defendants' affirmative acts to conceal their conspiracy.  *See id.; see also Hendrickson Bros.*, 840 F.2d at 1083-85.

In this Circuit, nothing more is required to satisfy the first element of fraudulent concealment.  *See Hill*, 825 F.2d at 335 n.2; *see also Aspartame*, 2007 WL 5215231 at *6 (allegation of self-concealing price-fixing conspiracy sufficient to plead concealment); *Pressure Sensitive Labelstock*, 2006 WL 433891 at *4 (same); *Mercedes-Benz*, 157 F. Supp. 2d at 372-73 (same); *Sumitomo Copper*, 120 F. Supp. 2d at 346 (same); *see also Infant Formula*, 1992 WL 503465 at *2 ("allegation that any price-fixing was kept secret" sufficient to survive *summary judgment*); *Bethlehem Steel Corp. v. Fischbach & Moore, Inc.*, 641 F. Supp. 271, 274 (E.D. Pa. 1986) (allegation of self-concealing bid-rigging conspiracy sufficient to plead concealment).

### B.    Plaintiffs Have Also Adequately Pled Due Diligence.

Plaintiffs have sufficiently pled due diligence by alleging that Defendants' efforts to conceal their conspiracy made it impossible for Plaintiffs, through the exercise of reasonable diligence, to discover the facts underlying their claims until shortly before they filed their initial complaint.[28]  (CAC ¶¶ 171-185.)  *See Flat Panel*, 586 F. Supp. 2d at 1119-20 (allegation that plaintiffs could not have discovered conspiracy through the exercise of reasonable diligence because of defendants' concealment sufficient to plead due diligence); *Rubber Chems.*, 504 F.

---

[28]  Plaintiffs' allegations that they were unable to discover Defendants' conspiracy because they reasonably relied on Defendants' pretextual justifications for their price increases (CAC ¶¶ at 178-180, 182) distinguish this case from *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 138 F. Supp. 2d 25 (D. Me. 2001), cited by Defendants.  (MTD at 50.)  The *Compact Disc* court held that the plaintiffs in that case could allege fraudulent concealment by pleading "due diligence *or* reasonable reliance on the defendants' concealment," and dismissed their claim because they pled neither.  *Id.* at 29 (emphasis added).  In contrast, here, Plaintiffs have alleged their reasonable reliance on Defendants' false and misleading explanations for their price increases.  (CAC ¶¶ 178-180, 182.)

Supp. 2d at 788-89 (same); *In re Issuer Plaintiff Initial Public Offering Antitrust Litig.* ("*IPO Antitrust*"), No. 00 Civ. 7804 (LMM), 2004 WL 487222, at *5 (S.D.N.Y. Mar. 12, 2004) (same); *Mercedes-Benz*, 157 F. Supp. 2d at 374 (same); *Vitamins*, 2000 WL 1475705 at *4, *clarified at* No. Misc. 99-197 (TFH), 2000 WL 34230081, at *5 (D.D.C. July 28, 2000); *Sumitomo Copper*, 120 F. Supp. 2d at 347 (same); *Nine West*, 80 F. Supp. 2d at 193 (same); *Catfish*, 826 F. Supp. at 1031-32 (same).

Here, Defendants argue that had Plaintiffs exercised due diligence, "they could have discovered the facts which form the basis of their claim." (MTD at 51.) But this is an argument for a jury at trial, not one for this Court on a motion to dismiss. *See Morton's Market*, 198 F.3d at 832 ("[W]e have held, along with a majority of the circuits, that the issue of when a plaintiff is on 'notice' of his claim is a question of fact for the jury.") (collecting cases); *IPO*, 2004 WL 487222 at *5 ("[W]hether such information should have put a reasonable plaintiff on notice . . . is a question of fact which cannot be determined on a motion to dismiss.") (citation omitted); *Catfish*, 826 F. Supp. at 1031 ("[W]hether plaintiff's duty was triggered . . . is a question of fact that need not and should not be decided on a motion to dismiss.") (citation omitted).[29]

Finally, even if Plaintiffs could have been on notice of Defendants' conspiracy, any investigation undertaken before industry insiders came forward would have been futile. (CAC ¶¶ 171, 179.) The Defendants alone held the evidence of their collusive pricing of cement and concrete and of their other anticompetitive collectively-imposed restraints. As a result, Plaintiffs would have been unable to unearth evidence of the conspiracy or to debunk Defendants' pretextual explanations for their price increases. Courts have held that plaintiffs in similar

---

[29]  Moreover, Defendants fail to address the CAC's non-public allegations, such as those attributable to insiders or individual fact witnesses, of their (previously) non-public acts that were in fact acts in furtherance of their conspiracy.

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

situations have adequately pled due diligence by alleging, as Plaintiffs have in the CAC, that they could not have exposed Defendants' conspiracy through diligent investigation.  (CAC ¶¶ 179, 183-184.)  *See Flat Panel*, 586 F. Supp. 2d at 1119-20; *Mercedes-Benz*, 157 F. Supp. 2d at 374; *Vitamins*, 2000 WL 1475705 at *4; *Catfish*, 826 F. Supp. at 1031-32.

