# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

*In re* **FLORIDA CEMENT AND**                    **MASTER DOCKET NO. 09-23187-CIV-**
**CONCRETE ANTITRUST LITIGATION**            **ALTONAGA/Bandstra**

*(DIRECT PURCHASER ACTION)*

_____/

## ORDER

**THIS CAUSE** came before the Court on Direct Purchaser Plaintiffs' Corrected Motion for

Class Certification ("Motion") [ECF No. 326], filed on October 4, 2011.  Defendants, Cemex, Inc.

("Cemex"), Florida Rock Industries, Inc. ("Florida Rock"), VCNA Prestige Ready-Mix Florida

("Prestige"), Inc., and Tarmac America LLC ("Tarmac") (collectively, "Defendants, filed their Joint

Opposition to the Motion ("Response") [ECF No. 346] on November 16, 2011; and Plaintiffs filed

their Reply [ECF No. 360] on December 13, 2011.  The Court has carefully considered the parties'

written submissions, oral arguments presented on December 19, 2011, and applicable law.

## I. BACKGROUND

This case concerns an alleged price-fixing conspiracy in the Florida concrete industry.[1]

Specifically, Plaintiffs claim Defendants were involved in an unlawful conspiracy in violation of

Section 1 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 1, among vertically-

integrated cement companies to fix, raise, stabilize, or maintain prices of, and allocate customers

and markets for, ready-mix concrete ("Concrete")[2] in the State of Florida.  (*See* Fourth Consolidated

---

[1]   A full background of this litigation can be found in the Court's previous Orders. *See, e.g.*, *In re Fla. Cement and Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1297–1305 (S.D. Fla. 2010).

[2]   Concrete is a mixture of cement, aggregate (sand, gravel, and crushed stone), and water.  (*See* Compl. ¶ 37; Mot. 12).  The strength of Concrete is determined by the amount of water added, and is measured in pounds per square inch ("psi").  (*See* Compl. ¶ 40; Mot. 13).

Am. Compl. ("Compl.") ¶ 1 [ECF No. 249]).  Plaintiffs allege that as a result of this conspiracy, for a time Defendants charged supra-competitive, artificially inflated prices for Concrete throughout the State of Florida, thereby injuring Plaintiffs.  (*See id.* ¶¶ 1, 6).

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to certify a class consisting of:

> All persons or entities who purchased Ready Mix Concrete directly from one or more of the Defendants in the State of Florida at any time during the period from February 11, 2008 to October 29, 2009 or until such a time as Defendants' conspiracy no longer had common impact on direct purchasers of Ready Mix Concrete.  Excluded from the Class are Defendants and their subsidiaries, parents, or affiliates, Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and government entities.

(Mot. 8).  Defendants oppose certification of this class on the ground that common issues do not predominate over individual issues.  Specifically, Defendants contend that Plaintiffs have no methodology for proving their case on a class-wide basis and thus fail to satisfy the requirements of Rule 23(b)(3).

## II. LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  "Questions concerning class certification are left to the sound discretion of the district court."  *Cooper v. Southern Co.*, 390 F.3d 695, 711 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc*., 546 U.S. 454, 457 (2006) (citing *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1386 (11th Cir. 1998)).  With this "great power comes great responsibility; the awesome power of a district court must be 'exercised within the framework of [Federal Rule of Civil Procedure] 23.'"  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th

Cir. 1996)).  Thus, to be entitled to class certification, the party seeking certification must have standing and must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as the requirements of at least one subsection of Federal Rule of Civil Procedure 23(b).  *See id.*, 382 F.3d at 1250.

Rule 23(a) "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."  *Wal-Mart*, 131 S. Ct. at 2550.  Under Rule 23(a), the party seeking class certification has the burden of showing that the four requirements of numerosity, commonality, typicality, and adequacy of representation are satisfied. Rule 23(a) provides as follows:

> One or more members of a class may sue on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims and defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

The class must also satisfy one of the three additional requirements of Rule 23(b).  Plaintiffs assert a class is appropriate under Rule 23(b)(3).  Rule 23(b)(3) provides that certification is available if the Court finds "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).

In examining whether the party seeking certification has satisfied the requirements of Rule 23, the Eleventh Circuit has counseled that "[a]lthough the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied."  *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003).

Indeed, the Supreme Court recently acknowledged that "'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  *Wal-Mart*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)) (internal citations omitted).  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped."  *Id.*

## III.  ANALYSIS

### A.  Rule 23(a)

As stated, Plaintiffs must first satisfy the four requirements of Rule 23(a): (1) Numerosity; (2) Commonality; (3) Typicality; and (4) Adequacy.  The Court examines each requirement in turn.

#### 1.  Numerosity

With regard to the numerosity requirement, Plaintiffs must establish the class is so numerous that joinder of all members is impracticable.  *See* FED. R. CIV. P. 23(a)(1).  As a general rule, a group of more than 40 satisfies the numerosity requirement of Rule 23, a group of fewer than 21 does not, and the numbers in between are subject to judgment based on additional factors.  *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009) (citation omitted).  "To meet this requirement, plaintiffs need not prove the exact size of the proposed class, but rather need demonstrate only that the number is exceedingly large, and joinder impracticable."  *In re Infant Formula Antitrust Litig.*, No. MDL 878, 1992 WL 503465, at *3 (N.D. Fla. Jan. 13, 1992) (citing *Anderson v. Bank of the South, N.A.*, 118 F.R.D. 136, 145 (M.D. Fla. 1987)).  Essentially, a plaintiff seeking to certify a class must make a showing with factual support that the numerosity will be satisfied.  *Vega*, 564 F.3d at 1267.

In this action, the proposed class is to include thousands of Concrete purchasers throughout the State of Florida who purchased Concrete directly from Defendants.  (*See* Mot. 3, 29).  Plaintiffs maintain that because the class numbers in the thousands, and because members of the class are geographically dispersed, joinder is impracticable.  (*See* Mot. 29).  Defendants do not contest this assertion.  Based on the foregoing, the Court finds Plaintiffs' proposed class satisfies the requirement of numerosity.