## CONCLUSION

For the reasons stated above, Direct Purchaser Plaintiffs respectfully submit that this Court should deny Defendant's Motion to Dismiss the Consolidated Amended Complaints as it relates to the Direct Purchaser Plaintiffs' Consolidated Amended Complaint.


Date:  April 22, 2010                    Respectfully submitted,

                                         */s/ Robert C. Josefsberg*
                                         Robert C. Josefsberg (Florida Bar No. 040856)
                                         Victor M. Diaz, Jr. (Florida Bar No. 503800)
                                         Katherine W. Ezell (Florida Bar No. 114771)
                                         Alexander Rundlet (Florida Bar No. 692301)
                                         **PODHURST ORSECK, P.A.**
                                         City National Bank Building
                                         25 West Flagler Street, Suite 800
                                         Miami, FL 33130
                                         Telephone: 305.358.2800
                                         Facsimile: 305.358.2382
                                         rjosefsberg@podhurst.com
                                         vdiaz@podhurst.com
                                         kezell@podhurst.com
                                         arundlet@podhurst.com

                                         *Plaintiffs' Interim Liaison Counsel*

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

Jay L. Himes
Hollis Salzman (Florida Bar No. 947751)
Gregory S. Asciolla
Ryan G. Kriger
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: 212.907.0700
Facsimile: 212.818.0477
jhimes@labaton.com
hsalzman@labaton.com
gasciolla@labaton.com
rkriger@labaton.com

Michael D. Hausfeld
William P. Butterfield
Brian A. Ratner
Ralph J. Bunche
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: 202.540.7200
Facsimile: 202.540.7201
mhausfeld@hausfeldllp.com
wbutterfield@hausfeldllp.com
bratner@hausfeldllp.com
rbunche@hausfeldllp.com

William A. Isaacson
Matthew W. Friedrich
**BOIES, SCHILLER & FLEXNER LLP**
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone: 202.237.2727
Facsimile: 202.237.6131
wisaacson@bsfllp.com
mfriedrich@bsfllp.com

MASTER DOCKET NO. 09-23187-CIV-ALTONAGA/Brown
MASTER DOCKET NO. 09-23493-CIV-ALTONAGA/Brown

Stephen N. Zack (Florida Bar No. 145215)
Mark J. Heise (Florida Bar No. 771090)
**BOIES, SCHILLER & FLEXNER LLP**
100 SE Second Street, Suite 2800
Miami, FL 33131
Telephone: 305.539.8400
Facsimile: 305.539.1307
szack@bsfllp.com
mheise@bsfllp.com

*Plaintiffs' Interim Co-Lead Class Counsel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 22, 2010, I caused the foregoing document to be electronically filed with the Clerk of the Court using CM/ECF.

I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

*/s/ Robert C. Josefsberg*

Robert C. Josefsberg

*/s/ Katherine W. Ezell*

Katherine W. Ezell

1

## SERVICE LIST
### In re Florida Cement and Concrete Antitrust Litigation
### Master Docket No. 09-23187-CIV-ALTONAGA/Brown
### United States District Court, Southern District of Florida

Michael Nachwalter
Elizabeth B. Honkonen
Jalaine Garcia
**KENNY NACHWALTER, P.A.**
201 South Biscayne Boulevard
1100 Miami Center
Miami, Florida 33131
Telephone: 305.373.1000
Facsimile: 305.372.1861
Email: nachwalter@kennynachwalter.com
Email: ehonkonen@kennynachwalter.com
Email: jgarcia@kennynachwalter.com

*Counsel for Defendant Cemex Corp.*

Martin L. Steinberg
D. Bruce Hoffman
**HUNTON & WILLIAMS LLP**
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: 305.810.2500
Facsimile: 305.810.2460
Email: msteinberg@hunton.com
Email: bhoffman@hunton.com

Ryan Shores
**HUNTON & WILLIAMS LLP**
1900 K Street NW
Washington DC 20006
Telephone: 202.955.1521
Facsimile: 202.778.2201
Email: rshores@hunton.com

*Counsel for Defendant Florida Rock
Industries, Inc.*

Cliff Aronson
Paul Eckles
Matt Martino
Shepard Goldfein
**SKADDEN ARPS SLATE MEAGHER &
 FLOM LLP**
4 Times Square
New York, NY 10036
Telephone: 212.735.3000
Facsimile: 212.735.2000
Email: clifford.aronson@skadden.com
Email: paul.eckles@skadden.com
Email: matthew.martino@skadden.com
Email: shepard.goldfein@skadden.com

*Counsel for Defendant Cemex Corp.*

Juan J. Rodriguez
**CAREY RODRIGUEZ GREENBERG
PAUL LLP**
1395 Brickell Avenue, Suite 700
Miami, FL 33131
Telephone: 305.372.7474
Email: jrodriguez@crgplaw.com