### 2. Commonality

The second requirement for maintaining a class action under Rule 23 is that "there are questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  Rule 23(a)(2) "'does not require that all the questions of law and fact raised by the dispute be common' . . . or that the common questions of law or fact 'predominate' over individual issues."  *Vega*, 564 F.3d at 1268 (quoting *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986)).  Rather, "[t]he commonality requirement demands only that there be 'questions of law or fact common to the class.'"  *Id.* (quoting FED. R. CIV. P. 23(a)(2)).  As the Supreme Court recently explained, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Wal-Mart*, 131 S. Ct. at 2551 (internal quotations and citation omitted).  In other words, their claims "must depend upon a common contention" that is "capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 2545.

In this case, Plaintiffs allege a price-fixing conspiracy — that beginning on February 11, 2008, Defendants, who together control more than 75% of Florida's Concrete industry, engaged in a conspiracy to fix, stabilize, and maintain prices of Concrete sold in Florida.  In cases containing allegations of price-fixing, courts have consistently held that the nature of the antitrust conspiracy

5

action compels a finding that common questions of fact and law exist.  *See, e.g.*, *In re Infant Formula*, 1992 WL 503465, at *4 ("By the very nature of a conspiracy antitrust action, common questions of fact and law exist."); *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229, 232 (M.D. Fla. 1993) (same); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486-PJH, 2006 WL 1530166, at *3 (N.D. Cal. June 5, 2006) ("[T]he very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.") (citations omitted).

Likewise, here, the Court finds common questions of law and fact are implicated.  Many of the issues in the instant action involve the Defendants' alleged conspiracy and the manner in which it may have affected the purported class as a whole.  For example, questions such as whether the Defendants conspired to fix the prices for Concrete, the identity of each member in the conspiracy, and the time period during which the conspiracy existed — which could involve review of numerous documents going back years and testimony of Defendants' principals — would be better handled in one trial rather than in many trials.  As the court reasoned in *In re Commercial Tissue Products*, "[i]f each class member proceeded individually, each would have to prove the existence and impact of the identical conspiracy to fix prices.  Obviously, individual actions designed to prove identical elements would completely destroy any notions of judicial economy."  183 F.R.D. 589, 593 (N.D. Fla. 1998) (internal quotation marks and citation omitted).

The Eleventh Circuit has explained that the commonality requirement is a "relatively light burden."  *Vega*, 564 F.3d at 1268.  Given that common questions of fact and law exist among proposed class members, the burden is met in this case, and the commonality prong of the Rule 23(a) analysis is satisfied.  Whether these common issues predominate will be discussed below with regard to Rule 23(b)(3).

### 3. Typicality

The typicality prong requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). Plaintiffs maintain this requirement is satisfied because "Plaintiffs' claims are based on the same legal theories as those of absent Class Members," and "[e]ach Plaintiff and member of the Class was subject to Defendants' price-fixing scheme and paid supracompetitive prices for Concrete." (Mot. 39). In contrast, Defendants contend Plaintiffs are not typical of the putative class members because they "are not representative of the overwhelming majority of direct ready mix concrete purchasers in Florida." (Resp. 33).

In particular, Defendants assert that while Plaintiffs propose a statewide class of purchasers, each named Plaintiff "for the most part operates only in central and south Florida." (*Id.*). Defendants note that both price levels and the pricing process differ in different parts of Florida. (*See id.* 33–34). Thus, Defendants suggest Plaintiffs "have not shown that proving a potential impact on the prices they paid in central Florida also necessarily will prove that the prices paid by putative class members in areas of the state where only one Defendant operated were impacted." (*Id.*). Additionally, Defendants point out that the named Plaintiffs are representative of only small-volume Concrete purchasers, and the proof necessary to show impact on small-volume purchasers differs from that necessary to show impact on high-volume "power buyer" purchasers. (*Id.* 34). Basically, Defendants claim the named Plaintiffs "represent just a small sliver of the direct ready mix concrete purchasers in Florida (i.e., small volume, residential and light commercial builders that focused on the central and south Florida regions)," and suggest the differences between named Plaintiffs and other class members "illustrate the predominance of individualized questions of fact relating to impact here [and] should preclude class certification." (*Id.* 25).

"A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)." *Cooper*, 390 F.3d at 713 (quoting *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001)). "'[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large.'" *Id.* (quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)). "Any discussion of 'typicality' tends to considerably overlap with [the] 23(b)(3) predominance [discussion]." *In re Commercial Tissue*, 183 F.R.D. at 593. However, there are some considerations that are exclusive to Rule 23(a)(3) typicality, the most prominent one being the absence of an adverse interest between the representative parties and other members of the class. *See id.*

With regard to the adverse-interest consideration, the Court does not find there is an adverse interest between the named Plaintiffs and the other putative class members, nor do Defendants seem to dispute this point. To the extent Defendants' argument regarding typicality addresses the predominance of individualized questions of fact relating to impact, the Court addresses these arguments below in its Rule 23(b)(3) analysis. *See* Part III.B.1, *infra*.

### 4. Adequacy

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The Eleventh Circuit has described the adequacy prong of a class certification analysis as follows:

> Rule 23(a)(4) requires that the representative party in a class action "must adequately protect the interests of those he purports to represent." *Phillips v. Klassen*, 502 F.2d 362, 365 (D.C. Cir. 1974). This "adequacy of representation" analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *In re HealthSouth Corp. Securities Litigation*, 213 F.R.D. 447, 460–61 (N.D. Ala. 2003). If substantial conflicts of interest are determined to exist among a class, class certification is inappropriate.