*Counsel for Defendant Holcim (US) Inc.*

2

Andrew G. Klevorn
Adam B. Deutsch
Michael B. MacKenzie
**EIMER STAHL KLEVORN & SOLBERG LLP**
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: 312.660.7600
Facsimile: 312.692.1718
Email: aklevorn@eimerstahl.com
Email: adeutsch@eimerstahl.com
Email: mmackenzie@eimerstahl.com

*Counsel for Defendant Holcim (US) Inc.*

Helaine S. Goodner
**FOWLER WHITE BURNETT, P.A.**
1395 Brickell Avenue, 14th Floor
Miami, FL 33131-3302
Telephone: 305.789.9200
Facsimile: 305.789.9201
Email: hgoodner@fowler-white.com

*Counsel for Defendant Lehigh Cement Company*

Juan A. Gonzalez
Frank P. Cuneo
**LIEBLER GONZALEZ & PORTUONDO P.A.**
44 West Flagler Street, 25th Floor
Miami, FL 33130
Telephone: 305.379.0400
Facsimile: 305.379.9626
Email: jag@lgplaw.com
Email: fpc@lgplaw.com

*Counsel for Defendant Lafarge North America Inc.*

John B. Wyss
Joshua W. Abbott
Thomas R. McCarthy
**WILEY REIN LLP**
1776 K Street, N.W.
Washington, DC 20006
Telephone: 202.719.7000
Facsimile: 202.719.7049
Email: jwyss@wileyrein.com
Email: jabbott@wileyrein.com
Email: tmccarthy@wileyrein.com

*Counsel for Defendant Lehigh Cement Company*

Thomas E. Scott, Jr.
**COLE SCOTT & KISSANE, P.A.**
Dadeland Centre II Suite 1400
9150 S. Dadeland Boulevard
Miami, FL 33156
Telephone: 305.350.5381
Facsimile: 305.373.2294
Email: thomas.scott@csklegal.com

Robert D. Rightmyer
**COLE SCOTT & KISSANE**
1900 Summit Tower Boulevard, Suite 750
Orlando, FL 32810
Telephone: 321.972.0000
Facsimile: 321.972.0099
Email: robert.rightmyer@csklegal.com

*Counsel for Defendant Oldcastle Materials*

Amit Kurlekar
Reginald D. Steer
**AKIN GUMP STRAUSS HAUER & FELD LLP**
580 California Street, Suite 1500
San Francisco, CA 94101
Telephone: 415.765.9500
Facsimile: 415.765.9501
Email: akurlekar@akingump.com
Email: rsteer@akingump.com

Mitchell P. Hurley
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, New York 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
Email: mhurley@akingump.com

*Counsel for Defendant Suwannee American Cement LLC*

Benjamine Reid
Amy L. Hurwitz
**CARLTON FIELDS**
100 S.E. Second Street, Suite 4000
Miami, Florida 33131
Telephone: 305.530.0050
Facsimile: 305.530.0055
Email: breid@carltonfields.com
Email: ahurwitz@carltonfields.com

*Counsel for Defendant Suwannee American Cement LLC*

Franklin G. Burt
**JORDEN BURT LLP**
1025 Thomas Jefferson St, NW
Washington, DC 20007-5208
Telephone: 202.965.8140
Facsimile: 202.965.8104
Email: fgb@jordenusa.com

Richard J. Ovelmen
**JORDEN BURT LLP**
777 Brickell Avenue, Suite 500
Miami, Florida 33131-2803
Telephone: 305.347.6805
Facsimile: 305.372.4720
Email: rjo@jordenusa.com

*Counsel for Defendant Titan America LLC*

James L. Cooper
Laura C. Taylor
Ryan Z. Watts
**ARNOLD & PORTER LLP**
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: 202.942.5000
Facsimile: 202.942.5999
Email: james.cooper@aporter.com
Email: laura.taylor@aporter.com
Email: ryan.watts@aporter.com

*Counsel for Defendant Titan America LLC*

Christopher B. Hopkins
**BUTZEL LONG**
125 Worth Avenue, Suite 330
Palm Beach, Florida 33480
Telephone: 561.659.8676
Facsimile: 561.659.8679
Email: hopkins@butzel.com

Richard B. Brosnick
**BUTZEL LONG**
380 Madison Avenue
New York, New York 10017
Telephone: 212.676.3055
Facsimile: 212.818.0494
Email: brosnick@butzel.com

*Counsel for Defendant Prestige AB
Management Company, LLC*

Christopher B. Hopkins
**BUTZEL LONG**
125 Worth Avenue, Suite 330
Palm Beach, Florida 33480
Telephone: 561.659.8676
Facsimile: 561.659.8679
Email: hopkins@butzel.com

*Counsel for Defendant Votorantim Cimentos
North America, Inc.*

John Fornaciari
Robert Disch
Jeremy Keim
**BAKER & HOSTETLER LLP**
Washington Square, Suite 110
1050 Connecticut Avenue, N.W.
Telephone:  202.861.1169
Email:  jfornaciari@bakerlaw.com
Email:  rdisch@bakerlaw.com
Email:  Jkeim@bakerlaw.com

*Counsel for Defendant Oldcastle Cement*

5