*Valley Drug Co.*, 350 F.3d at 1189.  An adequate class representative must be one willing to vigorously litigate the action on behalf of the class.  *Clausnitzer v. Fed. Express Corp.*, 248 F.R.D. 647, 657 (S.D. Fla. 2008).  Additionally, class counsel must be competent to undertake the litigation.  *Id.*

Plaintiffs contend that there are no conflicts that would warrant denial of class certification, and that both the class representatives and their attorneys will vigorously prosecute the case.  (*See* Mot. 33–34).  Defendants do not contest these positions.  There is no indication that the interests of the representatives are in conflict with the other members of the putative class.  Moreover, the Court has reviewed the credentials of proposed counsel for the representative parties (*see* Mot. Exs. 59–61), and finds "no reason to doubt their qualifications or ability to conduct this litigation in a manner that protects the other class members."  *In re Carbon Dioxide*, 149 F.R.D. at 233.  This prong is satisfied.

### B.  Rule 23(b)

In addition to establishing the elements of Rule 23(a), Plaintiffs must show they satisfy at least one of the conditions of Rule 23(b).  *See Klay*, 382 F.3d at 1250.  As stated, Plaintiffs assert a class is appropriate under Rule 23(b)(3).  (*See* Mot. 34).  Rule 23(b)(3) requires finding both (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3); *Vega*, 564 F.3d at 1277.  These requirements are known as predominance and superiority.  *See Behrend v. Comcast Corp.*, 655 F.3d 182, 190 (3d Cir. 2011).

Predominance "is perhaps the central and overriding prerequisite for a Rule 23(b)(3) class."  *Vega*, 564 F.3d at 1278.  "Common issues of fact and law predominate if they 'ha[ve] a direct

impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Klay*, 382 F.3d at 1255 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)) (alteration in original). "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Id.*

To prevail on price-fixing claims, Plaintiffs must demonstrate (1) a violation of antitrust laws (here, violation of section 1 of the Sherman Act), (2) direct injury (or impact) from the violation, and (3) damages sustained by the Plaintiffs. *See In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 695 (S.D. Fla. 2004) (citing *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981)). The crux of Defendants' argument is that Plaintiffs do not and cannot provide a common methodology for proving these elements on a class-wide basis, and therefore, the issues should be resolved on an individual basis. Specifically, Defendants contend that Plaintiffs cannot prove common impact on the class members and that the calculation of damages for each class member would require an individualized factual determination.

### 1. Common Impact

"The fact of injury or 'impact' is an essential element of the antitrust claims that requires proof that . . . Plaintiffs suffered some injury that was caused by Defendants' antitrust violations." *In re Terazosin Hydrochloride*, 220 F.R.D. at 696. "In an overcharge case, impact is shown through proof that: (1) Defendants charge more than they would have but-for their antitrust violation; and (2) class members made some purchases at the illegally inflated or stabilized price." *Id.* "[T]he question at [the] class certification stage is whether, if such impact is plausible in theory, it is also susceptible to proof at trial through available evidence common to the class." *In re Hydrogen*

*Peroxide Antitrust Litig.*, 552 F.3d 305, 325 (3d Cir. 2008).

In this case, Plaintiffs claim that all class members were impacted by the alleged conspiracy because they paid higher prices for Concrete than they would have in the absence of the conspiracy. Plaintiffs plan to present "evidence that (1) Defendants colluded in setting prices, and bolstered their price-increase conspiracy by allocating major customers and other illegal conduct; (2) the collusively-set price was the basis for all prices paid by Defendants' customers; and (3) Defendants' prices were higher than they would have been in a competitive market."  (Mot. 36).  Plaintiffs contend they will able to present common, class-wide evidence of each of these elements. Defendants, however, assert the alleged conspiracy does not involve a class-wide common impact. They claim that assessing the injury to members of the class requires an individualized determination.

Numerous courts have held that "because the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 695 (D. Minn. 1995) (citing *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 327 (E.D.N.Y. 1982)); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1041 (N.D. Miss. 1993) ("[I]n an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price."); *Behrend*, 655 F.3d at 191; *In re Potash*, 159 F.R.D. at 693 ("[A]s a general rule in antitrust price-fixing cases, questions common to the members of the class will predominate over questions affecting only individual members."); HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 18:28 (4th ed.) (explaining that "[a]s a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions") (citing cases); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493,

518 (S.D.N.Y. 1996) ("Courts repeatedly have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present.") (collecting cases).  Despite this presumption, however, Plaintiffs cannot demonstrate common impact by merely *alleging* a price-fixing conspiracy.  *See In re Hydrogen Peroxide*, 552 F.3d at 321; *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 420–21 (5th Cir. 2004) ("There are no hard and fast rules . . . regarding the suitability of a particular type of antitrust case for class action treatment.") (internal citation and quotation marks omitted); *In re Commercial Tissue*, 183 F.R.D. at 595 ("[A] Mere charge of conspiracy does not mean that common questions predominate.").

Plaintiffs maintain they will prove impact on a class-wide basis at trial by showing "that Defendants' conspiracy caused members of the Class to pay supra-competitive prices during the Class Period."  (Mot. 37).  They claim Defendants did so by imposing on all class members coordinated price increases that rose in lockstep and resulted in across-the-board price increases.  (*See id.*).  In support of their allegations of common impact, Plaintiffs present the opinion of Dr. Russell W. Mangum III, Ph.D. ("Dr. Mangum").  (*See* Mot. Ex. 1 ("Mangum Report")).  Dr. Mangum examined Defendants' actual transaction data, information regarding local commercial conditions, Defendants' deposition testimony, and publicly available information related to the Concrete industry.  (*See id.* ¶¶ 2–3, 14–18).  Dr. Mangum opines that a conspiracy to fix the price of Concrete in Florida would have a common impact on all members of the proposed class.  (*See id.* ¶ 20).

In particular, Dr. Mangum concludes: (1) Concrete is a homogenous product used interchangeably by purchasers, which in an untainted market would produce price competition (*see id.* ¶¶ 62–65); (2) Defendants offered or were economically capable of offering similar products,

service, and quality (*see id.* ¶¶ 71–80); (3) Defendants operated in overlapping delivery areas, which should lead to price competition (*see id.* ¶¶ 81–85); (4) Defendants dominated the supply of Concrete in Florida, preventing the class members from avoiding the impact of Defendants' conspiratorial conduct (*see id.* ¶¶ 87–95); (5) there were barriers to entry and survival in the Florida Concrete industry, preventing the introduction of non-conspiring suppliers into the market (*see id.* ¶¶ 96–100); and (6) the nature and demand for Concrete limited the ability of purchasers to avoid antitrust impact (*see id.* ¶¶ 101–13).   Dr. Mangum further opines that the characteristics of the Concrete industry in Florida, including the interrelationships among Defendants and related entities, facilitated the conspiratorial conduct.   (*See id.* ¶¶ 115–24).   He explains that "a price increase announcement may have 'impact' on transaction prices if it: (1) increases transaction prices; (2) stabilizes transaction prices (particularly if prices had been declining); or (3) retards or moderates a decline in prices (such as if prices had been falling precipitously)."   (*Id.* ¶ 143).   After analyzing several price increase announcements by Defendants and other Concrete suppliers in Florida, he concludes the nature of the announcements suggests the increases were broadly implemented, and the empirical analysis and documentary evidence confirm the increases had a common impact on transaction prices.   (*See id.* ¶¶ 144–48).

Defendants nevertheless insist Plaintiffs "have failed to identify the facts necessary to meet their burden to show they can prove that each class member was injured through common proof." (Resp. 35).   In particular, Defendants contend that neither the price increase announcements, Dr. Mangum's correlation analysis, nor reference to market characteristics, allows Plaintiffs to prove common impact.   (*See id.* 36–48).   In support of their position, Defendants proffer an analysis of their own expert, Dr. Janus Ordover ("Dr. Ordover").   Dr. Ordover examined price lists and transaction data and concludes that they do not support a finding of common impact.   Contrary to

Dr. Mangum's findings, Dr. Ordover concludes that "not only did price changes vary substantially across Defendants, time, products, geographies, and customers, but also that a large fraction of sales were made at lower or the same prices as before the announcements." (*Id.* ¶ 18). Specifically, Dr. Ordover finds that price changes were highly variable across customers, there are many customer-specific aspects to pricing that need to be considered when assessing impact and damages, and a number of factors influence the determination of Concrete prices. (*See* Ordover Report ¶¶ 12, 44–50). Defendants and Dr. Ordover contend that the Concrete industry in Florida "includes thousands of unique product mixes, distinct local geographic markets, and separate customer agreements," and therefore an individualized inquiry is necessary to assess whether any given putative class member paid more as a result of the purported conspiracy. (Resp. 12).

The Court must therefore analyze Dr. Mangum's conclusions to determine whether the alleged antitrust impact is in fact susceptible to proof at trial through available evidence common to the class.

### a. Defendants' Pricing Behavior

#### i. Price Increase Announcements and Price Lists

Plaintiffs first point to price lists and the price increase announcements issued by Defendants to demonstrate that antitrust impact was common to the Class. (*See* Mot. 18 (citing Mot. Exs. 7, 11, 21–22, 27–42)). They assert Defendants instituted price increases that applied to every customer and were communicated broadly to the entire Concrete industry. (*See* Mot. 10; Mot. Exs. 6–14). According to Plaintiffs, as a result of Defendants' conspiracy, prices "rose in lockstep and resulted in across-the-board price increases." (Mot. 37). For example, Dr. Mangum opines that in October 2008, the month the $25 increase was implemented, "the declining trend of the spring and summer gave way to stabilization and a slight increase." (Mangum Report ¶ 146). He concludes that the

nature of the price increases (*i.e.* that they were intended to apply across-the-board), combined with the empirical and documentary evidence, confirms the announced price increases had an impact on transaction prices for all customers.  (*See id.* ¶¶ 145–48).

Nevertheless, the evidence in the record shows that the prices paid by many customers did not correspond with Defendants' price increases.  As Dr. Ordover points out, numerous customers indicated they paid no more, and often less, after the 2008 price increase announcements.  (*See* Ordover Report ¶ 22 (citing deposition testimony and declarations of various customers)).[3]  More importantly, Dr. Ordover's empirical analysis demonstrates that some class members' prices increased, while many Class members' prices stayed the same or decreased.  (*See id.* Report ¶¶ 25–38).  His report is consistent with the accounts of several putative class members who admit their prices for Concrete went down following the price increase announcements.  (*See* Tatum Dep., Resp. Ex. 17 at 148:2–25; Kroeger Dep., Resp. Ex. 18 at 207:14–208:5, 211:23–212:8, 214:12–215:3; Decl. of Murray Rice ("Rice Decl."), Resp. Ex. 7 at ¶ 3; Decl. of Vernon Sommers ("Sommers Decl.") Resp. Ex. 4 at ¶ 8; Decl. of Brenda Tartaglia ("Tartaglia Decl.") Resp. Ex. 2 at ¶¶ 6–7; Decl. of Dave Hutchins ("Hutchins Decl."), Resp. Ex. 1 at ¶ 6–7).

That some customers avoided paying price increases or artificially-stabilized prices, is inconsistent with Plaintiffs' theory of common impact.  Dr. Mangum fails to explain how or what common proof could be used to determine that the alleged conspiracy impacted all, or almost all, customers.  In fact, Plaintiffs present no empirical analysis of the actual effect of the price increase announcements on individual customers to counter the evidence presented by Defendants, and unlike Dr. Ordover, Dr. Mangum did not conduct any significant analysis at the individual customer

---

[3]   That prices decreased rather than increased is not by itself detrimental to Plaintiffs' position. Theoretically, a price-fixing conspiracy can maintain supra-competitive prices by preventing prices from falling as low as they would have in the absence of the conspiracy, as opposed to actually causing an increase in prices.

level to determine whether any price changes were consistent across the putative Class.   Thus, Plaintiffs have not shown how the price increase announcements — even if they were intended to affect all customers across-the-board — constitute common evidence through which impact on the individual class members can be proven.

### ii.  Correlation Analysis

Plaintiffs also rely on a "correlation analysis" conducted by Dr. Mangum, which tracks "average monthly prices."  (*See* Mangum Report ¶¶ 130–42).  Dr. Mangum claims the analysis shows that prices "moved similarly" over time, such that if a conspiracy existed, it would have impacted every purchaser.  (*Id.* ¶¶ 127–28, 130, 132–33, 135, 137, 139, 141).  Dr. Mangum explains that

> [p]rices of [Concrete] that move similarly over time, in response to shifts in supply or demand, would tend to support a conclusion that the pricing was determined by common conditions in the marketplace.  If they respond similarly to changing market conditions, then it is likely that they would respond similarly to price-fixing misconduct such as that alleged against Defendants.

(*Id.* ¶ 127).  Nonetheless, the Court does not find Dr. Mangum's correlation analysis sufficient to prove the impact of the conspiracy is susceptible to proof through common evidence.

Plaintiffs do not explain how the mere fact that average prices move similarly over time in response to general changes in market conditions necessarily implies those prices will also respond similarly to a price-fixing scheme such as the one alleged here.  The implementation of a price-fixing scheme may involve different considerations besides changes in market conditions.  Moreover, as Dr. Ordover points out, the majority of Dr. Mangum's correlation analysis aggregates all customers, which "limits the ability to reach a meaningful conclusion regarding whether common proof can be used to establish impact to individual members of the purported class." (Ordover Report ¶ 152; *see also* Mangum Decl., Resp. Ex. 11 at Figs. 11–16).  Dr. Mangum offers

no explanation as to how this analysis of "average monthly price" establishes that individual customers were affected by the purported conspiracy. Additionally, when Dr. Mangum did not aggregate all customers — analyzing the data based on prices paid by Defendants' ten largest customers — some of his results actually indicate a negative correlation between different customers' average prices. (*See* Ordover Report ¶ 153 (citing Mangum Report Table 17c)).[4] Dr. Mangum's correlation analysis fails to establish that impact is susceptible to proof by common evidence.

### iii. Pricing after March 2009

Plaintiffs also present evidence to suggest Defendants' Concrete prices began a precipitous decline after the Department of Justice was informed of the existence of the conspiracy. (*See* Pl.'s Hr'g Ex. at 37; *see* Hr'g Tr. 71:4–8, 72:5–9). They contend this evidence establishes that prices were being artificially stabilized across the board. (*See* Hr'g Tr. 75:4–7 ("[I]f, in fact, there was no commonality to what the defendants sought to do and did do, you would have seen no precipitous price drop when the conspiracy started to dissipate."); *see also id.* 75:21–76:13). Yet this graph still utilizes only aggregate prices for Concrete. It does not address individual customers in any way. The fact that the aggregate price dropped significantly following initiation of the Department of Justice investigation lends support to the existence of the conspiracy; however, it fails to demonstrate that all, or almost all, of the individual class members were actually impacted by the conspiracy.

For the abovementioned reasons, Plaintiffs have not shown that Defendants' pricing behavior serves as evidence of common impact.

---

[4] When Dr. Ordover conducted the same analysis with Defendants' 11th to 20th largest customers, he found 36% of the correlation coefficients for Florida Rock customers are "uncorrelated," 26% for Tarmac customers, 43% for Prestige customers, and 7% for Cemex customers. (*See id.* ¶ 154, Tables 11a–d).

### b. Market Characteristics

Similarly, Plaintiffs' assertion that the market for Concrete is such that the pricing of Concrete would be driven by economic factors common to the class, rather than individual factors, fails to persuade.  (*See* Mot. 39).  Essentially, Plaintiffs and Dr. Mangum suggest that the market characteristics of Concrete — namely, the product's homogeneity and Defendants' domination of the market — are such that class members could not avoid any conspiratorially-inflated prices.  As discussed, Dr. Mangum opines the following regarding the characteristics of the Concrete market: (1) Defendants offered or were economically capable of offering similar products, service, and quality; (2) Defendants operated in overlapping delivery areas, which should lead to price competition; (3) Defendants dominated the supply of Concrete in Florida, preventing the class members from avoiding the impact of Defendants' conspiratorial conduct; (4) there were barriers to entry and survival in the Florida Concrete industry, preventing the introduction of non-conspiring suppliers into the market; and (5) the nature and demand for Concrete limited the ability of purchasers to avoid antitrust impact.  While a market with the characteristics identified by Dr. Mangum may in theory be vulnerable to a price-fixing conspiracy (and capable of proof under a common impact theory), Dr. Mangum fails to show that the market at issue here possesses those characteristics.  As Dr. Ordover points out, there are a number of factors present that influence the determination of Concrete prices, and thus an individualized inquiry of impact is necessary.  The Court examines some of these factors below.

### i. Interchangeability/Homogeneity of Concrete

First, the Court does not find persuasive Plaintiffs' conclusion that Concrete is a homogenous product.  In their Motion, Plaintiffs acknowledge that Concrete can be comprised of varying cement-to-water ratios or chemical admixtures and have different compressive strengths,

but they contend these differentiations are "minor in scope." (Mot. 11; *see also* Mangum Report ¶¶ 66–68). In support of their contention, Plaintiffs point to Dr. Mangum's conclusion that the Concrete produced by the various Defendants is interchangeable and therefore customers would have purchased Concrete solely on the basis of price. However, upon review of the evidence presented, the Court does not find Plaintiffs have established the Concrete products at issue in this case are in fact interchangeable.[5]

Dr. Mangum and Dr. Ordover offer conflicting opinions with regard to the interchangeability of the Concrete products. According to Dr. Mangum, "there were no salient differences in the type, quality, and range of [Concrete] products" supplied by Defendants. (Mangum Report ¶ 64). Dr. Mangum notes that all the Defendants produce Concrete using similar technology and raw materials. (*See id.* ¶ 65). Dr. Mangum also contends that "[a]dherence to industry standards imparted predictability and uniformity on the [Concrete] used by different defendants." (*Id.*). While he acknowledges that Concrete is available in a variety of mix designs that may vary by performance characteristics, raw materials, physical appearance, and setting properties, he insists "[t]here is no evidence that [Concrete] of any particular mix design manufactured by a defendant is not comparable to [Concrete] of the same mix design manufactured by another defendant." (*Id.* ¶ 66). In support of his contention, Dr. Mangum cites to Defendants' business documents, which characterize Concrete as a fungible product, as well as analyses of the Concrete industry from other sources — including the Department of Justice and the Federal Trade Commission — which suggest Concrete is a homogenous product. (*See id.* ¶¶ 67–68). Additionally, Dr. Mangum points out that, at times, Defendants purchased Concrete from each

---

[5] "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for [] one over the other, either would work effectively." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) (internal quotations and citation omitted).

other, which is an indicator of homogeneity of the product.

Dr. Mangum explains that when products produced by various suppliers are interchangeable, customers decide among those products based largely on the basis of price.  (*See id.* ¶¶ 65–70).  Because he finds that the Concrete at issue in this case is homogenous, Dr. Mangum opines that customers would have purchased Concrete from Defendants solely on the basis of price.  (*See id.* ¶¶ 65–66).  Therefore, he concludes that any price increase would have a common impact on all purchasers.

In contrast, according to Dr. Ordover, Concrete is not properly classified as a homogenous product as "there [is] a wide range of different product mixes even within certain strength levels, many of which are developed specifically for particular projects."  (Ordover Report ¶ 121).[6]  After examining the most common mixes, Dr. Ordover notes that pricing can vary depending on the specific product mix employed.  (*See id.*).  He further asserts that even for the same Concrete mix, prices can vary based on differences in the end-use application of that mix.  (*See id.* ¶ 122).  This assertion is supported by the statements of several of Defendants' customers (and putative Class members) who indicate certain mixes are suitable for an array of jobs while other specialized mixes are designed for specific customer needs.  (*See* Tartaglia Decl. ¶ 11; Decl. of Allen Poston ("Poston Decl."), Resp. Ex. 8 at ¶ 10; Hutchins Decl. ¶ 10).

The customers also indicate they purchase from specific suppliers based on the suppliers' ability to produce specialized mixes; for example, some customers purchase Concrete from Cemex because Cemex has superior skill in designing Concrete mixes.  (*See* Tartaglia Decl. ¶ 11; Hutchins Decl. ¶ 10; Poston Decl. ¶ 10).  Defendants assert that "[b]ecause customers distinguish between suppliers based on their ability to produce specific mix designs and suppliers in turn calculate price

---

[6]  For example, during the Class Period, Cemex offered 8,105 distinct product mixes, Florida Rock offered 2,932 mixes, Tarmac offered 1,056 mixes, and Prestige offered 348 mixes.  (*See* Ordover Report, Table 7).

separately for each mix, there are no benchmarks that can be used to determine whether a particular price was competitive." (Resp. 15). As a result, Defendants contend "one must consider the mix design for a specific project on an individualized basis to determine whether the alleged conspiracy impacted the price paid." (*Id.*). Plaintiffs disagree, noting that Prestige, for example, has copies of Cemex's internal "mix selection" recipes, and thus Prestige can produce those mixes "exactly the same as Cemex could." (Reply 11). They suggest Defendants' argument — that customers distinguish based on the ability of some suppliers to design special mixes — is without merit. The Court is not persuaded. The mere fact that one supplier has the ability to copy another supplier's "mix recipe" does not mean customers will not distinguish between those suppliers based on a supplier's ability to design the specialized mixes itself. As mentioned, several putative class members indicate they do in fact distinguish among suppliers in this manner.

Furthermore, it is Plaintiffs, not Defendants, who bear the burden regarding common impact. Plaintiffs complain "Dr. Ordover merely theorizes that Dr. Mangum is wrong on the characteristics of the market," and that Dr. Ordover "did not attempt to confirm or quantify[] that any customer might 'be willing' to pay for non-price factors, such as perceived differences in service, quality, timeliness of deliveries, and willingness to accept returns." (Reply 11). The Court notes, however, that Dr. Ordover does support his opinions with the statements of actual Concrete purchasers as well as a substantial analysis of the empirical data produced by himself and Dr. Mangum. Plaintiffs seem to argue that Dr. Ordover did not perform enough quantitative analyses to prove that Concrete is *not* interchangeable and that the market characteristics are *not* such that the impact of the purported conspiracy would have been unavoidable. Nonetheless, it is not Defendants' burden to prove that the impact of the alleged conspiracy is *not* susceptible to common proof; to the contrary, it is Plaintiffs' burden to prove the impact is susceptible to proof by common

evidence.   After conducting a rigorous examination of Plaintiffs' arguments and Dr. Mangum's report, the Court simply does not find Plaintiffs have met their burden.

After careful review of the evidence presented, the Court agrees with Defendants that Plaintiffs fail to demonstrate that Concrete is indeed a homogenous product such that it can be used interchangeably.

### ii. Ability to Avoid Impact

Plaintiffs and Dr. Mangum contend Defendants had the ability to elevate prices because the Concrete market is such that Plaintiffs would have been unable to avoid the impact of supra-competitive prices charged by Defendants.   (*See* Mangum Report ¶ 86).   Specifically, Dr. Mangum maintains Plaintiffs were unable to avoid the impact because Defendants collectively dominated the Concrete supply in Florida, there were barriers to entry into Florida's Concrete industry, and the nature of the demand for Concrete allowed Defendants to increase revenue by increasing price. (*See id.* ¶¶ 86–114).   After careful analysis of the record, however, the Court does not find Plaintiffs have shown the characteristics of the Concrete market related to Plaintiffs' ability to avoid impact allow for proof of impact through common evidence.   Rather, there are several factors that require a more individualized inquiry.

First, Plaintiffs' analysis fails to address the distinctions in different local markets throughout Florida.[7]   Defendants maintain the price of Concrete is affected by the distinct local geographic markets throughout Florida, and thus rather than assuming a blanket statewide market for Concrete in Florida, the determination of whether a particular customer was impacted by the

---

[7]   In their Complaint, Plaintiffs indicate the relevant geographic market is "the State of Florida" (Compl. ¶ 29), and this is also the geographic market identified in the proposed class definition (*see* Mot. 1).   However, Plaintiffs later indicate that "Defendants did not sell or produce Concrete in the Florida Panhandle and Defendants' own documents show that they do not consider the Panhandle to be part of the Florida Concrete market."   (*Id.* 8 n.3).   Thus, it appears Plaintiffs intend the class definition to exclude those purchasers in the "Florida Panhandle."

purported conspiracy must account for these geographic differences.  (*See* Resp. 15–20).  They note that the suppliers from whom a customer can purchase Concrete vary drastically by geographic region, and therefore a regional analysis is required to determine whether non-Defendant suppliers constrained pricing for particular jobs.  (*See id.* 16–17).  As Plaintiffs' own expert acknowledges, there are geographic areas in Florida in which only one or two of the Defendants operate (*see* Mangum Dep., Resp. Ex. 19 at 113:15–22, 155:15–156:19; Mangum Report Ex. 11), and in those regions Defendants face active competition from sizable non-Defendants.  For example, in the Naples area, Cemex owned 33% of the active Concrete trucks, but its two main competitors are non-Defendants who have 27.5% and 18% of the active trucks, respectively.  (*See* Resp. Ex. 56). Similarly, in North Florida, Prestige faces competition from non-Defendant Hard Rock for business in that area.  (*See* Resp. Exs. 57–59).  In essence, the record establishes that the identity and number of non-Defendant suppliers competing with Defendants varies depending on the geographical region of Florida, and that in certain regions non-Defendant suppliers had significant market shares.

Additionally, as Plaintiffs acknowledge, Concrete begins to harden rather quickly, and consequently, the distance between the Concrete plant and the job site must be relatively short.  (*See* Ordover Report ¶¶ 73–75; Mot. 16).  In other words, each Concrete plant has a limited delivery area.  As a result, the Concrete supplied to each job site must originate from a local plant.  (*See id.*). Dr. Mangum acknowledges this fact as his maps identify a 25-mile radius around each plant to indicate the service area of that plant.  (*See* Mangum Report Ex. 11).  Nonetheless, Dr. Mangum fails to address the effect this has on the relevant geographic market.

The Court finds persuasive Dr. Ordover's opinion that when coupled with the substantial variation in the size and presence of Defendants and non-Defendants by geographic area, the fact that competition for Concrete is localized necessitates a localized analysis of potential impact to

class members.   (*See* Ordover Report ¶¶ 75–81).   In light of these geographical differences, Plaintiffs simply have not shown, nor does it seem likely they could show, the purported conspiracy would have had a common impact statewide.

Second, Plaintiffs' analysis fails to account for the variety of customer segments, across which the prices paid for Concrete significantly differ.   Defendants insist that any analysis of impact must account for separate customer segments (*i.e.*, contractors for single family homes, multi-family homes, public buildings, light and heavy commercial projects).   (*See* Resp. 21–22). Defendants contend "aggregating sales for all concrete mixes sold across these different customer segments ignores both the differences in pricing between segments and the different competitive pressures that impact pricing with each segment."   (*Id.* 22).   They note Plaintiffs' analysis fails to account for other individualized factors that affect negotiations such as relationship, quality, volume/capacity, and timing.   (*See id.* 22–27).

Indeed, the evidence presented indicates that both the volume purchased by customers and the length of the sales relationship between a supplier and customer have an effect on the prices paid for Concrete.   For example, Dr. Ordover's analysis demonstrates that the price increase announcements were particularly irrelevant to large volume purchasers of Concrete.   (*See* Ordover Report ¶ 158).   This is consistent with the record evidence, which indicates that large volume purchasers negotiate prices or solicit price quotes without any reference to general price announcements.   (*See id.*; Tartaglia Decl. ¶ 6; Hutchins Decl. ¶ 6; Poston Decl. ¶ 6).   The evidence indicates suppliers offer lower prices to these large volume purchasers.   (*See* Morgan Dep., Resp. Ex. 15 at 101:5–18; Kroeger Dep., Resp. Ex. 18 at 170:21–23).   Similarly, small or medium volume customers who establish a relationship with a supplier over time generally receive better pricing

than cash on delivery customers.  (*See* Stanton Dep., Resp. Ex. 20 at 86:7–10; *see also* Resp. Exs. 53, 89).

### iii.  Defendants' Motivation in Pricing

During the December 19 hearing, Plaintiffs presented excerpts of testimonial evidence relating to the existence of the conspiracy.  However, common impact addresses not the existence of the conspiracy, but whether the conspiracy actually succeeded and impacted the class members.   At the hearing, Plaintiffs repeatedly suggested that the fact Defendants engaged in a price-fixing conspiracy in the first place demonstrates the Concrete industry was such that all purchasers would unavoidably experience a common impact.  (*See* Tr. of Dec. 19, 2011 Hr'g. 19:17–20 ("Hr'g Tr.") [ECF No. 371] ("If ready-mix was not homogenous, there wouldn't have been any necessity to agree on the level of increase.  Everyone understood - - and there wouldn't have been a concern of avoiding a price war."); *id.* 20:17–21 ("If, in fact, ready-mix concrete was not homogenous, if purchase decisions were based on considerations other than price, then you would not have seen an effort collectively to increase that street price to all customers for all Florida, for all mixes.  You would not have been concerned about losing customers.  You would not have been concerned about someone underbidding you."); *id.* 73:4–11 ("Dr. Ordover doesn't respond to 'Why have this agreement if it was to have no effect?'. . . It makes no sense.").

In other words, Plaintiffs argue that the mere fact Defendants made an effort to collectively increase the price of Concrete necessarily means Concrete must be a homogenous product and the market characteristics must be such that the impact of the conspiracy would be unavoidable.  They further suggest Defendants should be precluded from arguing against common impact when their objective in establishing the conspiracy was to achieve such an impact.  (*See id.* 23:16–21 ("If you do [] that across the state for all customers, for all mixes, aren't you intending, in fact, to cause

common impact, and then can you really argue that something that you intended to do because you wanted to make more money, avoid a price war, not lose volume and still stay in business cannot be measured by the class after the fact?").  This argument fails to persuade.  Defendants' motivation in engaging in the alleged conspiracy is irrelevant to the Rule 23 inquiry.  The fact that Defendants were concerned about a price war or that they assumed a price-fixing agreement could be successful is not proof that Concrete was a homogenous product or that impact was unavoidable.  Even if Defendants truly believed the conspiracy would impact all customers, that belief alone does not constitute common evidence that the class members were in fact impacted.

*iv. Regression Analysis*

Lastly, Plaintiffs maintain the proposed class is manageable because the class members who were not impacted as a consequence of the conspiracy are outliers.  (*See* Hr'g Tr. 26:16–22).  In particular, Plaintiffs' counsel suggested that only 3/1000 of 1% of all class members were not impacted.  (*See id.* 27:1–2).  Plaintiffs derive this figure from Dr. Mangum's Reply Declaration.  (*See id.* 27:4–22).  In his Reply, Dr. Mangum analyzed Dr. Ordover's reconfiguration of Dr. Mangum's initial damages-regression analysis.  (*See* Mangum Reply Decl. ¶¶ 94–98).  In doing so, he found that one of the four regression models yields results showing impact on over 99% of customers.  (*See id.*).  Plaintiffs contend that based on those results the customers who were "uninjured" are outliers that account for only .003% of the total class.  (*See* Reply 23–25; Hr'g Tr. 27:1–25).  This, according to Plaintiffs, is evidence of common impact.

The Court does not find this statistic establishes impact can be proven by common evidence.  Notably, Plaintiffs' own expert discounts the use of his regression analysis in analyzing common impact.  In particular, Dr. Mangum maintains "[t]he regression analysis is not designed to test for common impact."  (Magnum Reply Decl. ¶ 97).  He further comments that "Ordover's customer

analysis is an inappropriate use of my regression analysis and the results have no bearing on whether there is a common impact from the alleged conspiracy." (*Id.* ¶ 98). In light of these statements, the Court finds Plaintiffs' reliance on this figure misplaced, especially in light of the rigorous analysis that must be performed at this class certification stage.

In sum, Plaintiffs have not shown the market characteristics are such that all customers could not avoid paying conspiratorially-inflated prices, and would experience a common impact. While the proposed class seeks to address a common issue — the alleged price-fixing by Defendants — "there are many cross-cutting factual circumstances among the class members that would make the class incoherent." *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991). There are significant differences between the markets for Concrete throughout the different geographic regions of Florida, between large-volume and small-volume purchasers, and between customers who have long-standing relationships with suppliers and those who do not. In addition, the price of Concrete is affected by numerous other individual factors including the specific mix of the Concrete and the proposed end-use of the product. Given the diversity of the Concrete market throughout Florida, Plaintiffs have not satisfied their burden of showing that the alleged antitrust impact is susceptible to common proof at trial.

Although this is sufficient to warrant denial of the Motion, the Court will nonetheless briefly address the sufficiency of Plaintiffs' proposed method of calculating damages on a class-wide basis.

### 2. Damages

"'[I]n assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods [for computing damages] are so insubstantial as to amount to no method at all . . . [Plaintiffs] need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis.'" *Klay*, 382 F.3d at 1259 (quoting *In re Terazosin*

*Hydrochloride Antitrust Litig.*, 220 F.R.D. at 698).  "Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." *Id.* at 1259–60 (footnote call numbers omitted).

It is Dr. Mangum's opinion that Defendants' alleged collusion would produce a common impact on the class and that there are formula-based damage methodologies that can be applied to each member's claims.  Dr. Mangum concludes that "there [is] likely to be sufficient data available from defendants and third parties and one or more feasible and reliable methodologies to estimate damages to members of the proposed Class on a common basis."  (Mangum Report ¶ 3).  In particular, Dr. Mangum proposes the use of a natural log, reduced-form model that would allow for identification and quantification of the effects of the alleged anticompetitive activity on the prices members of the proposed class paid for Concrete.  (*See id.* ¶¶ 154–55).  He claims that by identifying factors that affect price, he can isolate the impact of each of these variables on the price of Concrete.  (*See id.* ¶¶ 153, 159–64).  Then, because he has controlled for all economically-relevant variables that affect price, he can compare Defendants' prices during the conspiracy to what their prices should have been absent a conspiracy.  (*See id.*).

Defendants, in contrast, argue that "because many factors make each sale of concrete unique, individualized questions relating to each customer and its transactions preclude calculation of damages by common proof."  (Resp. 3).  The Court agrees.  Even if Plaintiffs had demonstrated that the impact of the alleged conspiracy could be shown by common proof — which the Court finds they have not — determining the amount of damages resulting from that injury necessarily requires investigation into facts specific to each individual class member.  As discussed, the final prices paid by Defendants' customers varied widely based on a combination of several

individualized factors, including geographic region of the project, length of the relationship with the supplier, and customer segment (large volume vs. small volume purchasers). The Court is not persuaded that Dr. Mangum's regression model can accurately calculate damages in light of the inherently diverse experiences of the individual class members in negotiating prices for Concrete. Stated simply, given the unique nature of the individual transactions, it is not reasonable to assume that a generalized formula can be created.

Because of the many individualized factors that established what each Plaintiff actually paid, it is not possible to present evidence in a common manner as to the price each Plaintiff would have paid but for the alleged conspiracy. Thus, Plaintiffs have not established that the alleged damages in this case are capable of measurement on a class-wide basis using common proof.

## IV.  CONCLUSION

While Plaintiffs are correct that there are issues common to all purported class members, and judicial efficiency would be achieved by trying these issues in one trial, Plaintiffs fails to satisfy the Court's concerns about the many individualized inquiries that would remain in this proposed class action, inquiries that outweigh the common issues. A district court is required to conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class. Having conducted that rigorous analysis, and for the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 326]** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 3rd day of January, 2012.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record